UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DISABILITY LAW CENTER, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MASSACHUSETTS DEPARTMENT OF CORRECTION; | ) |
| KATHLEEN DENNEHY, COMMISSIONER OF THE | ) |
| MASSACHUSETTS DEPARTMENT OF CORRECTION, in | ) |
| her official capacity; JAMES BENDER, DEPUTY | ) |
| COMMISSIONER OF THE MASSACHUSETTS | ) |
| DEPARTMENT OF CORRECTION, in his official capacity; | ) CIVIL ACTION |
| VERONICA MADDEN, ASSOCIATE COMMISSIONER | ) NO. 07-10463 |
| OF REENTRY AND REINTEGRATION OF THE | ) |
| MASSACHUSETTS DEPARTMENT OF CORRECTION, in | ) |
| her official capacity; JOHN MARSHALL, JR., ACTING | ) |
| SUPERINTENDENT OF MCI-CEDAR JUNCTION AND | ) |
| ASSISTANT DEPUTY COMMISSIONER – NORTHERN | ) |
| SECTOR, in his official capacities; and TIMOTHY HALL, | ) |
| ACTING ASSISTANT DEPUTY COMMISSIONER – | ) |
| SOUTHERN SECTOR, in his official capacity, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

### Introduction

By placing prisoners with mental illnesses in segregated confinement, the Massachusetts Department of Correction subjects these vulnerable individuals to conditions they are physically and psychologically incapable of tolerating for any sustained period of time. The extreme social isolation and sensory deprivation conditions of segregated confinement are difficult for all prisoners; for prisoners with mental illnesses, they exceed the limit of human endurance. Indeed, it is only too common for prisoners with mental illnesses to suffer further psychological deterioration, inflict serious harm to themselves, and even commit suicide as a result of placement in segregation.

The Department of Correction and each of the individually named defendants is aware of the effect placement in segregation has on prisoners with mental illnesses.  Nevertheless, they have taken no effective action to ameliorate the conditions under which prisoners with mental illnesses can be confined outside of the general prison population.  By acting with deliberate indifference to this situation, each of the individually named defendants subjects prisoners with mental illnesses to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.  The Department of Correction has also failed to address the problem, and therefore violates both Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*

On behalf of all Massachusetts prisoners with mental illnesses, the Disability Law Center, Inc. brings this action to challenge the unlawful practice of the Massachusetts Department of Correction and each of the individually named defendants of confining prisoners with mental illnesses in segregation.

### Parties

1.     Plaintiff Disability Law Center, Inc. ("DLC") is a not-for-profit Massachusetts corporation and the authorized protection and advocacy agency for Massachusetts under the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq.* Among other things, DLC is authorized by statute to pursue legal, administrative, and other appropriate remedies to ensure that individuals with mental illnesses confined in Massachusetts prisons are protected from abuse and neglect.  42 U.S.C. §§ 10802, 10805.

2.     Defendant Massachusetts Department of Correction ("DOC") is a department of the Commonwealth of Massachusetts.

3.     Defendant Kathleen Dennehy is presently Commissioner of Correction for the DOC, and at all times relevant to this Complaint, was acting within the scope of her employment and under color of state law in her capacity as Commissioner of Correction.  Defendant Dennehy is directly responsible for the administration of all DOC correctional facilities, and has the

authority to transfer any prisoner to segregated confinement for any amount of time she determines appropriate, consistent with DOC regulations.  She is sued in her official capacity.

4.      Defendant James Bender is presently Deputy Commissioner of the DOC, and at all times relevant to this Complaint, was acting within the scope of his employment and under color of state law in this capacity.  Responsible for ensuring compliance with federal and state law, Defendant Bender directly oversees the daily operation of the DOC, including whether prisoners shall be confined to the Department Disciplinary Unit (a type of segregated confinement).  He is sued in his official capacity.

5.      Defendant Veronica Madden is presently Associate Commissioner of Reentry and Reintegration of the DOC, and at all times relevant to this Complaint, was acting within the scope of her employment and under color of state law in this capacity.  Defendant Madden has supervisory authority over Inmate Health Services, including the provision of mental health care to prisoners held in segregated confinement.  She is sued in her official capacity.

6.      Defendant John Marshall, Jr. is presently Assistant Deputy Commissioner – Northern Sector, and acting Superintendent of MCI Cedar Junction, and at all times relevant to this Complaint, was acting within the scope of his employment and under color of state law in these capacities.  Defendant Marshall has authority for supervising the operations of eight correctional facilities, including Souza Baranowski Correctional Center ("SBCC"), MCI-Concord, MCI-Framingham, MCI-Shirley, and the North Central Correctional Institution at Gardner, and is specifically responsible for the safe and humane operation of the segregation units at MCI Cedar Junction.  He is sued in his official capacity.

7.      Defendant Timothy Hall is presently Acting Assistant Deputy Commissioner – Southern Sector, and at all times relevant to this Complaint, was acting within the scope of his employment and under color of state law in this capacity.  As Acting Assistant Deputy Commissioner, Defendant Hall has authority for supervising the operations of nine correctional facilities, including Bay State Correctional Center, MCI-Cedar Junction, MCI-Norfolk, MCI-Plymouth, Pondville Correctional Center, Bridgewater State Hospital, Massachusetts Alcohol

and Substance Abuse Center, Massachusetts Treatment Center, and Old Colony Correctional Center.  He is sued in his official capacity.

## Jurisdiction And Venue

8.     This court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343.

9.     Plaintiff is entitled to declaratory relief pursuant to 28 U.S.C. § 2201.

10.    Venue is proper in this district under 28 U.S.C. § 1391(b).

## Facts

## Background and Types of Segregated Confinement

11.    Mental illness is widespread in Massachusetts prisons.  Approximately twenty-five percent of all prisoners receive treatment for some kind of mental disorder.  The percentage of mentally ill prisoners in segregated confinement is much higher than the percentage of mentally ill prisoners in the general population.

12.    The DOC operates dedicated segregation units in all of its maximum and medium security prisons: Massachusetts Treatment Center, MCI-Cedar Junction, MCI-Concord, MCI-Framingham, MCI-Norfolk, MCI-Shirley, North Central Correctional Institution at Gardner, Old Colony Correctional Center, and Souza Baranowski Correctional Center. At any given time, there are at least 500 prisoners in segregation units.

