# ATTACHMENT B

A/73331054.2/0999997-0000928766

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DISABILITY LAW CENTER, INC.,<br><br>                                    Plaintiff,<br><br>        v.<br><br>MASSACHUSETTS DEPARTMENT OF<br>CORRECTION; HAROLD W. CLARKE,<br>COMMISSIONER OF THE MASSACHUSETTS<br>DEPARTMENT OF CORRECTION, in his official<br>capacity; JAMES BENDER, DEPUTY<br>COMMISSIONER OF THE MASSACHUSETTS<br>DEPARTMENT OF CORRECTION, in his official<br>capacity; VERONICA MADDEN, ASSOCIATE<br>COMMISSIONER OF REENTRY AND<br>REINTEGATION OF THE MASSACHUSETTS<br>DEPARTMENT OF CORRECTION, in her official<br>capacity; JOHN MARSHALL, JR., ACTING<br>SUPERINTENDENT OF MCI-CEDAR JUNCTION<br>AND ASSISTANT DEPUTY COMMISSIONER-<br>NORTHERN SECTOR, in his official capacities;<br>AND TIMOTHY HALL, ACTING ASSISTANT<br>DEPUTY COMMISSIONER-SOUTHERN SECTOR,<br>in his official capacity,<br><br>                                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>CIVIL ACTION<br>NO.  <u>07-10463-MLW</u> |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS RENEWED
MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM THIRD PARTY
UNIVERSITY OF MASSACHUSETTS CORRECTIONAL HEALTH PROGRAM
<u>PURSUANT TO A SUBPOENA</u>**

Plaintiff Disability Law Center, Inc. ("DLC") submits this memorandum in support of its

motion for an order compelling the University of Massachusetts Correctional Health Program

("UMCHP") to produce documents in response to a subpoena served on UMCHP on

October 9, 2007.  As set forth below, the documents being withheld contain information critical

and highly relevant to the above-captioned lawsuit, and, UMCHP's argument that a medical peer

review privilege precludes production of certain responsive documents  has no basis in either

federal or state law.  DLC respectfully requests that this Court compel the immediate production

of these documents.

## **RELEVANT BACKGROUND**

On March 8, 2007, DLC filed a Complaint in this matter against the Massachusetts Department of Correction ("DOC") *et al.*, challenging the placement of certain mentally ill prisoners in segregated confinement units in DOC facilities.  Specifically, the Complaint alleges three counts: cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments; violation of Section 504 of the Rehabilitation Act of 1973; and violation of the Americans with Disabilities Act.  Compl. ¶¶73, 78, 84.  As set forth in the Complaint, in the two and a half years prior to DLC filing the Complaint, at least eleven prisoners committed suicide while being held in segregated confinement units. *Id.* ¶41.  At least seven of those prisoners suffered from a documented mental illness. *Id.*

UMCHP was the sole provider of medical and mental health services to prisoners in DOC facilities from 1998 to 2007.[1]  As the former provider of mental health services to the DOC, UMCHP possesses documents relevant to this lawsuit, including reports—both internal reports prepared by UMCHP reports ("UMCHP Reports") and joint reports of UMCHP and DOC ("DOC Reports")—evaluating the mental health and medical care provided to prisoners who committed suicide while housed in segregated confinement units.  The DOC and UMCHP Reports are sometimes referred to as "morbidity and mortality reviews" or "m&m reviews."  Upon information and belief, the DOC and UMCHP Reports contain critical information highly relevant to this lawsuit, including:

- Whether the mental illness of the subject prisoners made their placement in segregation clinically contraindicated;

- Whether alternatives to segregation were available or considered for prisoners contraindicated for segregation as a result of their mental illness;

- The likely cause of death of the prisoner, including whether placement in

---

[1] Beginning in 1998, the University of Massachusetts Medical School contracted with DOC for the provision of medical and mental health services.  UMCHP took over that contract in 2003.

segregation contributed to that death;

- Preventative steps that could or should have been taken by UMCHP and/or DOC staff to prevent the death; and

- Problems or deficiencies in the quality of mental health care and services to prisoners in segregation within the DOC, as well as any efforts made to improve care and services.

UMCHP also presumably has possession of notes and other documentation pertaining to the DOC and UMCHP Reports. DLC cannot obtain the UMCHP Reports from the DOC, as DOC has represented that they are not within DOC's possession, custody, or control. Although DOC has possession of the DOC Reports, it has yet to obtain those reports from DOC.[2]

## RELEVANT PROCEDURAL HISTORY

On October 9, 2007, DLC served UMCHP with a subpoena *duces tecum* pursuant to Fed. R. Civ. P. 45. *Declaration of Alison Hickey Silveira In Support of Plaintiff's Motion To Compel Production From Third Party University Of Massachusetts Correctional Health Program Pursuant To A Subpoena* ("Silveira Decl."), ¶4 (attaching subpoena). Although UMCHP concedes that the subpoena encompasses both the DOC and UMCHP Reports, and the notes of any meetings or discussion pertaining thereto, it has objected to producing the DOC and UMCHP Reports, stating on various occasions that:

- "UMCHP morbidity or mortality reviews [*i.e.*, the UMCHP Reports] are protected under state and federal law and, in certain aspects, are protected by the attorney-client privilege." Silveira Decl., ¶5 (attaching letter from James A. Bello to Alison E. Hickey dated October 18, 2007).

- The DOC and UMCHP Reports are not subject to production because they "discuss patient-specific treatment issues." Silveira Decl., ¶6 (attaching letter from James A. Bello to Alison E. Hickey dated October 23, 2007).

