UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DISABILITY LAW CENTER, INC., <br><br> Plaintiff, <br><br> v. <br><br> MASSACHUSETTS DEPARTMENT OF CORRECTION, et al., <br><br> Defendants. | CIVIL ACTION <br> NO. 07-10463 (MLW) |

## JOINT MEMORANDUM IN SUPPORT OF THE PARTIES'
## JOINT MOTION TO APPROVE SETTLEMENT AGREEMENT

The parties have moved the Court to approve a negotiated comprehensive settlement of this matter (the "Settlement Agreement" or "Settlement").  The Settlement is fair, reasonable and adequate to resolve the claims in the plaintiff's Complaint.  The Settlement will benefit Massachusetts state inmates with serious mental illness who are in segregation or who have been sanctioned with segregation.  The case has been zealously litigated, negotiations have been lengthy, vigorous and conducted at arms' length, and the Settlement is the product of reasonable and considered compromise. Because the settlement discussions have been confidential, the Parties have moved the Court for leave to file the signed Settlement Agreement under seal pending its approval by the Court.

The Parties now request that the Court approve this Settlement Agreement and retain jurisdiction of the case as set forth in the Settlement Agreement. The Parties herein summarize the pertinent history of the litigation and the settlement process and describe the salient features of the Settlement Agreement. The Parties' description of the Settlement Agreement is not intended to modify the terms of the Settlement Agreement or to be utilized for interpretation of the Settlement Agreement, but is offered solely in support of the Parties' joint motion. The Parties will be pleased to provide any additional information that may be helpful to the Court.

### I.  The Complaint and Answer

Following an investigation prompted in part by reports of suicides in Massachusetts Department of Correction ("the Department") facilities, the Disability Law Center ("DLC" or "Plaintiff")[1] initiated this action on behalf of its constituents with serious mental illness against the Department and individual Department administrators in their official capacities (collectively, the "Defendants"), on March 8, 2007.  The Complaint alleged three counts: cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments; violations of Paragraph 504 of the Rehabilitation Act of 1973; and violations of the Americans with Disabilities Act. Complaint (Doc. No. 1, ¶¶ 73, 78, 84).

The Defendants answered on May 7, 2007, denying the allegations in the Complaint (Doc. No. 18). The Answer also detailed certain Departmental initiatives commenced prior to the initiation of the litigation including the implementation of recommendations made by the Department's expert consultant on prison suicide prevention, Lindsay M. Hayes, (Doc. No. 18, ¶¶ 21 - 30, 34, 65, 66, 68) and mental health initiatives described in the Department's then-pending December 15, 2006 request for response for new medical and mental health services contracts (including a maximum security residential treatment unit and behavioral management unit) (Doc. No. 18, ¶ 30).

Discovery commenced shortly after a Rule 16(b) scheduling conference on September 5, 2007.

### II. Settlement discussions in 2007 – 2008.

In November 2007, the Defendants provided the plaintiff with a detailed plan for the management of mental health needs of inmates within the Department that the Department had developed in response to Mr.  Hayes' report. The parties began meeting on November 21, 2007 using the plan as a starting point for settlement discussions.  The Plaintiff agreed to

---

[1]  DLC is the protection and advocacy agency for individuals with disabilities Massachusetts. Under the provisions of the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq.*, DLC is authorized to pursue legal, administrative and other appropriate remedies to ensure that individuals with mental illness are protected from abuse and neglect. 42 U.S.C. § 10802, 10805. Complaint, ¶ 1 (Doc. 1, p. 2).

some voluntary limits on discovery during these settlement discussions.  The parties met regularly to discuss settlement in 2008.  After reaching an impasse on several matters, the parties jointly requested a settlement conference with the Court. The Court agreed.[2]  The parties continued to regularly confer and met jointly with the Court four times over the following several months.  In the course of the meetings with the Court, the Court stayed discovery generally, but allowed limited discovery to proceed, including expert visits to Department facilities and discovery needed for settlement discussions.[3]  Order, March 21, 2008 ¶3 (Doc. 51, at 2).