13.    There are at least three different types of dedicated segregation units in the DOC: the Department Disciplinary Unit ("DDU"), Department Segregation Units ("DSU"), and Special Management Units ("SMU").  Each is intended to serve a different purpose.

14.    The DDU is designed to punish prisoners who have committed a serious infraction of the DOC disciplinary rules.  Prisoners may be sentenced to the DDU for terms of up to ten years per disciplinary offense.  Although a prisoner's sentence can be extended for misbehavior in the DDU, it cannot be reduced.

15.    Currently, the DDU exists only at MCI-Cedar Junction, and has the capacity to hold about 124 prisoners.

16.     The DSU is intended to confine prisoners who pose a substantial threat to others or to the security of the institution when housed in the general prison population.  Prisoners placed in a DSU remain there until they meet a set of conditions established by the DOC for their release to general population.  Since prisoners often fail to fulfill these conditions, they may be housed in a DSU for years at a time.

17.     Currently, the DSU exists in two blocks in the East Wing of MCI-Cedar Junction, but not at any other facility.  There are approximately 45 prisoners in each DSU block.

18.     Unlike the DDU and the DSU, the SMU is a catch-all for those prisoners DOC determines cannot otherwise be in the general population.  The DOC may confine a prisoner in an SMU not only as discipline for offenses that do not warrant placement in the DDU, but also for protective custody or administrative segregation.  Prisoners are held in the SMU for varying lengths time, from as little as a few days to several years.

19.     Currently, the DOC operates SMUs at MCI-Cedar Junction (including a section of units referred to as "10 Block"), Souza Baranowski Correctional Center, MCI-Concord, MCI-Framingham, MCI-Norfolk, MCI-Shirley, the Old Colony Correctional Center, the Massachusetts Treatment Center, and the North Central Correctional Institution at Gardner.

20.     The DOC also holds prisoners under segregation conditions outside the formal segregation units for weeks at a time.  For example, a prisoner may be locked alone in his cell for 23 or more hours per day on "awaiting action" status, even when his cell is located in the general population.

21.     Prisoners may also be moved from a regular segregation cell into a DOC health services unit where they may be placed in four-point restraints[1] or put on a mental health watch or security watch.  Prisoners may be isolated in these units for weeks or even months, during which time they generally are denied visits, telephone calls, showers, or any other out-of-cell time, even to meet with a mental health clinician.  These overly restrictive and punitive

---

[1] 103 CMR 505.6 defines a four point restraint as "[a]ny combination of instruments of restraint such that four limbs of an inmate are restrained at any one time, in any manner to a fixed object."

conditions often exacerbate an inmate's mental illness or suicidal feelings.  While mental health watch is not technically a form of segregation, a DOC consultant recently concluded that "[c]onfining a suicidal inmate to their [*sic*] cell for 24 hours a day only enhances isolation and is anti-therapeutic."   Lindsay M. Hayes, 2007 TECHNICAL ASSISTANCE REPORT ON SUICIDE PREVENTION PRACTICES WITHIN THE MASSACHUSETTS DEPARTMENT OF CORRECTION 26 (Feb. 1, 2007) (hereinafter "Hayes Report").

<u>**Conditions in Segregation**</u>

22.     The cells in each type of dedicated segregation unit are very small.  For example, cells in the DDU are seven feet by twelve feet; DSU cells in 10 Block in MCI-Cedar Junction are six feet by nine feet.  The walls of the cells in the DDU and in 10 Block are constructed from solid concrete.  In most segregation units, the door is also solid except for one narrow slot that is used to deliver food to the prisoner and a small window.  Some segregation cells, such as those at 10 Block, have both a solid outer door and an inner barred door.  There is typically one small window to the outside that allows in little, if any, natural light.  Some segregation cells, however, such as those at 10 Block, MCI-Norfolk, and NCCI-Gardner, have no windows at all to the outside.  All segregation cells have minimal furnishings.

23.     Prisoners are confined in these cells for approximately twenty-three hours each day.

24.     Prisoners held in segregation are allowed one hour of solitary exercise each weekday in small outdoor cages.  As the exercise cages are at least partially open to the weather, recreation is often cancelled when it rains or snows.  Moreover, prisoners with mental illnesses often choose not to exercise because they are too depressed or their mental illness makes them too afraid to leave their cell.  Many do not leave their cell for weeks or even months at a time.

25.     Each type of segregated confinement is designed to minimize the prisoner's contact with others.  As a result, prisoners in segregation are deprived of virtually all social contact and environmental stimulation:

a.     A prisoner in segregation cannot see other prisoners from his cell.

b.      A prisoner in segregation must eat alone in his cell for each meal.

c.      In order to communicate with neighboring prisoners in segregation, the prisoner must yell through air vents or the food slot in his cell door.

d.      A prisoner held in segregation cannot attend religious services, cannot work in a prison job, cannot attend programs, and cannot participate in rehabilitative activities.

e.      A prisoner held in segregation is allowed only non-contact visits, i.e., the prisoner is separated from his visitor by a plexiglass window and must speak through a telephone.  Visits are infrequent and often denied as a result of the prisoner's behavior in segregation.

f.      Access to telephones, reading material, and radios is highly restricted.  Television is prohibited to all prisoners in segregation, except to some prisoners in the DDU.

### Placement of Prisoners with Mental Illnesses in Segregation

26.     Many mentally ill prisoners have difficulty conforming their behavior to prison rules.  They often manifest their illness by self-harm or other disruptive behaviors.  Their unusual behavior also makes them prone to victimization and assaults by other prisoners.

27.     DOC custodial staff are not properly trained in the identification and management of mentally ill prisoners.  They often do not recognize that the problematic behavior is caused by mental illness.  Instead, they commonly conclude that the prisoner is being manipulative or feigning symptoms.

28.     Although DOC has a policy, 103 CMR 650, that requires prison administrators to consult with mental health staff before a prisoner is placed in segregation, the policy does not require that mentally ill prisoners be excluded from segregation.  Indeed, mental health personnel complain that they are not regularly invited to participate in segregation review meetings.