- The DOC and UMCHP Reports are protected under state and federal law allegedly establishing a medical peer review privilege, including a state court ruling "in the Hakeem Obba case" [*Porcher v. Commonwealth*, 2005 WL 3670952 (Mass. Super. Ct. Nov. 30, 2005)] and *In re Administrative Subpoena Blue Cross and Blue Shield of Mass.*, 400 F. Supp. 2d 386 (D. Mass. 2005). *Silveira Decl.* ¶¶8-9.

---

[2] DLC continues to try to obtain the DOC Reports from the DOC directly.

- The DOC and UMCHP Reports contain "protected health information" and are thus immune from disclosure under the Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 (1996) and the correlating Privacy Standards for Individually Identifiable Health Information and Security Standards, 45 C.F.R. §§160 et seq. and 164 et seq. (collectively, "HIPAA"). Non-Party University of Massachusetts Correctional Health Program's Memorandum in Support of its Opposition to Motion to Compel ("Initial Opposition," Docket No. 73) at 3-5.

- The DOC and UMCHP Reports are "protected by [] the patient-psychotherapist privilege," citing both state and federal law. *Id.* at 5-7.

- The UMCHP Reports are "not relevant to this suit and will not assist the Plaintiff in proving or disproving a material fact of consequence to the case." *Id.* at 7-8.

On December 17, 2007, UMCHP produced a limited number of documents that were located in the file of the former UMCHP Director of Mental Health.[3]  This production did not contain any DOC Reports or UMCHP Reports or any notes of any UMCHP representative from any such meetings.  UMCHP has not moved to quash or modify the subpoena under Fed. R. Civ. P. 45(c)(3).  Nor has UMCHP provided a privilege log as required by Fed. R. Civ. P. 45(d), despite withholding the subpoenaed documents by claiming a privilege.

In accordance with its meet-and-confer obligations, DLC supplied UMCHP with legal authority holding that reports such as the DOC and UMCHP Reports are not privileged documents. *Silveira Decl.*, ¶¶7, 10 (attaching letters from Alison E. Hickey to James A. Bello, dated October 31, 2007 and January 7, 2008).  DLC also offered to cooperate in seeking entry of a protective order, in which it would agree "not to distribute the [DOC and UMCHP Reports] to anyone outside of [the] lawsuit, and to use the documents for the purpose of [the] lawsuit only." *Id*.  Finally, DLC twice requested that UMCHP provide a privilege log for those documents over which UMCHP claimed a privilege.  *Id.*, ¶¶7, 10 (attaching letters from Alison E. Hickey to

---

[3] UMCHP also has not fulfilled its obligations to search for responsive documents.  Counsel has represented that only the files of Dr. Kenneth Applebaum were seriously reviewed for responsive documents in an effort to comply with Fed. R. Civ. P. 30(b)(6) and that any other efforts to locate responsive documents were incomplete.  Since DLC will first attempt to obtain those documents from Defendants, rather than a third party, DLC is not pursuing the production of documents in this motion, but reserves the right to move to compel production of those documents in the future.

James A. Bello, dated January 7, 2008 and June 13, 2008). UMCHP has failed to provide such a log, and has provided no response at all to DLC's most recent request. *Id.*, ¶12.

On July 31, 2008, DLC filed a Motion to Compel Production of Documents from Third Party University of Massachusetts Correctional Health Program Pursuant to a Subpoena. (Docket No. 61). UMCHP filed its Initial Opposition on September 15, 2008, and DLC filed a reply on October 30, 2008 (Docket No. 80). Simultaneous with filing its opposition, UMCHP also moved to stay DLC's request for discovery from UMCHP, asserting that there was no ongoing discovery occurring between DLC and DOC at that time, and UMCHP's belief that "a settlement may be imminent." (Docket No. 74, ¶8) DLC opposed UMCHP's motion to stay, but agreed to a one month stay in light of then on-going settlement negotiations. (Docket No. 76 at 5). On March 4, 2009, the Court entered a stay of all discovery in the case while DLC and DOC pursued settlement negotiations. In connection with that stay, on March 22, 2009, the Court denied DLC's then-pending Motion to Compel, without prejudice, and granted UMCHP's motion to stay discovery as between UMCHP and DLC "without prejudice to reconsideration if requested." (Docket No. 88). On April 26, 2010, DLC moved to lift the stay of discovery between UMCHP and DLC, consistent with the Court's lifting the discovery stay between the parties to the underlying litigation. (Docket No. 119)

DLC now submits this renewed motion seeking the same discovery from UMCHP which it sought in its earlier motion (Docket No. 61), pursuant to a subpoena which has now been outstanding for nearly two and a half years. The one change to the scope of discovery sought by the subpoena is that by mutual agreement of DOC and DOC, DLC has agreed not to seek UMCHP Reports or DOC Reports from either DOC or UMCHP which pre-date September 15, 2005. Thus, by this motion DLC seeks only the UMCHP and DOC Reports dated September 15, 2005 or later.

## ARGUMENT

UMCHP's grounds for withholding production of the DOC and UMCHP Reports are meritless. There is no federal medical peer review privilege that protects those documents from

disclosure.  Furthermore, while a federal court in a federal question case may recognize a forum state's medical peer review privilege when it can be done without substantial cost to federal policy, no court in the First Circuit, and indeed, no Court of Appeals anywhere, has ever so held. The vast majority of district courts nationwide are in accord, particularly in Section 1983 cases like this one.  Nothing in this case warrants charting a new course on federal medical peer review privilege law.

Even if this Court were to recognize Massachusetts's medical peer review statute conceptually, UMCHP has not carried its burden to prove that the DOC and UMCHP Reports are eligible for that statute's protection, and it is unlikely that it would be able to do so.  This is particularly evident given UMCHP's failure to provide a privilege log in support of withholding any document; such failure in itself waives any asserted privileges in favor of disclosure.