Despite the efforts of the Court and the parties, the settlement discussions were not successful.  The negotiations ultimately failed because of disagreements that arose in the context of the Commonwealth's financial crisis at that time.  Accordingly, after nearly two years of settlement discussions, the parties notified the Court on November 6, 2009 that settlement negotiations had terminated.  Defendants' Proposed Amended Scheduling Order, Nov. 6, 2009 (Doc. 109, at 1); Plaintiff's Request to Lift the Stay of Discovery and Proposed Amended Scheduling Order, Nov. 6, 2009 (Doc. 110, at 1).

Thereafter, the Court lifted the stay of discovery on February 10, 2010 and entered a revised scheduling order.  Order and Amended Scheduling Order, Feb. 10, 2010 (Docs. 119-1 and 119-2).

### III.  Discovery

Following the lifting of the stay, the parties engaged in extensive discovery. For the purpose of supporting the Parties' representation that this Settlement Agreement is founded upon the informed professional judgment of the Parties and their counsel, the scope of

---

[2] At the Court's request, each of the parties confirmed that it would not request the Court's recusal based on its effort to mediate a settlement.  Joint Submission in Accordance with the Court's March 10, 2008 Order (Doc. 48, at 3); Clerk's Notes (Doc. 50).

[3] With the Court's permission, some of the parties' experts (Drs. Jeffrey Metzner and Kathryn Burns) participated in one of the conferences. *See* Electronic Clerk's Notes Sept. 11, 2009 (No document number).

discovery is summarized in the following paragraphs.

### A. Expert Consultation and Tours

DLC and its experts made several extensive tours of Department facilities and met with well over one hundred individual inmates in those facilities.  On November 27-29, 2006, prior to DLC filing the Complaint, one of DLC's experts, Kathryn Burns, M.D., a knowledgeable prison psychiatrist with significant experience as an expert witness and as a monitor of prison mental health litigation, visited several facilities and met with individual inmates. After the filing of the Complaint, Dr. Burns returned to the facilities during September 17 to 21, 2007, accompanied by two other DLC experts, Craig Haney, Ph.D., a psychologist, and Walter Kautzky, an experienced prison administrator and a former state corrections commissioner. All three experts met with individual inmates, toured segregation units in six facilities and spoke to Department staff. [4]

Dr. Burns also returned four times during the litigation.  First, from February 4 to 8, 2008, she met with inmates in the DDU and 10-Block units at MCI-Cedar Junction.  She returned from April 23 to 28, 2008, during which time she reviewed inmates' medical records at MCI-Cedar Junction and met with individual inmates.  In June, 2010, Dr. Burns toured the DDU at MCI-Cedar Junction and the Secure Treatment Program ("STP") at the Souza Baranowski Correctional Center ("SBCC") and met with individual inmates.  Finally, Dr. Burns toured several facilities, including MCI-Cedar Junction, SBCC, the Old Colony Correctional Center ("OCCC"), and MCI-Framingham and met with inmates from January 4 to 7, 2011.

In addition to the tours with their experts, on August 20, 2008, DLC's counsel had the opportunity to visit, observe programming and meet with inmates in the STP, which had been opened to remediate some of the same concerns addressed in the Complaint.

---

[4] Dr. Haney returned to the facilities on three more occasions.  On January 21-25, 2008 and again from March 31-April 11, 2008, he met with dozens of individual inmates housed in the Department Disciplinary Unit ("DDU") at MCI Cedar Junction.  On November 29 - December 3, 2010 he toured Old Colony Correctional Center ("OCCC"), the DDU, the Behavioral Management Unit ("BMU"), and the 10-Block segregation unit at MCI Cedar Junction, and Souza Baranowski Correctional Center ("SBCC"), including the Secure Treatment Unit, and interviewed inmates at those facilities.

The Department retained as its expert and consulted closely with Jeffrey Metzner, M.D., a forensic psychiatrist with extensive correctional psychiatric experience, including expert consultation and monitoring in significant prison mental health systems litigation.  Dr. Metzner visited Department facilities and provided consultation to Department officials on numerous occasions.[5] The Defendants have also benefited from two studies undertaken by their suicide prevention expert, Lindsay M. Hayes.[6]

### B.    Other Discovery

The parties engaged in document and ESI discovery.  In response to DLC's requests for production of documents, the Defendants produced thousands of printed pages of documents and prisoner records.