29.     Unlike its counter-parts in most states, the DOC does not have a secure treatment program that could serve as an alternative to segregation.  As a result, mental health staff are under pressure from DOC administrators not to recommend that prisoners with mental illness be screened out of segregation.  When mental health clinicians inform correctional administrators that an inmate cannot tolerate segregation, the administrators often reject their recommendations. As a result, few prisoners are screened out of segregation because of their mental illness.

30.     Furthermore, those few prisoners with mental illness who are screened out of a segregation unit like the DDU are usually placed in some other form of segregated confinement. Because these prisoners still end up in segregated conditions, the absence of a high security residential treatment facility unit undermines the DOC mental health screening process.

## Effect of Segregation on Prisoners With Mental Illness

31.     The social isolation and sensory deprivation associated with segregation can create symptoms of mental illness even in psychologically healthy individuals.  These include massive anxiety and panic attacks, hypersensitivity, difficulty with concentration and memory, insomnia, compulsiveness, uncontrollable rage, acute confusional states, social withdrawal, hopelessness, hallucinations, and paranoia.  Some doctors have identified this constellation of symptoms in prisoners confined in segregation as a syndrome known as Special Housing Unit Syndrome.  This syndrome was first identified by a psychiatrist who published the result of his evaluation of prisoners confined in 10 Block in MCI-Cedar Junction more than twenty years ago.

32.     If a prisoner is already psychologically impaired when he is placed in segregated confinement, the harsh conditions of segregation can be devastating.  The result is often permanent and serious psychological harm and sometimes a catastrophic deterioration in his mental health.

33.     The symptoms of mental illness manifest in many ways.  Prisoners with mental illnesses held in segregation units may refuse to leave their cells for exercise, showers, or even to meet with a therapist, either out of fear or depression.  It is common for mentally ill prisoners in segregation to cut their arms, necks, or bodies.  Many are obsessed by suicidal thoughts, and some repeatedly attempt to hang themselves or cut themselves.  Some swallow razor blades, radio or television parts, wrist braces, or batteries.  Others insert metal objects in their penises. Still others assault staff.  Paranoia is rampant among mentally ill prisoners in segregation.  Some prisoners are afraid to sleep, fearing guards will open their cell doors and attack them.  Not uncommonly, a segregation cell block is filled with the odor of feces that a mentally ill prisoner

has smeared in his cell or on his body.  Many mentally ill prisoners neglect to bathe or lie in their beds most of the day.

34.     As a result, prisoners with mental illness receive disciplinary reports rather than appropriate mental health care.  Some face sanctions that include additional segregation time and loss of even minimal privileges afforded other prisoners in segregation.  The DOC is aware that this practice is not recommended by prison mental health experts.  Hayes Report at 32 ("it is strongly recommended that no inmate (regardless of their [*sic*] mental status) should receive a punitive sanction (i.e., disciplinary report) based solely upon self-injurious behavior").

35.     Although mental health clinicians in the prison system may inform defendants that these punishments exacerbate the prisoner's illness and increase his disruptive behavior, defendants rarely modify the sanction to accommodate the prisoner's mental disorder.  Prisoners are caught in a cycle in which they are punished for conduct that stems from their illness, the punishment exacerbates their conditions, and this in turn increases their self-destructive behaviors.

<strong><u>Provision of Mental Health Care in Segregation</u></strong>

36.     The devastating effects of segregation on prisoners with mental illnesses cannot be ameliorated by mental health treatment no matter how intensive.  In any case, the mental health services provided by the DOC to prisoners held in segregation are inadequate.

37.     Typically, mental health sessions occur while the prisoner is still in his cell, with the health care provider standing outside of the cell and speaking to the prisoner through the food slot or a crack in the side of the door.  Under these circumstances, there is no privacy or confidentiality.  The prisoner and the therapist cannot even look at each other face to face.

38.     Although the DOC does allow private meetings between therapists and prisoners, both DOC therapists and prisoners are reluctant to request them.  A prisoner must be strip-searched before each private meeting.  Correctional officers take advantage of the meeting to search the prisoner's cell.  Further, correctional officers often do not have enough time to stop what they are doing and to transport the inmate.  Consequently, private interviews are very infrequent.

39.     The mental health treatment provided to mentally ill prisoners in segregation cannot prevent deterioration, as evidenced by the fact that mentally ill prisoners in segregation - even if they receive intensive attention from mental health staff - frequently require transfer to Bridgewater State Hospital for in-patient mental health treatment.

40.     However, even transfer to Bridgewater State Hospital is not a permanent solution, as many prisoners with mental illnesses are returned to the same segregated conditions after they are stabilized, only to deteriorate once again.  Some prisoners are sent back to segregation on or before the expiration of the 30-day evaluation period even if they have not stabilized.  Others, thought to require a level of security that Bridgewater State Hospital cannot provide, spend their entire time at the hospital in segregation-like conditions, unable to benefit from the enhanced therapies that are supposed to be available to them.  Many prisoners have shuttled back and forth between segregation and Bridgewater State Hospital more than ten times.

41.     Since November, 2004, at least eleven prisoners have committed suicide while being held in segregated confinement, including four in the last ten weeks.  At least seven of these prisoners suffered from a mental illness.

### Examples of Mentally Ill Prisoners in Segregation

42.     Mr. A was a 26-year-old prisoner who was both mentally retarded and mentally ill, with diagnoses that included major depression with psychotic features.  Mr. A was placed in segregation on December 7, 2005 in the Health Services Unit at MCI-Cedar Junction in four point restraints after he cut his throat and his arm.  Several days later he was moved to 10 Block, even though a clinician at Bridgewater State Hospital had warned that confinement in segregation was likely to have a deleterious impact on his mental status.  On December 19, 2005, Mr. A met with an attorney and paralegal.  He appeared disoriented, scattered, and incoherent. He told them that he wanted to die because he was extremely depressed and sick of living that way.  The next day correctional officers closed the outer solid steel door to his cell because he threw his lunch tray on the tier.  Although correctional officers are supposed to check each

prisoner every half hour, they failed to do so on that day. That afternoon, Mr. A committed suicide by hanging himself in his cell.