The DOC and UMCHP Reports are similarly not protected from disclosure in this case under either the Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 (1996) (together with the Privacy Standards for Individually Identifiable Health Information and Security Standards, 45 C.F.R. §§ 160 *et seq.*, "HIPPA"), which protects information from disclosure only in the absence of a valid subpoena and protective order (both of which are present in this case), or the psychotherapist-patient privilege, which belongs to the patient and can only be asserted with proof that a document in fact contains information protected by the privilege.

For all of these reasons, as set out in greater detail below, DLC is entitled to UMCHP's notes and other documents that comprise the DOC and UMCHP Reports, both of which are highly relevant to the pending litigation, as well as a privilege log detailing any documents withheld for any reason.

### A.      There Is No Blanket Federal Medical Peer Review Privilege.

There is no federal medical peer review privilege.  *See, e.g., In re Administrative Subpoena Blue Cross and Blue Shield of Mass., Inc.*, 400 F. Supp. 2d 386, 389 (D. Mass. 2005)

(citing *Nilavar v. Mercy Health System-Western*, 210 F.R.D. 597, 601 (S.D. Ohio 2002) ("noting that 'federal common law has not evolved to the point that it recognizes a de jure physician peer review evidentiary privilege'"); *Pagano v. Oroville Hosp.*, 145 F.R.D. 683, 692 (E.D.Cal. 1993), *overruled on other grounds, Jaffee v. Redmond*, 518 U.S. 1 (1996), ("There is no federal statutory basis for a medical peer review privilege."). Congress declined to recognize either a federal peer review privilege or a federal evidentiary privilege for documents produced during a medical peer review when it enacted the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. §§ 11101–52. *E.g., Administrative Subpoena*, 400 F. Supp. 2d at 390–91 (citing *Nilavar*, 210 F.R.D. at 602 ("Congress, in enacting the HCQIA, carefully crafted a very specific privilege, applicable to peer review material <u>submitted</u> <u>to</u> <u>the</u> <u>Secretary</u> pursuant to the dictates of the mandatory reporting provisions of that statute. That is as far as Congress went, and that is as far as this Court should apply the privilege contained therein.")) (emphasis in original). Accordingly, "[i]t appears that every United States Court of Appeals that has addressed the issue of whether there is a federal medical peer review privilege has rejected the claim." *Jenkins v. Dekalb County*, 242 F.R.D. 652, 659 (N.D. Ga. 2007) (citing *Agster v. Maricopa County*, 422 F.3d 836, 840 (9th Cir. 2005); *see also Univ. of Pennsylvania v. Equal Employment Opportunity Comm'n*, 493 U.S. 182, 195 (1990) ("A privilege for peer review materials has no similar historical or statutory basis."). UMCHP therefore cannot withhold the DOC and UMCHP Reports on the basis of a non-existent federal medical peer review privilege.

> **B.     Federal Policy Demands That The Court Refuse to Recognize Massachusetts' Medical Peer Review Privilege As Part of Federal Law.**

Should UMCHP nonetheless seek to have this Court recognize the Massachusetts statute providing for a medical peer review privilege, it is UMCHP's burden to prove that it should apply to this case. *Bradford v. Meditech, Inc.*, 2002 WL 392496, *2 (D. Mass. Feb. 19, 2002) (citing *In re Grand Jury*, 183 F.3d 71, 73 (1st Cir. 1999). UMCHP is unable to meet this burden, and, as a result, this argument is equally unavailing.

Evidentiary privileges in federal court are governed by Federal Rule of Evidence 501, which provides in relevant part:

> Except as otherwise required by the Constitution . . . as provided by Act of Congress or in rules prescribed by the Supreme Court . . . , the privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

*Univ. of Pennsylvania*, 493 U.S. at 188.

Therefore, while federal "courts have the power to be flexible and adaptive with regard to the law of privilege, they should not use the power to recognize new privileges expansively." *Administrative Subpoena*, 400 F. Supp. 2d at 389-90 (citing *Univ. of Pennsylvania*, 493 U.S. at 189). This includes when federal courts, as a matter of comity, are asked to recognize existing state statutory or common law privileges. "When not federally adopted, privileges provided by the law of the forum state should be respected to the extent this can be accomplished at <u>no substantial cost to federal substantive and procedural policy</u>." *E.g., Krolikowski v. Univ. of Massachusetts*, 150 F. Supp. 2d 246, 248 (D. Mass. 2001) (citation omitted) (emphasis added); *Administrative Subpoena*, 400 F. Supp. 2d at 390. As evidentiary privileges "contravene the fundamental principle that the public . . . has a right to every man's evidence," federal courts should not create new evidentiary privileges "unless it 'promotes sufficiently important interests to outweigh the need for probative evidence . . . .'" *Univ. of Pennsylvania*, 493 U.S. at 189 (quoting *Trammel v. United States*, 445 U.S. 40, 50-51 (1980)). Indeed, the Supreme Court has warned that courts should be "especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself." *Univ. of Pennsylvania*, 493 U.S. at 189 (declining to create new academic peer review privilege). As described above, Congress has already struck the balance between protecting medical peer review confidentiality and other important federal interests when it declined to provide for a medical peer review privilege in the HCQIA. *Administrative Subpoena*, 400 F. Supp. 2d at 390 (quoting *Teasdale v. Marin Gen. Hosp.*, 138 F.R.D. 691, 694 (N.D. Cal.

1991)). This Court should heed Congress's silent mandate, and refuse to recognize Massachusetts's medical peer review privilege in this federal question case.

> **1.      The Massachusetts Medical Peer Review Privilege Fails the *Hampers* Test.**

To determine whether to recognize a state privilege, courts in the First Circuit follow the standard set out in *In re Hampers*, 651 F.2d 19 (1st Cir. 1981) (adopting the inquiries set forth in *American Civil Liberties Union of Miss. v. Finch*, 638 F.2d 1336 (5th Cir. 1981)). *Hampers* asks two threshold questions: whether the forum state would recognize the privilege, and whether the state's privilege is "intrinsically meritorious" in the independent judgment of the federal court. *Id.* at 22.