The Plaintiff also sought and obtained document discovery from the University of Massachusetts Medical School Correctional Health Program ("UMCH"), the Department's current medical services vendor and former mental health vendor, and MHM Services, Inc., the Department's current mental health vendor.

The plaintiff has taken fifteen depositions, including of twelve individuals who are not parties to this litigation.[7]  DOC noticed a Rule 30(b)(6) deposition of DLC but DLC obtained a

---

[5] Dr. Metzner made site visits to MCI-Cedar Junction, SBCC and MCI-Shirley on May 12, 2007, to MCI-Cedar Junction and SBCC on December 7, 2009, to OCCC on December 8, 2009, to MCI-Cedar Junction on January 25, 2011, to OCCC on January 26, 2011, to SBCC on January 27, 2011, to MCI-Framingham on January 28, 2011, to SBCC and MCI-Shirley on October 30, 2011, and to MCI-Cedar Junction and MCI-Norfolk on September 1, 2011.  In addition, Dr. Metzner consulted with Department officials multiple times via telephone during the litigation.

[6] Inasmuch as non-expert discovery remained outstanding, the parties have not disclosed their experts, have not produced a written report, and have not conducted expert discovery. *See* Fed. R. Civ. P. 26(a)(2).  However, throughout the course of the litigation, including during settlement discussions, the parties have consulted with, relied on and benefited from their experts' substantial experience, wisdom and advice.

[7]    The following individuals were deposed: Dale Bissonette, then Administrator of the DDU; Christopher Fallon, then DDU Captain; Kenneth Applebaum, M.D., the former Director of Mental Health of the University of Massachusetts Correctional Health Program (UMCH), the Department's former mental health provider; Patricia Onorato, then Executive Director of UMCH; Lindsay M Hayes, author of the suicide prevention reports; Joel T. Andrade, Ph.D., Clinical Director of MHM Services, Inc.; Lawrence Weiner, then the Department's Director of Behavioral Health and currently the Department's Assistant Deputy Commissioner for Clinical Services; James Bender and Veronica Madden, each then a Department of Correction Deputy Commissioner; Terre Marshall, then the Assistant Deputy Commissioner for Clinical Services; Harold Clarke, then Commissioner of Correction; Karen Bergeron, then Superintendent of OCCC; Lynn Bissonette, Superintendent of MCI-

protective order. Order on Disability Law Center, Inc.'s Motion for a Protective Order (Feb. 4, 2011) (Doc 171) (Boal, MJ).

The Defendants served written interrogatories which the Plaintiff has answered.

### C. Current Status of Discovery

After several extensions, non-expert discovery closed on June 6, 2011.  *See* Docket entry for March 29, 2011 (setting scheduling order deadlines).  Because the Plaintiff believed some discovery remained incomplete, it filed a motion to compel. directed to the Defendants (Doc. 197).

Full resolution of that motion was still pending when the parties reached a tentative settlement on October 21, 2011.  The parties notified the Court and jointly moved to cancel future scheduled status conferences. Joint Motion for Order to Cancel Upcoming Status Conferences (Doc 246).  That motion was granted on October 25, 2011 (Electronic Order 10/25/2011) (granting motion and ordering parties to "file a joint status report within thirty days unless they file a joint motion to approve a settlement agreement before the status report is due.") (Boal, MJ). The Parties filed a report on November 17, 2011 informing the Court that they had received the approval of all necessary parties and other stakeholders and were drafting a joint motion for approval. Joint Status Report (Doc. 247). The Magistrate Judge ordered the Parties to file a status report or a joint motion for approval within thirty days. Electronic  Order November, 18, 2011 (Boal, MJ).

### III. Renewed Negotiations

Prior to the accord on the Settlement Agreement, the Department had undertaken several initiatives designed to serve inmates with serious mental illness who are in or are referred to segregation.  These initiatives, which the Defendants describe more fully in the Introduction to the Settlement Agreement, include the implementation of a Mental Health

---

Framingham; Roland Rheault, then STP Director; and William Micucci, the Mental Health Director at MCI Cedar Junction.

Dr. Applebaum and Ms. Oronato also were deposed pursuant to F. R. Civ. P. 30(b)(6) as corporate representatives for UMCHP.  Dr. Andrade was deposed individually and as the corporate representative of MHM Services, Inc.