43.     Mr. B was 22 years old when he committed suicide by hanging himself in an SMU at SBCC on October 22, 2005. Mr. B had a history of serious mental health issues, including bipolar disorder, attention deficit hyperactivity disorder, and extreme paranoia. In the months before his death, he was placed on suicide watch on multiple occasions, and once cut his arm so badly that it required twenty staples. Mr. B was placed in segregation because of a fight with another prisoner that was caused by his paranoid state. While in the SMU, Mr. B's mental status began to deteriorate and he became increasingly despondent and paranoid. He talked about other prisoners knowing things about him and complained about cameras and other listening devices in his cell. He lost weight because he thought prisoners and staff had tampered with his food. He was often awake all night talking to himself, and he began writing numbers on his cell wall with soap. As a result of this behavior, he was admitted to Bridgewater State Hospital on September 14, 2005. This was his second Bridgewater hospitalization. On October 18, 2005, he was returned to SBCC and was once again placed in segregation. The next evening he was put on a mental health watch because he was paranoid, delusional, and agitated. On October 22, 2005, he was cleared from mental health watch and returned to the SMU. That night medical staff failed to bring him his medication. An hour later, officers found him hanging from the bars on his cell window. On his cell desk he had written in soap "Dust in the wind." After Mr. B's death, the DOC conducted a mortality review that concluded that, because of his mental illness, he should not have been housed in segregation.

44.     Mr. C was 38 years old when he hung himself in the segregation unit at SBCC on January 29, 2007. Mr. C had a long history of mental illness and had been chronically depressed for years. This was not the first time Mr. C had attempted to kill himself in segregation. Mr. C suffered from sleep apnea and in March, 2006, tried to hang himself with his breathing machine in the SBCC segregation unit. When he was unable to do so, he smashed the machine to find something sharp he could use to slice his neck. When that failed, he started eating the machine,

hoping that it would cause internal bleeding that would kill him.  He also cut his legs and arms. Mr. C told mental health staff that he could not handle segregation.  Because of this suicide attempt, Mr. C was transferred to Bridgewater State Hospital, but was returned to SBCC approximately one month later.  His Bridgewater clinicians believed that the suicide attempt was a reaction to "unbearable feelings in conjunction with his being socially isolated and without his usual sources of support" in segregation.

45.     Mr. D is a 38-year-old prisoner currently confined in the DDU at MCI-Cedar Junction and has been in segregation continuously for almost a year.  Mr. D has been receiving mental health treatment since he was a child and has been diagnosed with severe depression. Since being placed in segregation, Mr. D has seriously attempted to commit suicide three times, swallowing a razor on the second attempt.  He has been transferred to Bridgewater State Hospital following his attempts, but each time was returned to prison and to segregation within 30 days. He endures chronic physical pain that is poorly managed.  This chronic pain, together with the isolation, causes his depression to be even more severe.  He continues to have suicidal feelings.

46.     Mr. E is a 38-year-old prisoner with bi-polar illness who is currently confined in the DDU at MCI-Cedar Junction.  Prior to his incarceration, he was committed to a series of state mental hospitals for a total of five years.  He also spent a significant portion of his youth in inpatient and residential mental health facilities.  Mr. E has been in segregation continuously for over two years.  Although his original prison sentence has long since expired, his mental illness causes him to accumulate disciplinary reports and new criminal charges that keep him incarcerated and in segregation.  In segregation, Mr. E experiences suicidal depressions.  During these periods, he has cut his wrists, swallowed razors and batteries, and tied a noose around his neck in an attempt to strangle himself to death.  Mr. E has asked for therapies like anger management and stress management that might help him break this cycle, but has been told that these types of programs are not available in the DDU.  His mental health treatment consists of seeing a counselor once a month and a psychiatrist once every two months, both usually at cellfront and not in private.

47.     Mr. F is a 30-year-old prisoner currently confined in 10 Block at MCI-Cedar Junction who has been in segregation for over two years.  Mr. F has been diagnosed with Major Recurrent Depression and has attempted suicide six times in the last three years.  These suicide attempts have led to his transfer to Bridgewater State Hospital for evaluation.  Mr. F reports that Bridgewater clinicians have stated that he cannot cope with the conditions in segregation and that it is contraindicated for him.  In spite of these recommendations, he remains in segregation at MCI-Cedar Junction.

48.     Mr. G is a 30-year-old prisoner currently confined in the DDU at MCI-Cedar Junction.  Mr. G has been in segregation for over a year.  Mr. G has received mental health treatment since he was 10 years old.  He is often acutely psychotic.  He stays up at night arguing with voices in his head that tell him his entire family has been murdered or killed in a car accident.  On one occasion, he smashed his television as a result of an argument with these voices.  Mr. G has been transferred to Bridgewater on several occasions but each time has been returned to the DDU within 30 days.

49.     Mr. H is a 41-year-old prisoner currently confined in the DDU at MCI-Cedar Junction.  Mr. H has been in segregation since 2001.  Mr. G has been diagnosed with Bi-Polar Disorder and Personality Disorder Not Otherwise Specified.   The isolation inherent in segregation exacerbates his mental illness, and causes him to become paranoid.  He has had multiple hospitalizations at Bridgewater State Hospital, where clinicians have written that he should not be sent back to segregation.  In spite of these recommendations, he is always returned to segregation when he leaves Bridgewater.  Mr. H is unable to cope with segregation and as a result, keeps accumulating more and more disciplinary reports.  These infractions in turn prolong his isolation and he continues to deteriorate.

50.     Mr. I is a 34-year-old prisoner recently released from segregation in 10 Block at MCI-Cedar Junction.  Except when at Bridgewater State Hospital, he had been in some form of segregated confinement since October, 2004.  Mr. I has been diagnosed with severe, recurrent depression.  In the summer of 2005, having lost over twenty pounds as a result of worsening

depression, he was transferred from segregation to Bridgewater State Hospital. After a few weeks at the hospital, he was returned to segregation at SBCC. This was the first of many times that he cycled back and forth between Bridgewater and segregation. In the autumn of 2005, he slit his throat from ear to ear and was committed to Bridgewater State Hospital for treatment. In February, 2006, he was discharged back to SBCC and placed in segregation despite a recommendation from Bridgewater clinicians that segregation was clinically contraindicated. A few days later, he attempted suicide again and was sent back to Bridgewater. In March, 2006, he was returned to segregation at SBCC, but was returned to Bridgewater a few days later. In April, 2006, he was discharged from Bridgewater to MCI-Cedar Junction, where he was placed first in 10 Block and then in a DSU, where he was allowed out of his cell for only one hour a day, and only at a time when all other inmates are locked in their cells (usually at night). In September, 2006, he was transferred to 10 Block to await disciplinary action for lighting a fire in his cell. He remained there until the middle of February, 2007.