Here, there is no question that Massachusetts has a statutory medical peer review privilege. M.G.L. c. 111, § 204. As to the "intrinsically meritorious" factor, the *Hampers* court set out a separate, four-prong test. 651 F.2d at 23 (adopting the standard in *Finch, supra*, which in turn adopted the so-called "Wigmore test"). The four prongs of that test are:

1.      "whether the communications originate in a confidence that they will not be disclosed;"

2.      "whether this element of confidentiality is essential to 'the full and satisfactory maintenance of the relation between the parties;'"

3.      whether such relationship "is a vital one, which 'ought to be sedulously fostered;'" and

4.      whether "'the injury that would inure to the relation by the disclosure of the communications (would be) greater than the benefit thereby gained for the correct disposal of litigation.'"

*Id.* at 23 (quoting *Finch, supra*). Each of these four conditions must be met before a federal court should recognize a state privilege. *Finch*, 638 F.2d at 1344.

As to the first and third factors, DLC does not dispute that they are likely met in this case. As to the second factor, the Court of Appeals for the Ninth Circuit and at least two federal district courts have held that confidentiality is not necessary to the medical peer review process. *Agster v. Maricopa County*, 422 F.3d 836, 839 (9th Cir.2005) ("we are not convinced by the County's argument that such reviews will cease unless kept confidential by a federal peer review

privilege."); *Jenkins*, 242 F.R.D. at 659; *Nilavar*, 210 F.R.D. at 608; *but see also Administrative*

*Subpoena*, 400 F. Supp. 2d at 391.  As the *Jenkins* court explained:

> <u>The Court is not certain that the peer review privilege, and a total embargo upon
> the reports that are produced during such meetings, is essential to the peer review
> process</u>.  *See* Susan O. Scheutzow, *State Medical Peer Review:  High Cost But No
> Benefit-Is It Time for a Change?*, 25 Am. J.L. & Med. 7, 8 (1999) ("[A]nalysis of
> data available from the National Practitioner Data Bank (NPDB), suggests that
> peer review protection statutes do not encourage peer review.").  The answer to
> the question turns on what the purpose of the privilege is.  If the purpose is to
> encourage more peer review, the answer is simple.  <u>There is little data to suggest
> that states with more robust privilege statutes have more peer review</u>.  *Id.* at 49.
> . . .
>
> On the other hand, one might argue that even though the privilege does not
> necessarily encourage peer review, or address any one of a number of reasons that
> doctors or hospitals do not engage in peer review, when peer review does take
> place, the privilege encourages candor, which is essential to the quality of that
> review.  <u>The Court is not aware of any studies supporting this claim.</u>  [Citation
> omitted.]  Physicians have an incentive to identify bad practices or to call out poor
> physicians.  Oftentimes, one bad doctor can draw an entire medical team into a
> lawsuit, or undermine the reputation of a medical care facility.  Doctors have an
> incentive to identify such bad doctors.  <u>There may be a need for some
> confidentiality, or even legal immunity for the participants, but that is a far cry
> from the need for an absolute embargo upon peer review information.</u>  [Citation
> omitted.]

*Jenkins*, 242 F.R.D. at 659-60 (refusing to adopt a medical peer review privilege) (emphases

added).  In arriving at the same conclusion, the Southern District of Ohio explained its reasoning

as follows:

> Without the comforting guarantee of absolute confidentiality, it is unlikely that, in
> the clergy-penitent context, many people of faith would seek penitence or spiritual
> guidance; or that, in the attorney-client context, the truth in both civil and criminal
> matters would be anything more than an illusory ideal; or that, in the
> psychotherapist-patient context, emotionally distraught individuals would seek
> professional consultation for their illnesses. <u>Defendants have not convinced this
> Court that the need for confidentiality in the [medical] peer review process, as
> implicated in this particular case, rises to the highest level of importance as it does
> in those other contexts, or that the process will not function properly in the
> absence of a federal evidentiary privilege.</u>

*Nilavar*, 210 F.R.D. at 608 (refusing to adopt a medical peer review privilege) (emphasis added).

In this case in particular, there is <u>no</u> danger that this Court's decision will impact UMCHP's

decision to continue to perform medical peer reviews for the DOC—UMCHP is no longer providing mental health or medical services to the DOC, and hence not conducting peer reviews in any case.

Although the absence of the second *Hampers* factor is sufficient to support a holding that Massachusetts's medical peer review privilege should not be recognized in this case, the absence of the fourth factor completely forecloses UMCHP's claim.  As stated above, the fourth test balances any injury to the medical peer review relationship with the benefit gained by the disclosure of the assertedly privileged communications.  *Hampers*, 651 F.2d at 23.  This fourth factor weighs overwhelmingly in favor of disclosure in three key ways.  First, the information sought in the DOC and UMCHP Reports cannot be obtained elsewhere.  *See, e.g., id.* at 23; *Finch*, 638 F.2d at 1344.  Second, the information sought in the DOC and UMCHP Reports is necessary to prove DLC's allegations, and in fact, is likely to be the best source of evidence of its claims.  *See, e.g., Univ. of Pennsylvania*, 493 U.S. at 193 ("Indeed, if there is a 'smoking gun' to be found that demonstrates discrimination in tenure decisions, it is likely to be tucked away in peer review files."); *Nilavar*, 210 F.R.D. at 608 (citing *LeMasters v. Christ Hosp*, 791 F. Supp. 188, 191 (S.D. Ohio 1991); *Memorial Hosp. For McHenry County v. Shadur*, 664 F.2d 1058, 1063 (7th Cir. 1981); *Pagano*, 145 F.R.D. at 695; *Swarthmore Radiation Oncology, Inc. v. Lapes*, Civ. No. A-92-3055, 1993 WL 517722, at *3 (E.D. Pa. Dec. 1, 1993); *Price v. Howard County Gen. Hosp.*, 950 F. Supp. 141, 144 (D. Md. 1996)).