Classification system; a policy to exclude inmates with SMI from long-term segregation; the design and operation of two maximum security mental health treatment units designed to serve as alternatives to segregation: the Secure Treatment Program ("STP") and the Behavior Management Unit ("BMU"); and the design and operation of Residential Treatment Units ("RTUs"). The STP and the BMU are collectively referred as Secure Treatment Units ("STUs") in the Settlement Agreement.

Motivated in part by the Defendants' efforts in these and other areas, in February 2011 the parties agreed to restart settlement negotiations. The primary goals of the renewed negotiations were to design an agreement that would incorporate and expand the initiatives, to ensure adequate and appropriate mental health care for inmates with SMI who are placed in segregation or sanctioned with segregation, to provide the Defendants sufficient flexibility to meet the changing needs of inmates with SMI, to recognize the state's fiscal limitations and to establish a reasonable and fair system for administering the settlement. The parties believe they have negotiated a Settlement Agreement that is fully consistent with those goals.

The parties began meeting in early April 2011 to discuss a written proposal prepared by the Plaintiff. Although some important portions of the 2007-2008 draft settlement agreement were incorporated into the new draft, the parties agreed to engage in the negotiations with fresh ideas, guided by their experience, the discovery, the current status of the Defendants' initiatives and the advice of their experts. The parties' efforts were also informed by agreements and court orders in other jurisdictions. Early meetings, which usually included then-Deputy Commissioner for Classification, Programs and Re-entry Veronica Madden and now Assistant Deputy Commissioner for Clinical Services, Lawrence Weiner, were productive and the parties agreed to continue meeting and exchanging proposals. The parties met in person nine times and exchanged more than a dozen drafts of an agreement.

Negotiations were candid and at arms length and conducted without collusion. The final Settlement Agreement is the product of skillful and forceful advocacy by both sides and the willingness of each to compromise. A few issues proved particularly difficult to resolve and were the subject of intensive examination and debate. For example, the parties

understood that there might be occasions when the number of inmates with SMI who were eligible for alternative treatment programs – the STUs -- exceeded the capacity of the units. The parties disagreed what should happen in that circumstance and resolution was elusive for several months.  It was only when a compromise was reached on this difficult issue that it became apparent that settlement was likely. *See* paragraph II of the Agreement.

**IV.     The Settlement Agreement.**

From the Plaintiff's perspective, the Settlement Agreement accomplishes its main goals in bringing this case.  Most importantly, it requires the Defendants to maintain the current number of STU beds for SMI maximum security inmates who would be vulnerable to deterioration in segregation, yet who cannot be managed safely in general population.  As described more fully in the Settlement Agreement, absent exigent circumstances, Defendants may not house an inmate with SMI in the DDU unless he has been approved for placement in an STU and receives enhanced mental health services and additional out-of-cell time while he is awaiting the transfer.  It also calls for Defendants to strictly regulate the amount of time that inmates with SMI can be housed in other segregation units, and also requires that they receive expanded mental health services and out-of-cell time.

From the Defendants' perspective, the Settlement Agreement acknowledges and memorializes the significant initiatives that the Department has already implemented to enhance the delivery of mental health services, largely utilizing existing budgetary and staffing resources, in a manner that is fiscally responsible. These initiatives have enabled the Department to better manage violent and self-injurious inmates with SMI. The systemic impact of these initiatives has been manifested by significant reductions in self-injurious behavior, crisis intervention, psychiatric hospitalization, disciplinary reports and use-of-force incidents, with concomitant decreases in staff industrial accidents.

The Settlement Agreement is similar, though not identical, to settlements and court orders in other cases in other jurisdictions.[8] It is in accord with the parties' experts'

---

[8] As examples of such settlement agreements and unreported court decisions the Plaintiff notes the following: *Mast v. Donahue*, No. 2:05-cv-00037 LJM/WGH ¶¶ 11-16 (S.D. Ind. Jan. 23, 2007) (settlement agreement excluding seriously mentally ill prisoners from Secured Housing Units); *Austin*

recommendations.

The Settlement Agreement contains twelve sections and an introduction.  Each part is briefly summarized below.

*Introduction*.   This section includes a description of the case and the Parties' representation that the agreement is "fair, reasonable and adequate."  Neither side admits any infirmity with their claims or defenses.  The Defendants describe in detail various initiatives they have undertaken to enhance the delivery of mental health services to inmates.