51.     Mr. J is a 29-year-old prisoner currently in segregation at SBCC, where he has been for over a year awaiting out of state placement. Mr. J was lead poisoned as a child. Psychological testing begun prior to his being placed in segregation found him to be functioning at a third grade level. More psychological testing is indicated, but has not been completed because of insufficient correctional staff in the segregation facility to support the multi-day testing. Mr. J has been diagnosed with Psychotic Disorder, Not Otherwise Specified, and is currently on antipsychotic medication. His mental state and coping abilities are deteriorating in segregation as he continues to wait for an (unlikely) out of state transfer.

52.     Mr. K is a 33-year-old prisoner with attention deficient hyperactivity disorder and post traumatic stress disorder. He also suffers from severe depression and is psychotic at times. Although not currently in segregation, he has been in segregation at SBCC and several other facilities. In 2006, he twice attempted to commit suicide, hanging himself from a noose each time. Prior to each attempt he repeatedly but unsuccessfully asked correctional officers to see mental health staff. In his first hanging attempt, his heart stopped and he had to be taken to an

outside hospital by helicopter in order to be saved. He also nearly died on the second attempt, losing all control of his bodily functions. He survived again, but remains subject to placement in segregation where his access to mental health staff is dependent upon correctional officers who are often unresponsive to his pleas for help.

53.     Mr. L is a 24-year-old prisoner currently confined in the DDU at MCI-Cedar Junction. Mr. L has been incarcerated since he was 17-years-old and has spent most of that time in the DDU. Mr. L has been diagnosed with severe borderline personality disorder and possible seizures, with a pre-incarceration history of hospitalization for hallucinations, delusions, depression, and anxiety. Scars from self-mutilation cover his face, neck, torso, stomach, and arms. Mr. L reports having swallowed objects such as a piece of glass, cable wires, and an arm of his glasses. He has been sent to Bridgewater State Hospital for psychiatric evaluation at least 15 times, but has repeatedly been returned to his DDU cell rather than be committed to Bridgewater full-time, even though Bridgewater evaluators have noted that he poses a substantial risk of harm to himself and others. While Mr. L is not serving a long prison sentence, he has accumulated new criminal charges in prison. It is likely that these behaviors are due in part to his mental illness, which has been aggravated by segregation and lack of adequate treatment. He is currently serving a sentence for an assault carried out while incarcerated and has charges pending for another such assault. He has reported extreme stress from segregation: "I'm locked in a box. I feel defeated. I'm thinking only about one thing: the last day of my life."

54.     Mr. M is a 56-year-old prisoner currently committed to Bridgewater State Hospital. Mr. M has a long history of mental illness, including delusional disorder, bipolar disorder, and schizoaffective disorder. He has been hospitalized many times, including eight previous admissions to Bridgewater State Hospital. Mr. M was placed in segregation at MCI-Norfolk in November 2005 for behavior related to his mental illness. His mental health records indicate that he became highly anxious and demonstrated persecutory and paranoid delusions in segregation. He received over 30 disciplinary reports for reasons related to his mental illness, but often refused court ordered medications because he believed that mental health staff were

trying to poison him.  On September 1, 2006, Mr. M was transferred to Bridgewater State Hospital because he had become floridly manic, trashed his cell, and thrown a cup of water at a nurse.  On September 18, 2006, Bridgewater filed a petition for his commitment, concluding that he had extreme difficulty coping while in segregation, was increasingly paranoid and delusional, and would be at risk of becoming suicidal should he return to MCI-Norfolk.

55.    Mr. N is a 44-year-old prisoner who, until his recent release from the DDU at MCI-Cedar Junction, had been confined in segregation for more than four years.  Although no longer in the DDU, he has not been returned to general population.  Mr. N is mentally retarded and is unable to read or write.  He has attempted suicide several times, starting at age 13.  Mr. N's mental health records indicate that he has difficulty in the DDU, and while in the DDU experienced sleep problems, increased anxiety, and both visual and auditory hallucinations.  In July, 2006, Mr. N received a psychological evaluation that concluded he is clinically contraindicated for extended periods of segregation because of his significant deficits and lack of adaptive coping mechanisms.  Nevertheless, Mr. N remained in the DDU for another six months.

56.    Mr. O is a 32-year-old prisoner currently confined in the DDU, where he has been for more than three years, and from which he is not scheduled to be released until he completes his criminal sentence.  Mr. O has a long history of mental health issues, starting at least as early as third grade.  His diagnoses include bipolar disorder, post traumatic stress disorder, and antisocial personality disorder.  He has tried to commit suicide several times in the DDU, and has been placed in four-point restraints on numerous occasions.  He suffers from severe insomnia and often becomes agitated and paranoid.  Mr. O reports that in December, 2006, he was placed in an observation cell in the DDU because he cut his wrist.  When correctional staff refused to give him a blanket, he smeared feces over his body and refused to take a shower or clean himself for several days.

57.    Mr. P is a 27-year-old prisoner who has been diagnosed with schizophrenia, anxiety, and depression.  Although he was transferred out of segregation in December, 2006, he was in segregation at SBCC for almost a year and a half, awaiting an out of state transfer.  Mr. P

has received mental health treatment since he was a child. He is currently taking anti-anxiety, anti-psychotic, and anti-depressant medications. While in segregation, Mr. P attempted to commit suicide four times. On September 28, 2006, Mr. P's clinicians informed DOC administrators by letter that Mr. P cannot tolerate segregation. Nevertheless, Mr. P remained in segregation for approximately three additional months. Like many prisoners with mental illness, Mr. P has not been transferred out of state because other states often reject prisoners with mental illness.