Third, and most importantly, courts have recognized that full disclosure of peer review materials is particularly important in cases—like this one—that seek to enforce federal civil rights, including prisoner cases under Section 1983.  *See, e.g., Krolikowski*, 150 F. Supp. 2d at 249 (holding that access to information that might support a party's Title VII discrimination claim was more important than protecting medical peer review confidentiality); *Leon v. County of San Diego*, 202 F.R.D. 631, 636 (S.D. Cal. 2001) (holding that "special concerns about the protection of federal substantive law also weigh in favor of rejecting the state law claim" in case where prisoner's estate alleged deliberate indifference).

In these circumstances, courts have reasoned as follows:

- **In a case where a prisoner's estate sought peer review materials concerning the prisoner's suicide:** "Although the interests reflected in the state privilege are important, they are insufficient to outweigh the need for probative evidence in this case.  At issue in Plaintiffs' action are questions integral to the development of federal policy concerning the civil rights of inmates suffering from mental health problems.  And to preclude discovery of the Mortality Review report here would be detrimental to the development of that policy." *Weiss v. County of Chester*, 231 F.R.D. 202, 206-07 (E.D. Pa. 2005) (refusing to apply Pennsylvania's medical peer review privilege).

- **In a case where a prisoner's estate sought a "morbidity and mortality report" bearing on the death of the prisoner:**  "There are unique considerations at play in a post-death investigation ordered by a county jail that dramatically weaken the case for recognizing the privilege.  A review of a deceased inmate is not the straightforward evaluation of medical care that occurs in the civilian context.  The generation of post-death reports, including the one at issue in this case, may include details such as when jail officials notified medical officials of a particular problem, and whether there was a reason for non-medical officials to have monitored a situation more closely.  The report may verify the fact that a jail official failed to notify medical personnel.  Not only is this type of information 'nonmedical', but it is also may shed light, or at least raise an inference, of jail customs or policies. . . .  Given the extreme difficulty prison inmates face in obtaining evidence of jail customs or policies, it is unlikely that access to a prisoner's medical records is enough." *Jenkins*, 242 F.R.D. at 660 (refusing to apply Georgia's medical peer review privilege) (emphasis added).

- **In a case where a prisoner's estate sought a mortality review concerning the death of the prisoner:** "Whereas in the ordinary hospital it may be that the first object of all involved in patient care is the welfare of the patient, in the prison context the safety and efficiency of the prison may operate as goals affecting the care offered.  In these circumstances, it is peculiarly important that the public have access to the assessment by peers of the care provided." *Agster*, 422 F.3d at 839 (refusing to apply Arizona's medical peer review privilege) (emphasis added).

- **In a case where the ACLU sued state officials for violation of constitutional rights by surveilling their activities:** "In this case, however, the federal interest in an independent evaluation of the claimed privilege is particularly strong.  The purpose of enacting s 1983 was to ensure an independent federal forum for adjudication of alleged constitutional violations by state officials; and, as we noted in *Carr*, there

> is a 'special danger' in permitting state governments to define the scope of
> their own privilege when the misconduct of their agents is alleged.
> [Citation omitted.] Moreover, the information contained within the
> Sovereignty Commission's files cannot be obtained by any method other
> than examination of the files." *Finch*, 638 F.2d at 1343-44 (emphasis
> added).

Indeed, "nearly every United States district court that has addressed the issue in the context of section 1983 litigation brought on behalf of jail or prison inmates has rejected the assertion of privilege." *Jenkins*, 242 F.R.D. at 659. Like the cases cited above, this is a Section 1983 case in which DLC is seeking to enforce the civil rights of its constituents (prisoners with mental illness). Like the cases cited above, the key evidence to DLC's case is whether UMCHP counseled the DOC against placing prisoners with mental illness in segregated confinement units, and whether their placement in those units contributed to the suicide of certain prisoners—information that resides solely in the DOC and UMCHP Reports and related documents and proceedings. Like the cases cited above, the DOC and UMCHP Reports likely contain information "such as when jail officials notified medical officials of a particular problem, and whether there was a reason for non-medical officials to have monitored a situation more closely." *Jenkins*, 242 F.R.D. at 660. In the absence of any compelling circumstances unique to this case, this Court should follow these courts' lead: it should refuse to recognize the Massachusetts medical peer review privilege and order UMCHP to produce the DOC and UMCHP Reports.

C.     **The DOC and UMCHP Reports Do Not Qualify For the Massachusetts Peer Review Privilege**

Even if this Court were to adopt the Massachusetts peer review privilege, UMCHP still must prove that it applies to the DOC and UMCHP Reports. *See Swartz v. Cartwright*, Civ. No. 000059, 2002 WL 31379860, at *4 (Mass. Super. July 19, 2002) (holding the party asserting the privilege has the burden to establish it applies) (citation omitted). The statutory medical peer review privilege in Massachusetts provides that "proceedings, reports and records of a medical peer review committee shall be confidential and shall not be subject to subpoena or discovery, or introduced into evidence, in any judicial or administrative proceeding."

M.G.L. c. 111, § 204.   However, the linchpin of the statute is that authors of any such proceedings, reports, or records must establish that the documents were, in fact, the product of a recognized <u>medical</u> <u>peer</u> <u>review</u> <u>committee</u>.   *Miller v. Milton Hosp. & Medical Center*, 766 N.E.2d 107, 111 (Mass. App. Ct. 2002).