I. *Definitions*.  This section contains numerous critical definitions that, in part, describe the inmates who will benefit from the Settlement Agreement, including definitions for "Serious Mental Illness" ("SMI"), "Segregation," and "Exigent Circumstances."  Other words and terms are also defined.

The definitions are the product of extended negotiations and are similar, though not identical, to definitions in court decisions and settlements in similar cases.  The Parties' experts and the Department's clinical staff and contractors were consulted throughout the negotiation of several of the definitions, particularly the definition of SMI, which the Defendants have been employing for over a year.

II. *Screening and Evaluation of Inmates in Segregation to Determine SMI*.  This section establishes the procedures that the Department will follow to screen and evaluate inmates who

---

*v. Wilkinson*, Civ. No. 4:01-CV 071 (N.D. Ohio, Nov. 21, 2001) ¶17 (N.D. Ohio. Nov. 21, 2001) (stipulation for injunctive relief); *Jones'el v. Berge,* No. 00-C-421-C ¶¶ 4.6 (W.D. Wis. June 24, 2002) (settlement specifying that no seriously mentally ill prisoners will be sent to supermax prison; nor will they remain in supermax prison); *Disability Advocates, Inc., v. New York State Office of Mental Health*, 02-Civ-4002 (GEL) ¶¶ 1-4 (S.D.N.Y. Apr. 2007) (settlement increasing out-of-cell therapeutic programming and treatment to two hours per day, five days per week to all inmates in SHU who meet DSM criteria and establishing Residential Mental Health Unit for inmate-patients); *Office of Prot. and Advocacy for Persons with Disability v. Choinsky*, Civ. No. 3:03-CV 1352 (RNC) ¶¶ 3-4 (D. Conn. Mar. 8, 2004) (removing seriously mentally ill inmates from Connecticut's Northern Correctional Institution and excluding them from segregation, unless Defendant demonstrates that prisoner poses extreme danger, that there are no other alternative institutions, and that treatment is provided while in segregation).

Published court decisions include *Madrid v. Gomez*, 889 F. Supp. 1146, 1205 (N.D. Cal. 1995) (stating that inmates with serious mental illness cannot be housed in segregation unit at supermax facility) and *Jones'el v. Berge*, 164 F. Supp 2d 1096, 1123 (W.D. Wis. 2001) (holding that public interest would not be served by housing seriously mentally ill inmates under conditions in which they risked irreparable emotional damage and risk of death by suicide).

have or may have SMI before and after they are placed in Segregation.  It requires, among other things, that all inmates be evaluated by a health care professional prior to placement in Segregation, including DDU (Settlement Agreement ¶ II A); establishes that mental health rounds will be made two times a week in DDU and all SMUs (Settlement Agreement ¶¶ II B and II D); requires face-to-face (out-of-cell) assessments of inmates in Segregation by mental health clinicians, absent exigent circumstances or inmate refusal (Settlement Agreement ¶ II C 3); and, requires that inmates in Segregation determined to have SMI be removed from Segregation subject to the procedures set forth in paragraph III (Settlement Agreement ¶ II C 4).

III. *Housing and Review of Inmates with Serious Mental Illness.*  The provision of alternatives to Segregation for SMI inmates is the heart of the Settlement Agreement.

Subparagraphs A and B restrict the placement of inmates with SMI in Segregation units.  Except in exigent circumstances, inmates with SMI may not be confined in the DDU. Inmates with SMI may not be confined in an SMU for more than thirty days.  However, these subparagraphs provide for the possibility that there may be times when the Department lacks an appropriate alternative placement – an STU bed -- for an inmate with SMI with a DDU sanction or who is in an SMU (Settlement Agreement ¶¶ III A & B).  In such a circumstance, the SMI inmate may be retained in Segregation awaiting placement but must be provided additional mental health services, out-of-cell activities and, in the case of DDU, certain privileges as well. (Settlement Agreement ¶¶ III A 1 & III B 1 & 2.)