58.     Mr. Q is a 28-year-old prisoner who was housed until the end of February, 2007, in a segregation unit at the North Central Correctional Institution at Gardner; he had been confined almost continuously in different DOC segregation units since May 2006. Mr. Q has a long history of mental illness and is diagnosed with bipolar disorder. Mr. Q has been hospitalized many times in the community. While in segregation, Mr. Q attempted suicide by hanging himself and cutting his arms, and has frequently required mental health watch. Recently, he bruised his head by repeatedly banging it against the wall. He reports that he sees demons when he looks at the cell walls. Even though he takes multiple medications, including an antipsychotic, a mood stabilizer, an anti-anxiety drug, and an antidepressant, the stress of segregation causes him to decompensate.

59.     Mr. R is a 43-year-old prisoner with post traumatic stress disorder and major depression with psychotic features. Mr. R is dyslexic and attended special education classes throughout his schooling. He was placed in a mental institution when he was 14 years old. Except for a 30 day period at Bridgewater State Hospital, he has been confined in the segregation unit at SBCC since July, 2005, not for discipline but because he is reported to have enemies in general population. In November, 2006, a psychiatrist at SBCC referred him to Bridgewater, noting that he had become very depressed and delusional, believed that "seven Spanish-speaking inmates" were plotting to kill him, and that he was "was staying up all night keeping vigil." He also was "missing meals because he thinks the food is poisoned." At Bridgewater State Hospital, he resumed taking anti-psychotic, anti-anxiety, and anti-depressant medications that he had

refused in segregation. As a result, his symptoms abated somewhat, and he was returned to segregation at SBCC—despite a warning from the Bridgewater evaluator that segregation could cause him to decompensate and "quite possibly [cause the] need [for] a period of inpatient psychiatric hospitalization."

### Deliberate Indifference

60.     Defendants have long been aware that confinement in segregation poses a high risk of harm to prisoners with mental illnesses.

61.     In 1989, the Governor's Special Advisory Panel on Forensic Mental Health recommended that the DOC establish a comprehensive mental health center with a 45 to 60 bed high security residential treatment unit and a 6 to 10 bed crisis residence unit that could serve as an alternative to both segregation and Bridgewater State Hospital.

62.     In 1990, the DOC's mental health vendor at the time, Prison Mental Health Service, had extensive discussions with the DOC about the need for a comprehensive treatment unit for prisoners who would otherwise be confined in segregation. The Prison Mental Health Service recommended that this unit be for "chronically psychotic inmates who are currently too ill to function within the general prison population, but are too violent, disruptive, or not acutely psychotic enough to remain at Bridgewater State Hospital, and who therefore spend most of their sentence in segregation" and "inmates who repeatedly engage in self-mutilating behavior, not because they are either suicidal or psychotic, but because of a very severe personality disorder, and who also therefore spend most of their time in segregation." *Letter from James Gilligan and Marie King to DOC Associate Commissioner Frank Jones,* dated October 24, 1990. These are precisely the type of prisoners who still languish in DOC segregation units. Strikingly, some of the very individuals who were mentioned by name in the October 24, 1990 letter as examples of prisoners who are inappropriately and unnecessarily housed in segregation remain there today.

63.     In 1997, an independent panel investigating the death of John Salvi, a prisoner who committed suicide while in "lockdown" at MCI-Cedar Junction, also recognized the deleterious effects of segregation on inmates, whether or not they were currently identified as

"open mental health cases."  The panel recommended daily mental health visits to all inmates who were locked in their cells 23 hours a day "to provide monitoring of their mental condition and an opportunity for meaningful social contact and mental health counseling."  REPORT ON THE PSYCHIATRIC MANAGEMENT OF JOHN SALVI IN MASSACHUSETTS DEPARTMENT OF CORRECTION FACILITIES 1995-1996 (submitted to the Massachusetts Department of Correction by the University of Massachusetts Medical Center Department of Psychiatry on January 31, 1997), at 38.  The purpose of the visits to these inmates who were not "open mental health cases" would be to "help to identify and protect inmates who are becoming quietly despondent and suicidal in such conditions."  *Id.*  This report also recommended that the "DOC . . . consider the appropriateness of creating residential special needs treatment programs, e.g., mental health, dementia, head injured, within one or more of its secure institution."  *Id.* at 42.

64.    More recently, in early 2005, the DOC assembled a Medical Review Panel to assist the Department of Correction Advisory Council in assessing the overall quality of medical and mental health care in the DOC.  In August, 2005, the Mental Health Services Subgroup of this panel filed a report stating that it had "interviewed a number of prisoners [in various DOC segregation units] whose mental illness appears to have been painfully aggravated by the severe conditions of segregation."  Significantly, the subgroup concluded that because DOC has "no alternative to segregation for mentally ill prisoners who are either too aggressive or too vulnerable for general population . . . many mentally ill prisoners are languishing – sometimes for years – in segregation units." Governor's Commission on Correction Reform, REPORT OF MENTAL HEALTH SERVICES SUBGROUP  (August 24, 2005).

65.    After the suicides of Mr. A and Mr. B in 2005, the DOC hired consultants to conduct mortality reviews.  According to the Hayes Report, these mortality reviews concluded that, because of their serious mental illnesses, neither victim should have been placed in segregation.  Hayes Report at 16.  The mortality reviews recommended that DOC create a work group to review policies and practices relating to the placement of mentally ill prisoners in segregation to ensure that they meet national standards, and that DOC work to develop an

effective alternative to segregation for inmates suffering from serious mental illness. Hayes Report at 17. The recommendations of the mortality reviews were ignored.

66.     DOC's current vendor, University of Massachusetts Correctional Health Program ("UMCHP"), has repeatedly urged the DOC to establish a high-security residential treatment facility as an alternative to segregation for prisoners with mental illness. UMCHP has submitted a comprehensive proposal to the DOC describing the need for such a unit and how it should be operated, including discussions of the physical plant needs, clinical staffing matrix, training and selection of security staff, and the type of programming that should be offered. DOC has rejected each of these proposals.