> As defined by statute, a medical peer review committee is

> a committee of a state or local professional society of health care providers . . . or of a medical staff of a public hospital or licensed hospital or nursing home or health maintenance organization organized under chapter one hundred and seventy-six G . . . which committee has as its function the evaluation or improvement of the quality of health care rendered by providers of health care services, the determination whether health care services were performed in compliance with the applicable standards of care, the determination whether the cost of health care services were performed in compliance with the applicable standards of care, determination whether the cost of the health care services rendered was considered reasonable by the providers of health services in the area, the determination of whether a health care provider's actions call into question such health care provider's fitness to provide health care services, or the evaluation and assistance of health care providers impaired or allegedly impaired by reason of alcohol, drugs, physical disability, mental instability or otherwise . . . .

M.G.L. c. 111, § 1.

Here, because UMCHP has provided DLC with next to no information about how the DOC and UMCHP Reports were produced (indeed, they have not even provided a privilege log identifying the title or authors of the documents), it has not met its burden to show a "medical peer review committee," within the meaning of the statute, generated either.   *See Miller*, 766 N.E.2d at 112 (remanding to trial court where appeals court was unable to conclude whether document was product of peer review committee or not).

Even without the benefit of a privilege log confirming DLC's information and belief about the DOC Reports, it is highly unlikely that the DOC Reports are privileged.   *See generally, Porcher v. Commonwealth*, Civ. No. 0360014, 2005 WL 3670952 (Mass. Super. Nov. 30, 2005).

In *Porcher*, the court declined to grant a request by certain "medical defendants"[4] to recognize the state medical peer review privilege and withhold from disclosure two specific documents: an Executive Summary Investigation into the January 22, 2001 Death of Inmate Hakeem Obba at MCI-Cedar Junction and a Quality Assurance Mortality Suicide Review.  2005 WL 3670952, at *1.  These documents related to the death of a prisoner who had committed suicide while in the custody of DOC and under the care and supervision of UMCHP.  *Id.*  The court refused to recognize that a medical peer review privilege applied to either of these reports.  *Id.* at *1-2.

As to the Executive Summary Investigation, the court stated that it was "nothing more than a factual summary of the circumstances involving the suicide of [an inmate] and the circumstances leading up to his death" and thus not eligible for protection.  *Id.* at *1.  As to the Quality Assurance Mortality Suicide Review, the court held since the report was prepared by a panel that consisted of DOC employees and two doctors/consultants paid for by the Commonwealth, in contrast to a report prepared by a professional society of care providers, medical staff of a hospital, nursing home or health maintenance organization, the Quality Assurance Mortality Suicide Review was not privileged, and was subject to discovery in that case. *Id.*

Upon information and belief, what has been referred to in this brief as "DOC Reports," are, in fact, Quality Assurance Mortality Suicide Reviews—which the Massachusetts Superior Court has determined do not fall under the aegis of the Massachusetts medical peer review statute.  However, even if they are not exactly the same documents, presumably the DOC Reports, like the Quality Assurance Mortality Suicide Review, are reports on meetings in which DOC personnel attended, which mandates the conclusion that the constituents of those meetings are neither members of a professional society of care providers or medical staff of a hospital,

---

[4] The court in *Porcher* does not specify who the "medical defendants" are, but the docket indicates that at least one of the defendants was affiliated with the University of Massachusetts Medical School.

nursing home, or health maintenance organization. *Id.* Therefore, the DOC Reports cannot be medical peer review documents, and UMCHP should be compelled to produce them.

As to the UMCHP Reports, it is UMCHP's burden to prove they should be subject to privilege. *See Swartz*, 2002 WL 31379860, at *4. UMCHP has failed to do so, and hence it should be compelled to produce them.

### D.     The UMCHP and DOC Reports Are Not Protected Under HIPAA

The Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 (1996) and the correlating Privacy Standards for Individually Identifiable Health Information and Security Standards, 45 C.F.R. §§160 *et seq.* and 164 *et seq.* (collectively, "HIPAA") provides immunity from disclosure for certain types of qualifying "protected health information." *Id.* at §160.03. Without having ever seen either the UMCHP Reports nor the DOC Reports, DLC is uncertain whether either type of report contains information that falls under the HIPAA rubric. However, even if either type of report contains qualified protected health information, neither the UMCHP Reports nor the DOC Reports are immune from disclosure under HIPAA's own terms.

Under HIPAA, an entity that is subject to its regulations and privacy standards may disclose protected health information "in response to a subpoena or discovery request . . . if the covered entity receives 'satisfactory assurance'. . . that the requesting entity has made reasonable efforts to notify the individual who is the subject of the [protected health information]; or that the requesting entity has made reasonable efforts to obtain a 'qualified protective order.'" LISA M. BOYLE AND DAVID M. MACK, HIPAA: A GUIDE TO PRIVACY AND SECURITY LAW 6:51 (6th Supp. 2007), *quoting* 45 C.F.R. §164.512(e)(1)(ii) (emphasis supplied). Thus, when a valid subpoena has issued, HIPAA requires either notification of the individual or a qualified protective order. 45 C.F.R. §164.512(e)(1)(ii). As discussed, there is a valid protective order in this case. DLC explicitly informed UMCHP's counsel of that protective order, which is a matter of public record, on October 31, 2007. *See* Silveira Aff., ¶7 and Exhibit D (informing UMCHP counsel of existence of protective order).

To the extent UMCHP feels that it needs additional protection, DLC explicitly offered to consider a second protective order specific to UMCHP.  *See id.* (informing UMCHP counsel that "we are willing to enter into a protective order surrounding the morbidity and mortality reviews, in which we will agree not to distribute the documents to anyone outside the lawsuit, and to use the documents for the purpose of this lawsuit only.")  UMCHP's counsel did not request such a protective order, but in the event he feels one is necessary, DLC is willing to enter into one that adequately protects the interests of both parties.