The provisions of subparagraphs A and B were subject to prolonged and intense negotiation.  Each of the parties compromised their initial positions in the interest of reaching agreement on a clinically and operationally appropriate and pragmatic solution.  The subparagraphs incorporate the critical clinical understanding that inmates with SMI ordinarily should not be housed in DDU or in an SMU for more than thirty days.  The parties also recognized, however, that as a practical matter, the Department may on occasion lack adequate capacity to serve all such inmates in appropriate alternative placements.  In that event, the Defendants have agreed to provide additional mental health and out-of-cell time to the inmates

with SMI while they are awaiting placement.

Subparagraph C provides for the limited circumstances in which an inmate with SMI may be terminated from an STU prior to completing the program and returned to Segregation. (Settlement Agreement ¶ III C.)

Subparagraph D establishes the Department's internal administrative procedures for reviewing the status of inmates with SMI who are in or sanctioned to Segregation:

- A facility based Institutional Segregation Committee will meet at least weekly to review the status of inmates with SMI in Segregation at that facility (Agreement ¶ III D 1);

- A Central Office Segregation Oversight Committee will develop strategies to reduce the time spent in Segregation by inmates with SMI and will conduct a monthly review of the circumstances of inmates with SMI who are in Segregation for more than thirty days (Agreement ¶ III D 2); and

- Finally, a Secure Treatment Review Committee shall review all STU referrals and determine in which STU an inmate with SMI shall be placed (Agreement ¶ III D 3).

Each of the committees described in subparagraph D is currently in operation.

IV. *Specialized Treatment Units and Other Methods to Reduce Placement of SMI Inmates in Segregations.* This section describes the two STUs, the STP and the BMU, currently being operated by the Department. These housing units are designed as alternatives to Segregation for SMI inmates who have received DDU sanctions or who otherwise require intensive mental health treatment in maximum security. The Department agrees to maintain the current number of STU beds during the term of the Agreement (Settlement Agreement ¶ IV A 2). [9]

The STP is a nineteen bed unit at Souza Baranowski Correctional Center. The BMU is a ten bed unit at MCI Cedar Junction. (Settlement Agreement ¶ IV A 1.)  The provisions of this paragraph include descriptions of unit programming (Settlement Agreement ¶ IV B 1), out-of-cell time (Settlement Agreement ¶ IV B 2), treatment planning (Settlement Agreement ¶ IV B

---

[9] The Department may reduce the number of STU beds only if it determines that fewer beds are adequate to ensure that no inmate with SMI is housed in segregation in violation of the time limits in the Agreement.

3, and staffing (Settlement Agreement ¶ IV B 4). Treatment programming and out-of-cell time, in particular, significantly exceed what is currently offered in Segregation. Plaintiff's counsel and its experts toured and interviewed inmates housed in the RTUs, the STP and the BMU. Defendants' expert also toured these units, and he provided invaluable consultation to the Defendants on their operation.

V. *Mental Health Watch.* Mental health watch is used when mental health staff have reason to believe that an inmate is at risk of suicide or other possible harm. Among other things, this paragraph requires that an inmate returning to segregation from mental health watch be assessed by a mental health clinician on the third and seventh day following discharge. (Settlement Agreement ¶ V.) The provisions of this section are consistent with suicide prevention expert Lindsay M. Hayes's recommendations in his reports to the Department.

VI. *Role of Mental Health Staff in Disciplinary Process; Related Disciplinary Issues.* Inmates may be placed in segregation as a result of the disciplinary process. The Settlement Agreement memorializes the Department's prohibition of disciplinary reports solely for self-injurious behavior. The provisions of this section also insure that mental health staff are afforded reasonable input in the disciplinary process. Such consultation may include, in particular circumstances, whether the events leading to the disciplinary report implicate mental health issues (Settlement Agreement ¶ VI C), whether there are appropriate alternatives to the disciplinary process (*id.*), and whether mental health considerations may bear on issues of mitigation or the sanction (Settlement Agreement ¶ VI D 1). As mandated by state law, a disciplinary detention sanction for an inmate with SMI may not exceed thirty days, though no inmate may be placed continuously in disciplinary detention for more than fifteen days (Settlement Agreement ¶ VI E).

VII. *Training.* The parties recognize that security staff must be trained how to identify and work with inmates with SMI. (Settlement Agreement ¶ VII B 1). Like most other agreements, this Settlement Agreement includes standards for training for a variety of staff. The section also describes the staff training provided at the STUs (Settlement Agreement ¶ VII

B 2).