67.     On March 20, 2006, the Legislature's Joint Mental Health and Substance Abuse Committee held an oversight hearing at which Dr. Kenneth Appelbaum, the Director of Mental Health for the UMCHP, testified that DOC has a "dire need" for a high security residential treatment facility as an alternative to segregation for prisoners with mental illness, and that the number of mental health clinicians is seriously inadequate. Despite this testimony, and testimony from correctional experts and family members of prisoners who committed suicide in segregation about the extraordinarily destructive impact of segregation on prisoners with mental illnesses, Defendant Dennehy told the Committee that DOC's existing policies adequately protect prisoners with mental illness from inappropriate placement in segregation.

68.     In September, 2006, the DOC commissioned a suicide prevention assessment by Lindsay M. Hayes, Project Director of the National Center on Institutions and Alternatives, in order to "assess current practices, as well as offer any appropriate recommendations for improving DOC suicide prevention policies and practices," in an effort to "reduce the likelihood of future inmate suicides within the Massachusetts Department of Correction." Hayes Report at 1. The Hayes Report recommends that DOC develop "effective alternative placement options for those inmates suffering from severe and persistent mental illness, but whose behavioral difficulties and security needs require more strict containment than can be afforded in general population." *Id.* at 17-18. Although the Hayes Report states that this should be "*among the*

*highest priorities facing the DOC in its efforts to improve suicide prevention practices*," *id.* (emphasis in original), the DOC's Corrective Action Plan simply refers to the proposals for a residential treatment unit in maximum security and a behavioral management unit that are contained in its pending Request for Response ("RFR") for a new contract for medical and mental health services.  2007 DOC CORRECTIVE ACTION PLAN ADDRESSING RECOMMENDATIONS IN TECHNICAL ASSISTANCE REPORT ON SUICIDE PREVENTION WITHIN THE MASSACHUSETTS DEPARTMENT OF CORRECTION (DRAFT) 6-7.

69.     The Corrective Action Plan and RFR fail to address the problem of mentally ill prisoners in segregation in most important respects.  These include the failure to establish exclusionary criteria that will ensure that prisoners with serious mental disorders are not confined in segregation.  The RFR suggests that the proposed residential treatment unit will be primarily for mentally ill prisoners now in general population, and will not be an alternative to segregation.  In addition, the RFR and the Corrective Action Plan address only the role of mental health staff and do not address physical plant issues, correctional officer staffing, and rehabilitation program staffing.  Furthermore, in the Corrective Action Plan, the DOC acknowledges that it does not even know the cost of a residential treatment unit, except that it will be "significant in scope."  As has occurred in the past with previous proposals for residential treatment units, financial limitations and other concerns are likely to block implementation of reform.

70.     In addition to studies and investigations undertaken in Massachusetts, defendants are aware that numerous federal courts have ruled that it is unconstitutional to confine a seriously mentally ill prisoner in segregation. See e.g., *Jones 'El v. Berge***,** 164 F.Supp.2d 1096, 1126 (D. Wis. 2001)(ordering "seriously mentally ill" prisoners not to be housed in a supermax facility); *Ruiz v. Johnson*, 37 F.Supp.2d 855, 915 (S.D. Texas 1999) (evaluating conditions in administrative segregation units  and concluding that "As to mentally ill inmates… the severe and psychologically harmful deprivations of [] administrative segregation units are, by our evolving and maturing society's standards of humanity and decency, found to be cruel and unusual punishment."); *Madrid*

*v. Gomez*, 899 F. Supp. 1146 (N. D. Cal. 1995) (recognizing the value of segregation for disciplinary and security reasons, *id.* at 1262, but finding that "the continued confinement [in segregation, for three years or less as reflective of the data before the court]. . . constitutes cruel and unusual punishment in violation of the Eighth Amendment for two categories of inmates: those who are already mentally ill and those who. . . are at an unreasonably high risk of suffering serious mental illness as a result of the present conditions [in segregation]." *Id.* at 1267). Under these decisions, the types of mental disorder that warrant exclusion from segregation include not only individuals with a history of psychotic disorders, such as schizophrenia or bipolar disorder, but also those with a variety of other conditions, including, but not limited to, developmental disabilities, certain phobias, post traumatic stress disorder, and severe personality disorders, especially where there is a history of self-injurious behavior.

71.     As employees and representatives of the DOC, each of the individually named defendants are aware of each of the reports and recommendations described above.

## COUNT I
### CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

72.     Plaintiff DLC restates and realleges paragraphs 1-71 as if fully set forth in this Count I.

73.     By their policies, practices and acts, defendants Kathleen Dennehy, James Bender, Veronica Madden, John Marshall, and Timothy Hall violate the rights of convicted prisoners with mental illness to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution, as enforceable through 42 U.S.C. § 1983.

74.     As a matter of policy and practice, defendants Kathleen Dennehy, James Bender, Veronica Madden, John Marshall, and Timothy Hall impose periods of segregated confinement upon convicted prisoners with serious mental illness that lead to the deterioration of their mental health.

75.     Defendants Kathleen Dennehy, James Bender, Veronica Madden, John Marshall, and Timothy Hall have long been aware of the consequences of these conditions of confinement through meetings with and correspondence from legislative hearings, advocacy organizations, prisoner grievances and other means, but have failed to take reasonable corrective action.

76.     By imposing periods of confinement while aware of the deleterious effect that it will have on prisoners' mental health, Defendants Kathleen Dennehy, James Bender, Veronica Madden, John Marshall, and Timothy Hall act with deliberate indifference to the serious medical needs of, and the substantial risk of serious harm to, prisoners with mental illnesses.

## COUNT II
## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973

77.     Plaintiff DLC restates and realleges paragraphs 1-71 as if fully set forth in this Count II.

78.     Plaintiff's constituents are qualified individuals with disabilities as defined in Section 504 of the Rehabilitation Act of 1973.  They have mental impairments that substantially limit one or more major life activity, including but not limited to thinking, concentrating, and interacting with others, including their ability to control their behavior; they have records of having such an impairment; or they are regarded as having such an impairment.  As state prisoners, all Plaintiff's constituents meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by defendant DOC.  *See* 29 U.S.C. § 794.

79.     Defendant DOC administers a program or activity that receives federal financial assistance.

80.     Defendant DOC discriminates against mentally disabled prisoners by failing to provide reasonable accommodation for their disabilities.