### E.       The Patient-Psychotherapist Privilege Is Inapplicable

Finally, in the Initial Opposition filed by UMCHP in connection with DLC's original Motion to Compel (Docket No. 61), UMCHP asserts that the materials sought by DLC in its subpoena are "protected by [] the patient-psychotherapist privilege."  Initial Opposition at 5–7. In fact, neither state nor federal law support UMCHP's position.  As an initial matter, UMCHP does not have standing to assert the patient-psychotherapist privilege in this context.  The patient-psychotherapist privilege belongs to the patient, not to the medical provider, and UMCHP has no standing to assert the privilege on behalf of individual prisoners.  *See Commonwealth v. Oliveira*, 438 Mass. 325, 331–32 (2002) ("The privilege is not self-executing. The patient must therefore affirmatively exercise the [state patient-psychotherapist] privilege in order to prevent the psychotherapist from disclosing confidential communications….") (internal citations and quotations omitted).  Similarly, the federal privilege belongs to the individual patient, though "third persons may call the court's attention to the existence of the privilege on behalf of the owner of the privilege."  8 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE, §2016.1 (2008).  To the extent a provider may call the Court's attention to the existence of the privilege, however, it "may be treated as only a temporary precaution pending confirmation of the patient's own intentions."  *Oliveira*, 438 Mass. at 332 n.8 (*citing* 8 J. WIGMORE, EVIDENCE § 2386 (McNaughton rev.1961) (although physician witness may initially decline to answer on ground of patient's privilege, "still the claim of privilege must formally be

made ... by the patient, if he is before the court, or by his attorney; if he is not, then technically he should be given an opportunity to claim before the examination is proceeded with")).

In its Initial Opposition, UMCHP asserts the privilege not on behalf of the individual prisoners for whom UMCHP Reports exist, but rather on its own behalf in an attempt to avoid the subpoena absent a motion to quash.  UMCHP makes no showing that it ever attempted, despite nearly 17 months of sitting on the subpoena prior to this Court's issuance of a stay, to contact either the patients themselves or, in the event of a suicide, the executors of the patients' estates for whom UMCHP Reports exist, to notify them that it had been subpoenaed to provide such reports, so that either the executors or the patients themselves may object.  In addition, UMCHP has not shared with DLC the names of those patients for whom it has generated a UMCHP Report, thus leaving DLC entirely ill-equipped to contact those prisoners or executors itself.  Thus, because any alleged privilege does not belong to UMCHP, it has no standing to assert the privilege here, on its own behalf, and its argument should be entirely disregarded.

Furthermore, even if UMCHP has standing to assert the privilege under either state or federal law, it still may not assert the patient-psychotherapist privilege without evidence that the documents it seeks to protect from disclosure in fact contain privileged, confidential communications between a patient and his or her psychotherapist.  *See In re Grand Jury Proceedings (Gregory P. Violette)*, 183 F.3d 71, 73 (1st Cir. 1999) ("a party asserting a privilege has the burden of showing that the privilege applies.  To do so, the proponent of the privilege must set forth facts sufficient to establish all the elements of the claimed privilege."); *In re Adoption of Saul*, 804 N.E.2d 359, 366 (Mass. App. Ct. 2004) ("Without this information, the judge would have to resort to inferences concerning the actual status of the professionals whose signatures and initials appeared in the records and the contents of the entries to determine if they were made by a psychotherapist under [the state statute].") (internal citations omitted).  A party's "mere assertion of privilege . . . without providing specific information upon which the court can determine whether the asserted privilege in fact applies, falls short of satisfying [its] burden of

proof."   *Carpenter   v.   Massachusetts   Institute   of   Technology*,   Civ.   No.   03-2660,

2005 WL 1476542, *3 (Mass. Super. May 12, 2005).

UMCHP makes no affirmative showing that the subpoenaed documents actually qualify

for such protection.  It simply asserts that the UMCHP Reports, and apparently the entire files

related thereto, are protected by the privilege.[5]  Initial Opposition at 5–7.  In circumstances very

similar to the present case, the Massachusetts Superior Court in *Carpenter* ruled that medical or

mental health records were discoverable pursuant to a subpoena when there was:

> no indication to this court, by way of affidavit or otherwise, that the
> communications . . . were (a) made for the purpose of diagnosis and treatment of
> an emotional or mental condition, and (b) were made to a licensed
> psychotherapist or social worker.  Further, there isn't even an indication that [the
> patient's] counsel has taken the time to review the records in order to make these
> showings to the court.  Without such information, and only a blind assertion of
> privilege, the court is unable to separate non-privileged records from privileged
> records.

2005 WL 1476542, at *2.  Like the party opposing the subpoena in *Carpenter*, UMCHP makes

no showing in its Opposition, nor has it communicated to DLC in any way, what, specifically,

the UMCHP Reports or related documents contain by way of "confidential communications" to

establish that the records are privileged.  UMCHP alleges in its Initial Opposition (notably, the

first time it asserted the psychotherapist-patient privilege) only that the UMCHP Reports "are

based on the inmate's medical and mental health records and the memoranda and notes of the

intmate's treaters," and "are based solely on the protected records."  Initial Opposition at 6.  Like

in *Carpenter*, UMCHP's allegations are not supported by a shred of evidentiary support; thus

this Court should find that "any claimed privilege [if it exists at all] has been waived."  *See*

*Carpenter*, 2005 WL 1476542, *3 (emphasis supplied).

---

[5] Notably, UMCHP makes no assertion regarding the applicability of the patient-psychotherapist privilege
to the DOC Reports, or any notes or other documentation related thereto.