VIII.   *DLC's Designated Expert, Reports, Dispute Resolution and Enforcement*.  This section describes the process for DLC to monitor the implementation of the Settlement Agreement. Some form of monitoring is typical of many agreements and court orders, though the monitoring schemes vary widely.  This section includes a reasonable and workable process for monitoring, for resolution of disputes between the parties and, if necessary, for enforcement of the Settlement Agreement by the Court.

DLC will retain Dr. Burns as its designated expert at its own expense (Settlement Agreement ¶ VIII A 1 & 2).  The Defendants will provide Dr. Burns with access to its facilities with segregation units in order that she may assess compliance with the Agreement (Settlement Agreement ¶¶ VIII A 3-5).  She may make as many as three site visits, each for up to three days each, in each of the years the Agreement is in effect (Settlement Agreement ¶ VIII A 3).

Subparagraph B and Appendix A describe the records and documents that will be available to Dr. Burns, either routinely three times a year or at her or DLC's request. Documents will be provided subject to the Court's protective orders (Settlement Agreement ¶ VIII B and Appendix A).  Dr. Burns may prepare written reports on the Department's efforts to comply with the Agreement.  If she reports that the Department has not met the terms of any provision or provisions of the Agreement, she shall make recommendations for actions she believes necessary to meet the terms of the provision (Settlement Agreement, ¶ VIII C).

The Defendants may retain Dr. Metzner as a designated expert at its own expense (Settlement Agreement ¶ VIII A 7).

The Settlement Agreement provides, subject to Court approval, that the Court will retain jurisdiction for three years. (Settlement Agreement ¶ VII D 2; *see also* ¶ X B 2).  The parties have designed a process that encourages the parties to resolve any disputes regarding the implementation of the Settlement Agreement, allowing resort to the Court only after a mandatory negotiated resolution process has been exhausted. Prior to invoking the Court's authority to enforce the Settlement Agreement, the parties are required to identify, discuss and, if appropriate, remedy any compliance issues. The dispute resolution process has the following

steps:

- If DLC believes that the Department is not in substantial compliance[10] with any provision of the Agreement, it shall provide the Department with a written description of the alleged noncompliance making reference to any reports of its designated expert and to any Department documents claimed to support the allegation (Settlement Agreement ¶ VIII D 1);

- The Department shall provide a written response within thirty days. The parameters of the response are described in the Agreement (*id.*);

- DLC will advise the Department of its acceptance or rejection of the Department's response within seven days (*id.*);

- Either party may request a meeting to discuss the issue or issues and the parties shall meet within fourteen business days to attempt to resolve the matter (*id.*); and

- If the matter cannot be resolved by the parties, they may jointly or individually seek relief from the Court to effect substantial compliance, but not through a petition for contempt (*id.*).

If the Court finds that the Department is not in substantial compliance with a provision of the Settlement Agreement, the Court's jurisdiction over the provision shall continue for the remainder of the three year implementation period or the Court may extend its jurisdiction over the provision for not more than two years from the date of the finding (Settlement Agreement ¶ VIII D 2), and it may enter an order consistent with equitable principles (but not an order of contempt) designed to achieve compliance (Settlement Agreement ¶ VIII D 3). If DLC contends that the Department has not complied with an equitable order, it may seek further relief (Settlement Agreement ¶ VIII D 4). Paragraph X provides that any order to achieve compliance with the Agreement shall be subject to applicable provisions of the Prison Litigation Reform Act, 18 U.S.C. § 3626. Other matters related to Court approval and enforcement set out in paragraph X and XI are described below.

IX.   *Implementation Timetable*. This section establishes a timetable for implementation of certain provisions of the Settlement Agreement.

---

[10] Minor or isolated delays in implementation do not constitute substantial noncompliance. Indeed, an allegation of substantial noncompliance must be based on evidence of a pattern of noncompliance with respect to the particular provision. (Settlement Agreement ¶ VIII D 1.)

X.     *Form of Agreement*. The parties label the document a "Settlement Agreement" and agree it is binding on the parties (Settlement Agreement ¶ X A 2).  There are provisions for Court approval (Settlement Agreement ¶ X B 1), maintenance of jurisdiction (Settlement Agreement ¶ X B 1, 2) and Court enforcement (Settlement Agreement ¶ X B 3, 4).  There are also procedures for amendment (requiring approval of the Court) and interpretation of disputed terms, if any (Settlement Agreement ¶ X C).