81.     Defendant DOC discriminates against mentally disabled prisoners solely on the basis of their disabilities in violation of Section 504.  29 U.S.C. § 794.

82.     In placing prisoners with mental illness in disciplinary and administrative segregation, Defendant DOC has denied prisoners with mental illnesses the benefits of the facility's services, programs and activities, including school, recreation, exercise and mental health services, thus discriminating against the Plaintiff's constituents on the basis of their disability in violation of 29 U.S.C. §794.

## COUNT III
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

83.     Plaintiff DLC restates and realleges paragraphs 1- 71 as if fully set forth in this Count III.

84.     Plaintiff's constituents are qualified individuals with disabilities as defined in the Americans with Disabilities Act ("ADA"). They have mental impairments that substantially limit one or more major life activity, including but not limited to thinking, concentrating, and interacting with others, and controlling their behavior.  As state prisoners, all Plaintiff's constituents meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by defendant DOC. 42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2).

85.     Defendant DOC is a public entity as defined under Title II of the ADA, 42 U.S.C. § 12131(1)(B).

86.     Defendant DOC knowingly and consistently discriminates against mentally disabled prisoners by failing to provide them with reasonable accommodation.

87.     By failing to provide individualized assessments of the mental health needs and treatment requirements of prisoners with mental illness, and by placing prisoners with mental illness in disciplinary and administrative segregation, defendants have denied prisoners with mental illness the benefits of the facility's services, programs and activities, including school, recreation, exercise, and mental health services, thus discriminating against the Plaintiff's constituents on the basis of their disability in violation of 42 U.S.C. § 12132.  Discrimination

against prisoners with mental illness occurs particularly because such prisoners cannot receive mental health services sufficient to counteract the effects segregated confinement has on mentally ill prisoners which is distinct from the impact it has on prisoners who are not mentally ill.

88.     Defendant DOC discriminates against mentally disabled prisoners on the basis of their disabilities.

89.     In placing prisoners with mental illnesses in disciplinary and administrative segregation, the Defendant DOC (a) has failed to furnish a reasonable accommodation to prisoners with disabilities; (b) punishes prisoners with mental illnesses for disability related conduct; and (c) deprives prisoners with mental illnesses of access to adequate mental health services by placing them in segregation.

## PRAYER FOR RELIEF

Prisoners with mental illness have suffered and will continue to suffer immediate and irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the defendants as alleged herein, unless they are granted the system-wide relief requested. The Plaintiff has no adequate remedy at law to protect its constituents from this harm. The injunctive relief sought by Plaintiff is necessary to prevent continued and further injury.

**WHEREFORE**, Plaintiff requests that this Court grant it the following relief:

a.     Issue a preliminary injunction against defendants DOC, Kathleen Dennehy, James Bender, Veronica Madden, John Marshall, and Timothy Hall, their agents, officials, employees, and all persons acting in concert with them, requiring them to institute and follow practices specifically designed prevent the placement of seriously mentally ill prisoners in segregated conditions.

b.     Issue a permanent injunction against defendants DOC, Kathleen Dennehy, James Bender, Veronica Madden, John Marshall, and Timothy Hall, their agents, officials, employees, and all persons acting in concert with them, under color of state law or otherwise, from subjecting prisoners with mental illness to the unconstitutional and illegal acts, conditions, and practices described in this Complaint.

c.     Issue a judgment against defendants Kathleen Dennehy, James Bender, Veronica Madden, John Marshall, and Timothy Hall declaring that the acts, omissions, policies, and practices of these defendants with regard to prisoners with mental illnesses are unlawful and constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

d.     Issue a judgment against defendant DOC declaring that its acts, omissions, policies, and practices with regard to prisoners with mental illnesses constitute

discrimination in violation of the Rehabilitation Act, 29 U.S.C. § 794 and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132.

e.    Order defendant DOC to promulgate a formal policy stating that prisoners with serious mental disorders may not be housed in segregated conditions (defined as 23 hour solitary in-cell confinement), including those awaiting action and closed custody, for more than one week.

f.    Order defendant DOC to construct a maximum security residential treatment unit or units as an alternative to segregation for prisoners with serious mental disorders.  This facility must have sufficient capacity for all prisoners with serious mental disorders who cannot be housed in the general prison population.  This facility must provide for (i) at least 15 hours per week of structured out-of-cell activities, including therapy and rehabilitation, and (ii) at least 10 hours per week of out-of-cell time for unstructured activity, such as recreation and showers.

g.    Appoint an independent mental health professional who is empowered and authorized to monitor on an ongoing basis the process of ensuring that prisoners with serious mental illness are screened out of segregation and the operation of the residential treatment unit to ensure compliance with the above-described policies.

h.    Order defendants DOC, Kathleen Dennehy, James Bender, Veronica Madden, John Marshall, and Timothy Hall, their agents, officials, employees, and all persons acting in concert with them, under color of state law or otherwise, to take all other actions necessary to provide sufficient mental health treatment programs and services to prisoners with serious mental illnesses.

i.    Award Plaintiff its reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988 and other applicable law.

j.    Grant such other and further relief as this Court considers just and proper.

**Disability Law Center, Inc.,**

By its attorneys,


 /s/ Cynthia M. Guizzetti
Cynthia M. Guizzetti, BBO #653858
Robert B. Baker, BBO #654023
Allyson Kurker, BBO #665231
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA 02110-1726
(617) 951-8000

Richard M. Glassman, BBO #544381
Karen Talley, BBO #644764
Nancy Svirida, BBO #663749
**DISABILITY LAW CENTER, INC.**
11 Beacon Street, Suite 925
Boston, MA  02108
(617)723-8455

James Pingeon, BBO #541852
Leslie Walker, BBO #546627
Bonnie Tenneriello, BBO #662132
Joel Thompson, BBO #662164
**MASSACHUSETTS CORRECTIONAL
LEGAL SERVICES, INC.**
8 Winter Street, 11th Floor
Boston, MA 02108
(617) 482-2773

Robert Fleischner, BBO #171320
**CENTER FOR PUBLIC
REPRESENTATION**
22 Green Street
Northampton, MA 01060
(413) 587-6265

March 8, 2007