**F.     In Addition to the Relief Otherwise Requested, the Court Should Compel UMCHP to Produce a Privilege Log.**

Even if this Court decides to recognize either a medical peer review or psychotherapist-patient privilege applicable to the DOC Reports and/or the UMCHP Reports, that privilege has been waived.  Law in this circuit is clear: "A party that fails to submit a privilege log is deemed to waive the underlying privilege claim."  *In re Grand Jury Subpoena*, 274 F.3d 563, 576 (1st Cir. 2001) (*citing Dorf & Stanton Communications, Inc. v. Molson Breweries*, 100 F.3d 919, 923 (Fed. Cir. 1996) (holding that failing "to provide a complete privilege log demonstrating sufficient grounds for taking the privilege" waives the privilege)).  The Federal Rules of Civil Procedure mandate an exchange of logs describing documents or other materials that have been withheld in discovery for reasons of attorney-client, attorney work product, or any other guise of privilege.  *See* Fed. R. Civ. P. 26(b); 45(d).  Rule 45(d)(2), pertaining specifically to third parties subpoenaed under Fed. R. Civ. P. 45, specifically provides:

> A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must: (i) expressly make the claim; and (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

Fed. R. Civ. P. 45(d)(2)(A).  Despite this clear directive of the Federal Rules, UMCHP has refused to provide DLC with a privilege log, despite withholding documents on the basis of privilege, and has thereby waived any such assertion.[6]

DLC subpoenaed the DOC Reports, the UMCHP Reports, and a myriad of other documents from UMCHP on October 9, 2007.  UMCHP produced certain documents in January 2008, while at the same time indicating to counsel that it was withholding other documents—still, it has still failed to produce any sort of a privilege log despite the passage of nearly 17

---

[6] Counsel for UMCHP contends that certain of these documents are being withheld on the basis of attorney-client privilege.  *Silveira Decl.*, ¶13.  DLC does not challenge UMCHP's right to assert such a privilege; however, the basis, with supporting information by which DLC may determine whether it might challenge the propriety of such a withholding, still must be set forth on a privilege log.

months between receipt of DLC's subpoena and the Court's entry of a stay of this matter.

Incredibly, counsel for UMCHP has stated that it will not provide a privilege log because even disclosing the basic information which would be contained in such a log would waive certain privileges, such as disclosing to DLC those UMCHP meetings at which there was an attorney present,[7] which UMCHP counsel fears could subject his client to future liability.[8] Silveira Decl., ¶ 13.  DLC is unaware of any case law that supports such a position, and UMCHP has not provided any.  To the contrary, what the law does support is that failure to provide a privilege log will waive all asserted privileges, attorney-client, work product, or otherwise.  *See Grand Jury Subpoena*, 274 F.3d at 576 ("Although most of the reported cases arise in the context of a claim of attorney-client privilege, the 'specify or waive' rule applies equally in the context of claims of work product privilege.").  Thus, even if the Court is inclined to recognize any sort of medical peer review privilege, this case is not the appropriate case to do so, given that even if such a privilege existed, it has been waived by UMCHP.

## CONCLUSION

For all the reasons set forth above, the Court should grant DLC's Motion to Compel Production Of Documents From Third Party University of Massachusetts Correctional Health Program Pursuant to a Subpoena and require UMCHP, by a date certain, to provide DLC with (1) copies of the DOC Reports and any UMCHP notes or other documentation pertaining thereto; (2) copies of the UMCHP Reports and any notes or other documentation pertaining thereto; and,

---

[7] Indeed, the presence of an attorney is a factor that weighs against a finding that it was a "medical peer review committee" that generated the DOC and UMCHP Reports.  *See Pardo v. Gen. Hosp. Corp.*, Civ. No. 982174, 2001 WL 1174252, *5 (Mass. Super. Ct. July 30, 2001) (citing *Swatch v. Treat*, 671 N.E.2d 1004, 1006 (Mass. App. Ct. 1996)).

[8] In light of DLC's willingness to enter into a protective order, this contention is a non-starter.  The attorney-client privilege simply cannot be construed to protect the mere existence of the documents themselves.

(3) should also require UMCHP to produce a privilege log for any documents not ordered produced by the Court but still withheld on a ground of privilege or related doctrine.

Dated:  April 26, 2010                         Respectfully submitted,

Disability Law Center, Inc.,

By its attorneys,

_____/s/ Alison Hickey Silveira_____
David Yamin, BBO #562216
     david.yamin@bingham.com
Alison Hickey Silveira, BBO #666814
     alison.silveira@bingham.com
BINGHAM MCCUTCHEN LLP
One Federal Street
Boston, MA 02110-1726
(617) 951-8000

Richard M. Glassman, BBO #544381
     rglassman@dlc-ma.org
Karen Talley, BBO #644764
     ktalley@dlc-ma.org
Nancy Botta, BBO #663749
     nbotta@dlc-ma.org
DISABILITY LAW CENTER, INC.
11 Beacon Street, Suite 925
Boston, MA  02108
(617)723-8455

James Pingeon, BBO #541852
     jpingeon@mcls.net
Leslie Walker, BBO #546627
     lwalker@mcls.net
Bonnie Tenneriello, BBO #662132
     btenneriello@mcls.net
Joel Thompson, BBO #662164
     jthompson@mcls.net
MASSACHUSETTS CORRECTIONAL LEGAL
SERVICES, INC.
8 Winter Street, 11th Floor
Boston, MA 02108
(617) 482-2773

Robert Fleischner, BBO #171320
rfleischner@cpr-ma.org
CENTER FOR PUBLIC REPRESENTATION
22 Green Street
Northampton, MA 01060
(413) 587-6265

James S. Rollins
*admitted pro hac vice*
james.rollins@nelsonmullins.com
NELSON, MULLINS, RILEY &
SCARBOROUGH LLP
One Boston Place
Boston, MA 02108
(617) 573-4722

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served electronically through the ECF system on all counsel of record on April 26, 2010.

_____/s/ Alison Hickey Silveira_____
Alison Hickey Silveira, Esq.