XI.    *Funding*. The parties acknowledge the State's financial situation and that some provisions are limited in light of available funds (Settlement Agreement ¶ XI A).  However, the parties agree that the lack of funding will not preclude the Court from entering an appropriate enforcement order, if warranted. (Settlement Agreement ¶ XI 2.)

XII.   *Attorneys' Fees*. The Settlement Agreement memorializes the amount that the defendants have agreed to pay the plaintiff in settlement of attorneys' fees and costs for all work by its counsel to date (Settlement Agreement ¶ XII).  The agreement for reimbursement for fees and costs is reasonable.

The Executive Director of the Disability Law Center and the Commissioner of Correction have signed the Settlement Agreement. The parties' counsel have also signed in their capacity as counsel.

The Settlement Agreement includes a signature block for the Court's approval, indicating that the Court retains jurisdiction as provided in the Settlement Agreement.

## <u>CONCLUSION</u>

The parties have signed a Settlement Agreement that they believe is fair, reasonable and adequate to address the concerns raised in the Complaint. The parties further believe that approval by the Court is warranted, and that it is necessary and appropriate for the Court to retain jurisdiction in order that the parties, in accordance with the terms of the Settlement Agreement, may request the Court's assistance if a dispute arises during the course of implementation. Wherefore, the parties request that the Court allow their motion and approve the Settlement Agreement.

Dated:  December 12, 2011                    Respectfully submitted,

Disability Law Center, Inc.,

By its attorneys,

  /s/  Alison Hickey Silveira
David Yamin, BBO #562216
    david.yamin@bingham.com
Carol E. Head, BBO #652170
    carol.head@bingham.com
Alison Hickey Silveira, BBO #666814
    alison.silveira@bingham.com
BINGHAM MCCUTCHEN LLP
One Federal Street
Boston, MA  02110-1726
(617) 951-8000

Richard M. Glassman, BBO #544381
    rglassman@dlc-ma.org
Nancy Jane Murphy, BBO #663749
    nmurphy@dlc-ma.org
DISABILITY LAW CENTER, INC.
11 Beacon Street, Suite 925
Boston, MA  02108
(617)723-8455

James Pingeon, BBO #541852
    jpingeon@plsma.org
Leslie Walker, BBO #546627
    lwalker@plsma.org
Bonnie Tenneriello, BBO #662132
    btenneriello@plsma.org
PRISONERS' LEGAL SERVICES, INC.
8 Winter Street, 11th Floor
Boston, MA  02108
(617) 482-2773

Robert Fleischner, BBO #171320
    rfleischner@cpr-ma.org
CENTER FOR PUBLIC
REPRESENTATION
22 Green Street
Northampton, MA  01060
(413) 587-6265

James S. Rollins
    *admitted pro hac vice*
    james.rollins@nelsonmullins.com
NELSON, MULLINS, RILEY &
SCARBOROUGH LLP
One Post Office Square, 30th Floor
Boston, MA  02109-2127
(617) 573-4722

THE MASSACHUSETTS DEPARTMENT OF
CORRECTION, et al.,
By their attorneys:
NANCY ANKERS WHITE
Special Assistant Attorney General

/s/ William D. Saltzman
William D. Saltzman
BBO No. 439749
Department of Correction Legal Division
70 Franklin Street, Suite 600
Boston, Massachusetts 02110
(617) 727-3300, Ext. 154
wdsaltzman@doc.state.ma.us

/s/ Charles W. Anderson Jr.
Charles W. Anderson Jr.
BBO No. 635016
Department of Correction Legal Division
70 Franklin Street, Suite 600
Boston, Massachusetts 02110
(617) 727-3300, Ext. 161
cwanderson@doc.state.ma.us

/s/ Sheryl Grant
Sheryl Grant
BBO No. 647071
Department of Correction Legal Division
70 Franklin Street, Suite 600
Boston, Massachusetts 02110
(617) 727-3300, Ext. 140
sfgrant@doc.state.ma.us

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on December 12, 2011.

/s/ Alison Hickey Silveira