# **<u>Exhibit J</u>**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

DISABILITY ADVOCATES, INC.,   :

                    Plaintiff,   :

          - against -       :

NEW YORK STATE OFFICE OF   :
MENTAL HEALTH, et al.,

                       :

           Defendants.

----------------------------------------------------------x

02 Civ. 4002 (GEL)

RECEIVED
JAN 25 2007
CHAMBERS OF
GERARD E. LYNCH
U.S.D.J.

## PRIVATE SETTLEMENT AGREEMENT

## TABLE OF CONTENTS

Page

1. Commitment by DOCS and OMH to Heightened Level of Care; Definition of Serious Mental
   Illness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   Diagnostic Criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

1.1. Exceptional Circumstances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   a. Clinical Exceptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   b. Safety and Security Exceptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

2. Additional Keeplock Mental Health Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

3. Reception Screening . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

4. Increases in Bed Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   a. ICP Expansion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   b. Transitional ICPs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   c. STP Expansion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   d. New Residential Mental Health Unit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        (i) Housing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        (ii) Program Building . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        (iii) RMHU Not SHU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        (iv) Televised Programming Pilot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   e. New Ward at Central New York Psychiatric Center ("CNYPC") . . . . . . . . . . . . . . . 10
   f. Needs Reassessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   g. Use When Available . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

5. Treatment and Housing Settings Consistent With Safety and Security . . . . . . . . . . . . . . . . 11

6. Disciplinary Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   a. OMH Input . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   b. Self-Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   c. Informational Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   d. Refusals of Treatment and Medication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   e. Automatic Review of Certain SHU Sentences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   f. Restricted diet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   g. SHU Mental Health Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   h. Review of Existing SHU Sentences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   i. Time Cuts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   j. Expansion of CMCs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
   k. Central Office Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

7. Crisis Observation Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    a. Length of Stay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    b. Suicide Watch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    c. Amenities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    d. Clinical Contact and Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

8. Conditions of Confinement - Cell Doors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

9. Maintenance of Level of Mental Health Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

10. Role of Parties' Experts in Administration and Enforcement . . . . . . . . . . . . . . . . . . . . . 17
    a. Designation and Role . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    b. Periodic Tours and Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    c. Access to Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        (i) In conjunction with tours . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        (ii) Quarterly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        (iii) Semi-Annually . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        (iv) Annually . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        (v) On a one-time basis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    d. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    e. Consideration of Experts' Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

11. Enforcement Powers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

12. Attorneys' Fees; Post-settlement Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

13. Private Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

14. Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

15. Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

16. No Third-Party Beneficiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

17. Stipulation of Dismissal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

18. Funding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

19. No Admissions or Precedential Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

20. Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

21. Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

22. Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

DISABILITY ADVOCATES, INC.,      :

                Plaintiff,    :

          - against -       :

NEW YORK STATE OFFICE OF     :
MENTAL HEALTH, et al.,

                        :

               Defendants.
------------------------------------------------------x

02 Civ. 4002 (GEL)

## PRIVATE SETTLEMENT AGREEMENT

      The parties hereto, by their attorneys, hereby stipulate and agree as follows:

      WHEREAS, plaintiff filed the instant lawsuit seeking declaratory and injunctive relief on behalf of prisoners with mental illness in the custody of the New York State Department of Correctional Services ("DOCS"), alleging that DOCS and the New York State Office of Mental Health ("OMH") have provided inadequate mental health services within the prison system in violation of 42 U.S.C. §1983, the Eighth and Fourteenth Amendments of the United States Constitution, 29 U.S.C. § 794 (the Rehabilitation Act), and 42 U.S.C. § 12132 (the Americans with Disabilities Act of 1990);

      WHEREAS, the defendants have denied that they have violated any such constitutional or statutory rights;

      WHEREAS, the parties have conducted extensive fact and expert discovery, and have commenced, but not completed, the non-jury trial of this Action before the Honorable Gerard E. Lynch in the Southern District of New York;

WHEREAS, the parties, without conceding any infirmity in their claims or defenses, have subsequently engaged in extensive settlement negotiations to resolve the claims raised by this Action;

WHEREAS, the parties represent and agree that this Agreement is fair, reasonable and adequate to protect the interests of all parties, and that entering into this Agreement will benefit inmates with mental illness, who may develop mental illness, or who are at risk of developing mental illness, who are confined in the correctional facilities of the State of New York; and

WHEREAS, this Agreement and New York State Senate Bill No. 333 and Assembly Bill No. 4870 ("S.333/A4870") both seek to ameliorate the conditions for inmates with serious mental illness who are housed in disciplinary confinement, and the Agreement establishes a commitment by the State to a heightened level of care for all inmates with serious mental illness in disciplinary confinement, and provides for additional treatment modalities and benefits for persons with mental illness in the State's correctional system, and both sides have entered into this Agreement with the expectation that the Legislature will not pursue S.333/A.4870, or other legislation covering issues addressed by this Agreement;

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and between the parties, as follows:

1. Commitment by DOCS and OMH to Heightened Level of Care; Definition of Serious Mental Illness.

Defendants agree that, upon completion of the construction period for the programs and facilities provided under this Private Settlement Agreement, a heightened level of care (i.e. at least 2 hours of structured out-of-cell therapeutic programming and/or mental health treatment per day,

2

five days a week[1], in addition to exercise) will be offered to all inmates subject to a confinement sanction in a Special Housing Unit ("SHU") who meet the diagnostic criteria listed in (a) through (e) below ("inmate-patients with SMI" or "inmate-patients with serious mental illness"), except upon a determination of exceptional circumstances as provided below. The terms "SHU confinement" and "SHU confinement sanction" shall include Keeplock, if the Keeplock sanction is being served in a SHU. This Section shall not apply to inmate-patients subject to an aggregate SHU confinement sanction of 30 days or less and shall apply to inmate-patients with an aggregate SHU confinement sanction of more than 30 days. The treatment and programming required by this Section shall be offered within 30 days of the imposition of such SHU confinement sanction in excess of 30 days or which increases an aggregation of SHU confinement sanctions to a period in excess of 30 days. If an inmate who does not meet the diagnostic criteria set forth in (a) through (e) below at the time a SHU confinement sanction in excess of 30 days is imposed is later designated as meeting said diagnostic criteria and has 30 days or more remaining in a SHU confinement sanction, the treatment and programming required by this Section shall be offered within 30 days of such later designation.

<u>Diagnostic Criteria</u>

    a.  Inmates determined by OMH to have a current diagnosis or a recent significant history[2] of any of the following types of Diagnostic and Statistical Manual IV (DSM-IV) Axis I diagnoses:

---

[1]References in this Agreement to periods of time, such as five days a week, shall exclude state or federal holidays.

[2]"Recent significant history" is defined as a diagnosis specified in Section 1(a)(1) - 1(a)(9) within the past year and a recent history (within the past year) of commitment to Central New York Psychiatric Center ("CNYPC") and such a confirmed diagnosis at CNYPC after such commitment. All determinations and diagnoses under subsections (a) through (e) shall be made by OMH.

3

(1)     Schizophrenia (all sub-types)

(2)     Delusional Disorder

(3)     Schizophreniform Disorder

(4)     Schizoaffective Disorder

(5)     Brief Psychotic Disorder

(6)     Substance-Induced  Psychotic  Disorder  (excluding  intoxication and withdrawal)

(7)     Psychotic Disorder Not Otherwise Specified

(8)     Major Depressive Disorders

(9)     Bipolar Disorder I and II

b.  Inmates who are actively suicidal or who have engaged in a recent, serious suicide attempt.

c.     Inmate-patients diagnosed with a serious mental illness that is frequently characterized by breaks with reality, or perceptions of reality, that lead the individual to experience significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

d.  Inmate-patients diagnosed with an organic brain syndrome that results in a significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

e.  Inmate-patients diagnosed with a severe personality disorder that is manifested by frequent episodes of psychosis or depression, and results in significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

4

1.1. <u>Exceptional Circumstances.</u>

a. <u>Clinical Exceptions.</u> In rare instances an inmate-patient meeting the diagnostic criteria set forth in Section 1(a)(1) - (9) may not, based upon the reasonable judgment of the treating OMH clinicians, need the heightened level of care provided in Section 1. For example, some inmate-patients with a diagnosed bipolar disorder, due to a successful regimen of medication, may not need a heightened level of care involving structured programming. Any such determination by the OMH treatment team that an inmate-patient does not need such heightened level of care shall be documented with a written statement of the reasons for such determination and be reviewed by the CNYPC Clinical Director or his/her designee. In addition, any such determination is subject to change, should the clinical status of the inmate-patient change, and any such determination shall in any event be reviewed and documented by the treatment team every thirty days, and in consultation with the CNYPC Clinical Director or his/her designee not less than every ninety days.

b. <u>Safety and Security Exceptions.</u> Exceptional circumstances may also occur creating an unacceptable risk to safety and security of inmates or staff. When providing the level of care otherwise required by Section 1 for a particular inmate-patient would create such exceptional circumstances, based on a determination by the Superintendent in the facility where the inmate-patient is housed in consultation with the OMH treatment team, such determination shall be documented by a written statement of the reasons therefor. Defendants shall attempt to resolve any such exceptional circumstances, so that the specified level of care may be provided as soon as practicable after the exceptional circumstances cease to exist. A determination of exceptional circumstances due to safety and security shall be reviewed by the Superintendent, in consultation with the OMH treatment team, not less than every seven days. When there is a determination of such exceptional circumstances that remains unresolved for a period of 30 days, the case shall be referred

5

to the Central Office Review Committee created under Section 6(k), for review and possible resolution at the next scheduled Committee meeting.

2. <u>Additional Keeplock Mental Health Services</u>

Inmate-patients subject to a Keeplock confinement sanction of more than 60 days, who (a) are serving that sanction in a separate Keeplock housing unit, rather than in a SHU or a general population unit predominantly housing non-Keeplocked inmates, and (b) have any of the diagnoses in Section 1(a) through (e) shall:

>（i) receive a minimum of two individual out-of-cell clinical sessions per month in a private setting with their primary therapist and one such session with an OMH psychiatrist or nurse practitioner, and at the first of such sessions, receive a mental health and suicide prevention assessment;

>(ii) be subject to regular Case Management Committee ("CMC")[3] reviews to take place at least once every two weeks;

>(iii) receive preference for admission to the Intensive ICP at Wende;

>(iv) be eligible for admission to the RMHU, when it becomes operational.

3. <u>Reception Screening</u>.

The defendants will increase OMH staff in the system's reception facilities to provide mental health screening following intake of all new inmates. The purpose of this staff increase is to establish reception evaluation procedures which follow the model described in Guideline P-E-05 of the National Commission on Correctional Health Care.

---

[3]As used herein, the term "CMC" refers to the joint DOCS and OMH Case Management Committees established under 7 NYCRR §310.1.

6

4. <u>Increases in Bed Capacity</u>

    <u>a. ICP Expansion.</u> Defendants will add ninety (90) new beds in the Intermediate Care Program ("ICP"), in addition to the 572 current ICP beds and the 118 additional ICP beds covered by the previously approved 2004 and 2005 initiatives.

    <u>b. Transitional ICPs.</u> Defendants will create a new program which will provide heightened mental health services and program hours for inmate-patients who would benefit from a level of mental health programming and services in between the level of programming and services available in general population and the intensive treatment and programming in the existing ICPs. Two Hundred and Fifteen (215) Transitional ICP beds will be created under the new program as part of this Agreement. Inmate-patients admitted to a Transitional ICP will be housed together in existing general confinement areas.

    Admissions criteria will be defined. Transitional ICPs will have multiple feeder sources, including, without limitation, for example, (1) ICP inmate-patients no longer in need of an ICP level of care, but who would benefit from a transitional program before returning to other general population locations, (2) certain former BHU, STP or RMHU inmate-patients, (3) inmate-patients discharged from SHU or Keeplock on a case by case basis, (4) general population inmate-patients diagnosed with a serious mental illness who would benefit from Transitional ICP program and (5) inmates with mental illness entering the correctional system identified through intake screening as appropriate for the Transitional ICP program. The Transitional ICPs may also be appropriate for inmate-patients who would benefit from a long-term residential program. A goal and potential benefit of the Transitional ICPs will be a reduction of disciplinary involvement by inmate-patients with mental illness participating in the program.

c. STP Expansion. Defendants will add ninety (90) new Special Treatment Program ("STP") beds, as previously approved in the 2004 and 2005 initiatives, in addition to the 43 current STP beds, for a total of 133 STP beds.

d. New Residential Mental Health Unit. Defendants will create a new Residential Mental Health Unit ("RMHU") for disciplinary inmate-patients, using the existing "S-block" at Marcy Correctional Facility, which contains 100 double cells with a present capacity of 200 inmates.

(i) Housing. The designated S-block will be reconfigured as follows for use as the RMHU: Double celling will be eliminated, with the limited exception noted in this sub-section. Solid cell doors will be modified, so as to increase visibility and communication between inmate-patients and staff and among inmate-patients by including a barred or mesh opening on at least part of the cell doors. The initial capacity of the RMHU will be approximately 100 beds, each of which will be located in a former double cell. In a limited number of instances, if the treating OMH clinicians determine that for particular inmate-patients, double celling would aid in the treatment of both inmate-patients, double celling may be utilized in those instances, if it is not inconsistent with DOCS' regulations and policies on double celling. The reasons for determinations that double celling would aid in the treatment of the inmate-patients will be documented in the mental health treatment records.

(ii) Program Building. A new program building will be constructed, adjoining and connected to the RMHU's residential building. The program building will contain program areas, as well as clinical staff offices. The RMHU will offer out-of-cell therapeutic programming and/or mental health treatment to each inmate-patient four hours per day, five days a week. This programming is in addition to exercise.

8

Because of the characteristics of the cells, it will be possible to provide increased showers and exercise time. The RMHU will offer a range of security modalities for programming, in order to assure the safety of inmate-patients and staff and enable appropriate inmate-patients to progress to less restrictive therapy milieus. Therapeutic cubicles will be available for group and individual therapy, as well as small classroom study where needed, utilizing a modified cubicle design to enhance communication and visibility. The configuration of the therapy and classroom space will also permit therapy and class room study without the use of cubicles. In lieu of cubicles, other appropriate restraints may be used depending upon an inmate-patient's behavioral progress and safety considerations. Options for congregate therapeutic recreational activities will also be made available inside the program building, should  inmate-patient's behavioral progress and safety considerations permit. At the time of the first needs reassessment under sub-section (f) below, DOCS will consider the feasibility of making outdoor congregate exercise available to inmate-patients in the RMHU. DOCS will retain absolute discretion as to whether and to whom such an option will be provided. Outdoor congregate exercise, if any, to be provided in the RMHU will be counted as out-of-cell therapeutic programming for purposes of determining whether the required number of hours of such programming has been provided.

(iii) RMHU Not SHU. Once admitted to the RMHU, inmate-patients are not considered to be in SHU or Keeplock; however, their SHU and Keeplock time will continue to run.  Notwithstanding the foregoing, in light of the security concerns associated with the behaviors that gave rise to their SHU confinement sanctions,

9

inmates in the RMHU can be limited to the amenities provided under parts 302 through 304 of Title 7 NYCRR (although additional amenities may be provided). Furthermore, DOCS may make determinations, in its sole judgment, that for safety and security reasons, selected provisions of Part 305 of Title 7 NYCRR, not inconsistent with other provisions of this Agreement, should be applied to inmate-patients housed in the RMHU, provided that the due process provisions of Part 305 are followed.

(iv) Televised Programming Pilot. DOCS will launch a pilot program of providing televised in-cell programming, initially for 25 cells in an S-Block. This pilot may be part of or in addition to the RMHU, but shall not be in lieu of any level of care otherwise required by inmate-patients, i.e. will not be a substitute for the 2 hours of out-of-cell programming per day otherwise required by Section 1 or the 4 hours of out-of-cell programming to be provided in the RMHU.

e. New Ward at Central New York Psychiatric Center ("CNYPC"). OMH will create an additional 20-bed hospital ward at CNYPC, which shall be available for referrals from defendants' outpatient network in 2008.

f. Needs Reassessments. Needs reassessments will be appropriate in the future to assure that all inmate-patients with SMI identified in Section 1 receive a heightened level of care. Reassessments will be conducted in December 2007 and December 2008. In addition to the foregoing, (i) in or about September 2008, defendants will conduct an assessment of the need in medium security facilities for additional ICP and Transitional ICP beds, and (ii) within a year after the RMHU is completed and becomes operational, defendants will conduct an assessment to determine whether there is a need for expansion of the RMHU to add capacity for an additional 50

10

beds. In connection with all such reassessments, defendants will solicit the opinions and advice of the parties' experts, although all final determinations about needs reassessments and the general operation of prison mental health programs shall be made by defendants in keeping with their statutory responsibilities and the provisions of this Agreement.

g. Use When Available. As the additional bed capacity referred to in this Agreement will necessarily take time to construct, full compliance with the heightened level of care requirement must be assessed upon completion of said construction. Defendants will use new capacity to meet the needs of inmate-patients as the additional capacity becomes available. No determination by defendants to increase capacity following any needs reassessment provided for herein shall be deemed evidence of non-compliance with any term or provision of this Agreement, nor shall such a determination delay an assessment of compliance with other terms and provisions of this Agreement.

5. Treatment and Housing Settings Consistent With Safety and Security

Consistent with existing practices, defendants agree that the housing setting of inmate-patients with SMI subject to a SHU confinement penalty will be reviewed, at least every 90 days, to determine if it is consistent with both their mental health treatment needs and safety and security requirements. At OMH Level 1 and 2 facilities, the review shall be conducted by the CMC with input from the OMH treatment team. At other facilities, the review shall be conducted by the Superintendent with input from OMH. In reviewing such inmate-patients' status, defendants' goals are the movement of inmate-patients from more restrictive to less restrictive settings, as well as the significant reduction of time inmate-patients with SMI spend in restrictive environments, if and when safety and security permit. Defendants recognize that inmate-patients should receive all necessary mental health services in a clinically appropriate environment and, subject to the need to

11

ensure safety and security, should be removed from a more restrictive environment when this is clinically appropriate. While every inmate-patient with SMI in need of a heightened level of care, as provided in Section 1, should receive it, housing designation and length of participation in particular programs must be determined by the responsible clinical and security staff and shall not be based on fixed or presumptive time limits. Actions taken, and reviews conducted pursuant to this Section shall be subject to oversight review by the Central Office Review Committee.

6. Disciplinary Process

    a. OMH Input. OMH will continue to provide input and recommendations in disciplinary proceedings, including input and recommendations based upon opinions, if any, formulated by the reporting OMH clinicians on issues of fitness to proceed, culpability, mitigation and duration of and suitability for disciplinary housing. The written statement of the disposition of the charges, if any, shall reflect how the inmate's mental condition or intellectual capacity was considered in accordance with current procedures. Subject to the confidentiality provisions of this sub-section and Section 10(d) of this Agreement and solely for purposes of compliance with this Agreement, plaintiff may request up to 10 Superintendent's ("Tier III") Hearing tapes per month, including any tape-recorded testimony of OMH personnel taken outside the presence of the inmate in connection with applicable regulations in instances where an inmate's mental condition or intellectual capacity was considered.[4] Such tape-recorded testimony of OMH personnel and any information obtained during a review of that testimony must be kept confidential. Plaintiff's counsel is prohibited from revealing the content

---

    [4]Where in the same Superintendent's Hearing, in addition to the tape-recorded testimony of OMH personnel, tape-recorded testimony of a teacher or correction counselor is also taken outside the presence of the inmate in connection with applicable regulations in instances where both an inmate's mental condition and intellectual capacity are considered, DOCS will also include the tape-recorded testimony of the teacher or correction counselor. Where this additional testimony is produced, it shall be subject to all of the same confidentiality and use provisions herein which govern the tape-recorded testimony of OMH personnel.

of the tape to the inmate or anyone outside OMH or DOCS, except plaintiff's experts, plaintiff's counsel, and employees of such counsel, and a court pursuant to Section 11 hereof. Plaintiff's counsel may use confidential hearing tapes produced under this Agreement to advocate privately with DOCS and/or OMH on behalf of individual inmates; provided that tapes used for such individual advocacy shall not be used in, or to bring, lawsuits or other proceedings without express written consent of DOCS. Nothing in this Agreement shall require the release to plaintiff or plaintiff's counsel of any other confidential testimony.

b. Self-Harm. There will be a presumption against pursuing charges for self-harming behavior and threats of self-harming behavior, including related charges for the same behaviors, such as destruction of State property. In addition, pursuant to directions by DOCS' Central Office to all facilities, any such misbehavior report must be immediately referred to the facility's Deputy Superintendent for Security for review and a referral made to OMH. Only rarely or in exceptional circumstances may an inmate receive a SHU or Keeplock confinement sanction based upon self-harming behavior or verbally reporting to DOCS or OMH staff feelings or intentions regarding self-harm or suicide, as referenced in the first sentence of this sub-section.

c. Informational Reports. In order to aid in diversion of inmate-patients from SHU and Keeplock, informational reports, following the Great Meadow-Sullivan BHU template, will also be used in all ICPs, Transitional ICPs, STPs and the RMHU in lieu of some misbehavior reports.

d. Refusals of Treatment and Medication. Misbehavior reports will not be issued for refusing treatment or medication. An inmate-patient may, however, be subject to the disciplinary process or issuance of an informational report, where applicable, for refusing to go to the location where treatment is provided or medication is dispensed, in order to facilitate therapeutic involvement relating to an inmate-patient's decision to refuse treatment or medication.

13

e. Automatic Review of Certain SHU Sentences. There will be an automatic review by the facility Superintendent in consultation with OMH of all disciplinary hearing dispositions, where the inmate's mental health was an issue under applicable regulations, which impose a SHU confinement sanction of over 60 days, or in the event the inmate has accumulated SHU confinement sanctions or Keeplock confinement of 120 days or longer. Such review shall occur within 7 days of the conclusion of the disciplinary hearing. The Superintendent shall consider the appropriateness of such confinement sanctions standing alone and in light of any accumulation of such sanctions that may have previously been imposed. This review is intended to be in furtherance of the goals set forth in Section 5 above.

f. Restricted diet. When mental health is at issue in a disciplinary hearing, the restricted diet will not be used as a sanction, except for safety and security reasons enumerated under Section 304.2(b)(1) - (b)(3) of 7 NYCRR. Section 304.2(b)(4) will not be used as a basis for a restricted diet for such inmates. Absent exceptional circumstances (as such term is used in the first sentence of Section 1.1(b) above), where mental health is an issue in the disciplinary hearing, no restricted diet sanction in excess of 7 days shall be imposed.

g. SHU Mental Health Assessment. There will be a mental health assessment within one working day of the imposition of a SHU confinement sanction, as defined in Section 1, for all inmates in OMH Level 1 and 2 facilities. A suicide prevention screening instrument will also be administered within 24 hours of all such admissions to SHU.

h. Review of Existing SHU Sentences. As part of defendants' efforts to implement the goals described in Section 5 above, existing SHU confinement sanctions of all inmate-patients with SMI will be reviewed on a one time basis by a joint DOCS-OMH committee. The committee will include Central Office personnel from each agency to be designated by the Commissioners. The committee

14

will assess the feasibility of diverting inmate-patients from SHU, including the feasibility of time cuts, when in the committee's judgment this can be done without unacceptable risks to safety and security. This one time review will be completed within one year after this Agreement is signed by the parties.

i. Time Cuts. Primary responsibility for time cuts will be delegated to the CMCs with the Superintendent's approval. A specific proposal in that regard is being formulated as part of defendants' efforts to meet the goal described in Section 5 above. The proposal will include CMC time cut reviews of OMH caseload inmate-patients at least once every three months and, for such caseload inmate-patients, the waiver of the existing Departmental requirement that SHU inmate-patients serve at least one-half of their confinement time before being eligible for time cut consideration. The proposal is consistent with existing regulations which permit CMCs to consider time cuts at any time, and is not intended to dilute the CMCs' powers with respect to time cuts.

j. Expansion of CMCs. Case Management Committees will be created at all Level 2 facilities in order to perform CMC review functions with respect to SHU inmate-patients on the OMH caseload.

k. Central Office Review. In order to promote the review of the aggregation of SHU sentences of inmate-patients with SMI, and to provide oversight for other provisions of this Agreement, a Central Office Review Committee will be created. The Committee will include Central Office personnel from each agency designated by the Commissioners. The Committee will meet twice monthly and will conduct a specific review of the accumulation of SHU confinement sanctions by caseload inmate-patients for at least two facilities per month on a rotating basis, as well as provide oversight and review of other matters referred to the Committee pursuant to the terms of this Agreement.

7. Crisis Observation Program

a. Length of Stay. The use of observation cells should be no longer in duration than necessary to deal with the mental health crisis which caused the inmate-patient to be placed in observation. Defendants' goal shall be to keep inmates in observation cells for no more than four (4) days and there shall be a presumption in favor of releasing inmates from observation cells within four (4) days. However, any decision on when to release an inmate from an observation cell after more or less than any particular number of days is a clinical judgment. All cases in which an inmate is held over seven days in observation shall be referred to the CNYPC Clinical Director or designee for consultation.

b. Suicide Watch. Constant 24-hour observation will be provided for inmates on suicide watch.

c. Amenities. No inmate should be left in an observation cell without clothing, smock or paper gown, and a paper gown should only be used where there is a specific safety and security need. The specific amenities provided to an inmate in an observation cell must be determined on the basis of clinical need and safety and security considerations relating to the particular crisis involved in each case.

d. Clinical Contact and Treatment. All inmates in observation cells will be seen by clinical staff every day, five days a week, and by nursing staff on two shifts every day, seven days a week. In addition, every inmate in an observation cell will be offered a minimum daily out-of-cell individual session with a therapist and/or psychiatrist, five (5) days a week, Monday through Friday, when this can be done without unacceptable risk to safety and security. Determinations of such unacceptable risk shall be documented in the mental health treatment record.

16

8. Conditions of Confinement - Cell Doors.

Solid front cell doors in (i) STPs, (ii) SHU cells where inmate-patients with SMI are housed and (iii) in Keeplock cells in separate Keeplock housing units referenced in Section 10(c)(i) where inmate-patients with SMI are housed, will be modified, so as to increase visibility and communication between inmate-patients and staff and among inmate-patients by including a barred or mesh opening on at least part of the cell doors. Nothing herein shall preclude the issuance of a cell shield order in accordance with 7 NYCRR § 305.6.

9. Maintenance of Level of Mental Health Services.

Defendants have no intention of reducing the level of mental health services made available to inmate-patients following or based upon completion of the additional mental health programs and services provided under this Agreement. Additionally, the parties' experts may make recommendations as to possible changes to assist inmate-patients in SHU, BHU, RMHU, STP or any other elements of, or mental health programs in the prison system. Defendants will give full consideration to any such recommendations, provided that all final determinations with respect thereto shall be made by defendants.

10. Role of Parties' Experts in Administration and Enforcement.

a. Designation and Role. Plaintiff and defendants shall each designate a psychiatric expert. Plaintiff may also designate a security expert, provided that any such designated security expert shall participate in no more than one four-day tour per calendar year under Section 10(b) of this Agreement, and such expert shall not participate in interviews of inmates during any such tours. No designated psychiatric or security expert shall be a monitor, but shall advise, consult with and assist the parties as provided in this Agreement. Nothing shall limit defendants' ability to retain additional experts.

17

b. Periodic Tours and Assessments. Based on an agreed schedule of specified tours and assessments, each side's experts shall report to the retaining party concerning defendants' compliance with the terms of this Agreement. In or about September 2007, the experts, accompanied by counsel, shall conduct an initial consecutive four-day tour and assessment of mutually agreed selected correctional facilities. Tours will include SHU, Keeplock Units, all mental health program areas, Satellite Mental Health Units and any other areas of concern to the experts in evaluating mental health treatment and compliance with the terms of this Agreement. Further consecutive four-day tours and assessments at mutually agreed selected correctional facilities shall be conducted by the parties' experts, accompanied by counsel, according to the following schedule:

March 2008

September 2008

March 2009

September 2009

March 2010

September 2010

c. Access to Documents.

(i) In conjunction with tours: Approximately thirty (30) days in advance of the tours, the parties' counsel shall be provided with the following documents prepared by OMH relating to the facilities to be visited: a list of inmate-patients referred to the CNYPC Clinical Director or designee under Section 7(a) above; a list of inmate-patients who, while in SHU, were diagnosed within the past 6 months as meeting the diagnostic criteria set forth in Section 1 and who currently have an SMI diagnosis; a list of inmate-patients currently in mental health programs and/or beds, including AVP, ICP, Intensive ICP, Transitional ICP, BHU, STP, RMHU and

18

RCTP as of the last day of the prior month; a list of inmate-patients in SHU with designated OMH level; a list of inmate-patients in the separate Keeplock housing areas at Albion, Attica, Clinton, Coxsackie, Elmira and Great Meadow with designated OMH level[5]; and an Excel file of the data generated by the OMH SHU Mental Health Data Application as of a date approximately 30 days prior to each tour. During the tours the parties' experts shall be given reasonable access to current mental health records, to current DOCS disciplinary history printouts, facilities and access to, not private sessions with, personnel whose duties pertain to the provision of mental health services and/or who deal with inmate-patients within the correctional system, and the parties' experts shall have a reasonable opportunity to conduct confidential interviews of inmates in a location to be determined by the defendants. Plaintiff's counsel may be present during any such interviews conducted by their expert. After the tours, the parties' experts may request and shall be provided with copies of a reasonable number of current OMH mental health records and a reasonable number of additional DOCS disciplinary history printouts and disciplinary hearing packets and any reasonably available data as to informational reports.

(ii) Quarterly: Parties' counsel shall be provided with the following documents: all systemic quality improvement/quality assurance reports applicable to mental health prepared by OMH and DOCS, respectively; new or updated CNYPC operations and policy and procedure manuals and any accompanying transmittal letters; new or updated directives and training materials related to mental health programs prepared by OMH and DOCS, respectively; summary memoranda, notes or other documentation, including any custodial and clinical recommendations or determinations generated by the Central Office Review Committee meetings or CMCs; OMH

---

[5] Defendants shall notify plaintiff if any additional separate Keeplock housing areas are created and will not house inmate-patients with SMI in such newly created Keeplock housing areas.

Incident Review Committee summary memoranda, summary notes, memoranda, and/or reports; the OMH Risk Management Report for the quarter; and tables generated during the quarter by the OMH SHU Mental Health Data Application, including a table providing medication information similar to that provided as part of the Management Indicators Reports, namely as to the number of inmate-patients in SHU and STP on psychiatric medication, on anti-psychotic medication, on 2nd generation (atypical) medication, on clozapine and data relating to medication refusals during the quarter; DOCS' list of inmates who have received a SHU or Keeplock confinement sanction during the quarter based upon an act of self-harm (Rule 123.10); and documentation of any determination during the quarter of "exceptional circumstances" for clinical or safety and security reasons made in accordance with Section 1.1 of this Agreement, such documentation to be provided by OMH as to Section 1.1(a) and by DOCS as to Section 1.1(b); DOCS' list of inmates who have been placed on a restricted diet during the quarter as a result of a disciplinary hearing where mental health was at issue; a list of inmate-patients who have been subject to the automatic review under Section 6(e) above of certain SHU sentences and the outcome of such reviews.

(iii) Semi-Annually: Parties' counsel shall be provided with the following documents: expert reports, at the option of the retaining party; lists of inmates who in the previous six months: had an RCTP Observation Cell stay of longer than 7 days and the prison location(s); had three or more admissions to RCTP Observation Cell and the prison location(s); had two or more admissions to CNYPC and the prison location(s) transferred from and discharged to.

20

(iv) <u>Annually</u>: OMH shall provide parties' counsel with the following reports: Outpatient Statistical Report; STP Report; BHU Report; RMHU Report[6]; Intensive ICP Report; and Transitional ICP Report. The STP, BHU, RMHU, IICP, and Transitional ICP Reports shall include, *inter alia:* the total number of inmates admitted to the program; length of stay in the program; housing locations where admissions are from; number of inmate-patients discharged or transferred from the programs; housing locations where they are discharged to (but not for transfers to Observation Cells or Dorm Beds since these are temporary moves and do not constitute program discharge); the number and percentage of inmate-patients in each OMH level in the program; number and percentage of seriously mentally ill inmate-patients in the program; number and percentage of inmate-patients on each medication at intake; number and percentage of medication compliant inmate-patients at intake; number and percentage of seriously mentally ill inmate-patients who are offered 2 hours out-of-cell programming on a program day; number and percentage of inmate-patients with SMI who are participating in the 2 hours of out-of-cell programming; number and percentage of inmate-patients with SMI who are refusing out-of-cell programming; average number of inmate-patients with SMI receiving Tier III misbehavior reports during the program; number of inmate-patients with SMI on Keeplock status; number and percentage of inmate-patients with SMI with a SHU or Keeplock time cut, and average amount cut.

Regarding ICP, once a year as of the last day of a specific month, OMH shall provide parties' counsel with a report on the number of admissions in that month; census by mental health level by unit for that day; the percentage of SMI for that day; the percentage of inmate

---

[6]The first RMHU report is not expected to be issued by OMH until approximately 12 months after the RMHU is opened. The first report shall be somewhat limited due to program start-up and shall be based on available data.

patients receiving 20 hours of treatment each week that month by unit; the number in Keeplock as of the last day of the month.

Regarding RCTP, OMH shall provide parties' counsel an annual report on the number of admissions; median length of stay in Observation Cell and in Dorm; prison and housing type admitted from and housing type discharged to, to the extent available; number discharged from RCTP; number and percentage admitted by mental health level; number and percentage admitted with serious mental illness; number and percentage of observation cell inmates who were offered out of cell treatment; number and percentage of inmates who utilized out of cell treatment. The RCTP report will include information on transfers to CNYPC, disclosing the prison and housing type where the transfers to RCTP and then to CNYPC originated from.

Regarding long term Keeplock units at Albion, Attica, Clinton, Coxsackie, Elmira and Great Meadow, once a year as of the last day of a specific month, OMH shall provide parties' counsel with a report regarding the number of inmate-patients on the caseload; census by OMH level; and percentage of SMI.

Regarding SHU, OMH shall provide parties' counsel with an annual report that includes information as of the last day of a selected month regarding: the number of inmates on the OMH caseload; percentage by mental health level; percentage of SMI; average time in SHU to date; average time remaining in SHU; a summary of current medications; percentage of inmate-patients offered 2 private contacts the month of the report; percentage of inmate-patients receiving 2 private contacts the month of the report; average refusal rate of private contacts the month of the report.

Regarding CNYPC, OMH shall provide parties' counsel with an annual demographic and diagnostic report that shall include: the number of admissions that year; the census as of a specific date; a diagnostic and demographic profile of the admissions during that year.

OMH shall also provide parties' counsel once a year, with a report on the OMH input into the disciplinary process, which shall summarize the annual quality assurance review, conducted by CNYPC staff of the OMH testimony tapes.

(v) On a one-time basis: Parties' counsel shall be provided with the following documents: a summary report regarding the results of the joint DOCS-OMH committee's one-time review of existing SHU sentences of all inmate-patients with SMI; the proposed modified cell door configuration referenced in Section 8; a summary report of the results of each assessment and reassessment discussed in Section 4(f); draft and final reception mental health evaluation tools and suicide prevention screening instruments.

d. Confidentiality. Materials provided to plaintiff's experts shall be deemed confidential and for use in conjunction with tasks described in Sections 10 and 11 of this Agreement only. Materials provided to plaintiff and its counsel shall be deemed confidential and shall be used solely for purposes of compliance with this Agreement, including advocating with DOCS and/or OMH on behalf of individual inmates pursuant to Section 6(a) above.

e. Consideration of Experts' Recommendations. The experts' reports may include not only an assessment of defendants' compliance with the terms of this Agreement, but may also include additional advice, suggestions or proposals of a quality assurance or quality improvement nature as the experts deem appropriate. Although the defendants will give full consideration to advice, suggestions and proposals offered by the experts, all decisions concerning the provision

23

of mental health services within the State's correctional system will be made by defendants, in accordance with the goals of this Agreement and their statutory responsibilities.

11. Enforcement Powers.

In the event of any reported non-compliance by defendants with a material provision of this Agreement, counsel to the parties shall meet and confer in an effort to resolve the reported non-compliance within 30 days of receipt of written notice by DOCS and OMH of any such claimed non-compliance. In the event of a claimed pattern of pervasive non-compliance with a material provision of this Agreement and a failure to achieve a resolution of the issue within 60 days of the meet and confer, either side may seek mediation by Judge Lynch. If such mediation fails to achieve a resolution, plaintiff may move the Court for reinstatement of the lawsuit or ask the Court to recommend a one-year extension of the duration of this Agreement. Should the Court recommend that this Agreement be extended for one additional year, the parties agree to be bound by that recommendation; provided, that there may be no more than a single one-year extension during the term of this Agreement, as so extended. In the event that the lawsuit is reinstated pursuant to this Section, defendants shall have no further obligation under this Agreement, which shall thereupon be null and void. Plaintiff may also elect to proceed in State court and seek specific performance of the terms of this Agreement; provided, that plaintiff shall have first sought to resolve any compliance issue through the meet and confer and mediation procedures set forth in this Section, and such meet and confer procedures and mediation by Judge Lynch shall have failed to achieve a resolution. To prevail in either State or federal court plaintiff must make a clear showing that defendants have failed to comply with a material term of this Agreement, and that such failures were not minimal or isolated, but were sufficiently frequent and widespread so as to be pervasive. Experts designated by the parties hereunder shall have no

24

authority to initiate proceedings in any court, or to report to, or otherwise communicate with any court in any manner in connection with this Agreement. The parties agree not to submit any of the experts' reports to any court, except in connection with an application to a court pursuant to this Section for specific performance, mediation, or reinstatement of the lawsuit.

12. Attorneys' Fees; Post-settlement Activities.

a. Defendants shall pay to plaintiff the sum of $2,000,000, in full satisfaction of any and all claims in this lawsuit for attorneys' fees and up to $1,450,000 in full satisfaction of any and all costs and disbursements with respect to this lawsuit up to and including the date of execution of this Agreement, which costs and disbursements shall be substantiated by back-up documentation satisfactory to defendants' counsel. In the event that payment of the amounts referred to in this Section 12(a) is not made within one hundred and twenty (120) days after the receipt by defendants' counsel of a copy of this fully executed Agreement, approved by the Court as provided on page 31 below, interest shall accrue on the outstanding balance at the rate set forth in 28 U.S.C. § 1961, beginning on the one hundred and twenty-first day after receipt by defendants' counsel of a copy of this fully executed and so approved Agreement.

b. During the term of this Agreement, as provided in Section 14 hereof, it is anticipated that plaintiff will incur certain legal fees, expert and other costs and disbursements with respect to Sections 10 and 11 hereof. Plaintiff and plaintiff's counsel agree to limit all such attorneys' and experts' fees, costs and disbursements to what is directly and reasonably necessary in connection with such Sections up to a combined total, which shall not exceed $87,500 per year, calculated on the basis of a 365 day year, beginning on the effective date of this Agreement under Section 22 hereof and ending on the date this Agreement terminates pursuant to the provisions of Section 14 hereof. During the term of this Agreement, as the same may be extended pursuant to

25

Section 11, plaintiff's counsel agree to submit vouchers to defendants' counsel on a semi-annual basis for any such attorneys' fees, costs and disbursements and defendants agree to reimburse plaintiff's counsel within ninety (90) days of receipt of such vouchers. If payment is delayed beyond ninety (90) days, defendants will also pay interest at the rate set forth in 28 U.S.C. § 1961, which shall accrue beginning on the ninety-first day.

c. Payment of each of the amounts referred to in this Section 12 is subject to the approval of all appropriate New York State officials in accordance with the provisions of Section 17 of the New York Public Officers Law.

13. Private Settlement Agreement.

This Agreement is a private settlement agreement within the meaning of 18 U.S.C. § 3626, and shall not be deemed to grant "prospective relief" within the meaning of said Section 3626. Nor shall this Agreement be deemed to constitute a consent decree or an adjudication on the merits. Neither this Agreement, nor any policies or procedures established thereunder, shall define any state or federal constitutional rights, be deemed an admission, or a waiver of sovereign immunity or Eleventh Amendment protection. Moreover, none of the parties will contend that any of the provisions, policies, procedures, and goals stated herein define clearly established constitutional rights of inmates or create any private right of action against the State of New York, its agents, employees or representatives. This Agreement in no way waives or otherwise affects, limits or modifies the obligations of inmates to comply with the exhaustion requirements of the Prison Litigation Reform Act, DOCS' directives and regulations, or any current or future state or federal law governing the rights and obligations of incarcerated persons. Nothing in this Agreement shall be deemed to limit any existing authority of DOCS to transfer inmates to other state or federal jurisdictions. Moreover, nothing in this Agreement shall be

deemed to require or permit the defendants to violate the laws of the State of New York or the United States, or to violate any terms or conditions of any collective bargaining agreement to which DOCS or the State of New York is a party. The defendants are not aware of any conflict between any of the provisions of this Agreement and any such law or collective bargaining agreement referred to in this Section.

14. Term.

Without further action by the parties or the Court, and subject to Section 11 hereof, this Agreement shall expire either two years from the commencement of operation of the RMHU to be created under Section 4(d) above, or one year from the date on which all additional ICP and Transitional ICP beds to be created under Sections 4(a) and (b) of this Agreement shall become available for use, whichever is later.

15. Binding Effect.

This Agreement is binding upon the plaintiff, plaintiff's successors, employees and agents, the defendants named in this lawsuit, and on the defendants' successors in office, employees and agents.

16. No Third-Party Beneficiaries.

Only the plaintiff named in this Agreement shall have standing to seek enforcement of any of the terms and conditions of this Agreement, which does not confer, and is not intended to confer rights on any other party.

17. Stipulation of Dismissal

The parties shall simultaneously herewith execute and deliver a Stipulation of Dismissal with respect to the captioned Action in the form annexed as Exhibit 1 hereto. The parties agree that after the Court orders said Stipulation of Dismissal, the Court shall have only the jurisdiction

27

and authority specified in Section 11 of this Agreement, subject to the termination provisions of

Section 14 hereof.

18. Funding.

    Capital improvements and material on budgeted staffing increases associated with this

Agreement will necessarily be subject to approvals and budgetary processes and contingent upon

legislative appropriations therefor.  The parties will use their best efforts to seek approval of the

additional funding necessary to implement this Agreement.

19. No Admissions or Precedential Effect.

    Nothing in this Agreement shall be construed as an admission or acknowledgment  of

liability whatsoever by any of the defendants or the New York State Department of Correctional

Services regarding any of the allegations made by the plaintiff in his complaint. It is the parties'

intention that this Agreement and any Order entered thereon shall have no precedential value or

effect whatsoever and shall not be admissible in any other action or proceeding as evidence or for

any other purpose, except in an action or proceeding to enforce this Agreement.

20. Entire Agreement

    This Agreement embodies the entire agreement of the parties in this matter and no oral

agreement entered into at any time nor any written agreement entered into prior to the execution

of this Agreement regarding the subject matter of the instant proceedings, shall be deemed to

exist, or to bind the parties hereto, or to vary the terms and conditions contained herein. Captions

are included herein solely for convenience of reference, are not part of this Agreement, and shall

not be used to limit or otherwise interpret the terms hereof.

21. Notices

    All notices under this Agreement shall be in writing and shall be mailed Certified Mail,

28

Return Receipt, to the recipient or recipients at the address or addresses specified in the signature pages of this Agreement. Copies of any notice to a party shall also be mailed in the manner provided above to the below-listed counsel to the parties at the addresses specified for such counsel.

22. Effective Date

This Agreement shall be effective upon the later of (i) its execution and delivery by the parties and (ii) execution by the Court on page 31 below.

Dated: New York, New York
April 17, 2007

> DISABILITY ADVOCATES, INC.
> Plaintiff
> 5 Clinton Square, Third Floor
> Albany, New York 12207-2201
> Tel. No. (518) 432-7861
>
> By _Nina Loewenstein_
>     Nina Loewenstein
>     Staff Attorney
>     Cliff Zucker
>     Executive Director
>
> PRISONERS' RIGHTS PROJECT
> Legal Aid Society
> Attorneys for Plaintiff
> 199 Water Street
> New York, New York 10038
> Tel. No. (212) 577-7977
>
> By _Sarah Kerr_
>     Sarah Kerr
>     Staff Attorney
>     John Boston
>     Project Director

29

ANDREW M. CUOMO
Attorney General of the
   State of New York
Attorney for Defendants
120 Broadway
New York, New York 10271-0332
Tel. No.(212) 416-8650

By_____
    Richard W. Brewster
    Leonard A. Cohen
    Lee A. Adlerstein
    John Knudsen
    Assistant Attorneys General

      The Court approves this Private Settlement Agreement as to form only. Section 12 is so ordered by the Court. To the extent that this Agreement permits or requires disclosures to plaintiff of any confidential medical or mental health information, the Court hereby authorizes such disclosures, subject to the confidentiality provisions set forth in the above Private Settlement Agreement.

Dated: New York, New York
April 27, 2007

          ENTER:

                    _____
                    HONORABLE GERARD E. LYNCH
                    United States District Judge

EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
DISABILITY ADVOCATES, INC.,                   :

                              Plaintiff,      :
                                                        02 Civ. 4002 (GEL)
              - against -                     :

NEW YORK STATE OFFICE OF                      :
MENTAL HEALTH, et al.,

                              Defendants.     :
-------------------------------------------------------x

     IT IS HEREBY STIPULATED AND AGREED by and between the parties, by their respective counsel, that this Action be and hereby is dismissed and discontinued with prejudice.

New York, New York
April   , 2007

                                  DISABILITY ADVOCATES, INC.
                                  Plaintiff
                                  5 Clinton Square, Third Floor
                                  Albany, New York 12207-2201
                                  Tel. No. (518) 432-7861

                                  By_____
                                      Nina Loewenstein
                                    Staff Attorney
                                    Cliff Zucker
                                    Executive Director

                                  PRISONERS' RIGHTS PROJECT
                                  Legal Aid Society
                                  Attorneys for Plaintiff
                                  199 Water Street
                                  New York, New York 10038
                                  Tel. No. (212) 577-7977

                                  By_____
                                      Sarah Kerr
                                    Staff Attorney
                                    John Boston
                                    Project Director

PRISONERS' LEGAL SERVICES
OF NEW YORK
Attorneys for Plaintiff
114 Prospect Street
Ithaca, New York 14850
Tel. No: (607) 273-2283

By_____

    Betsy C. Sterling
    Director of Special Litigation
        and Projects
    Alba Susan Johnson
    Executive Director


DAVIS POLK & WARDWELL
Attorneys for Plaintiff
450 Lexington Avenue
New York, New York 10017
Tel. No. (212) 450-4000

By_____

    James W.B. Benkard


ANDREW M. CUOMO
Attorney General of the
    State of New York
Attorney for Defendants
120 Broadway
New York, New York 10271-0332
Tel. No.(212) 416-8650

By_____

    Richard W. Brewster
    Leonard A. Cohen
    Lee A. Adlerstein
    John Knudsen
    Assistant Attorneys General

33

PRISONERS' LEGAL SERVICES
OF NEW YORK
Attorneys for Plaintiff
114 Prospect Street
Ithaca, New York 14850
Tel. No: (607) 273-2283

By       _Betsy C. Sterling_

           Betsy C. Sterling
           Director of Special Litigation
              and Projects
           Alba Susan Johnson
           Executive Director

DAVIS POLK & WARDWELL
Attorneys for Plaintiff
450 Lexington Avenue
New York, New York 10017
Tel. No. (212) 450-4000

By       _James W.B. Benkard_

           James W.B. Benkard

NEW YORK STATE
OFFICE OF MENTAL HEALTH
44 Holland Avenue
Albany, New York 12229

By       _Michael Hogan_

           Michael Hogan
           Commissioner

NEW YORK STATE
DEPARTMENT OF CORRECTIONAL
      SERVICES
1220 Washington Avenue
State Office Campus
Building 2
Albany, New York 12226

By       _Brian Fischer_

           Brian Fischer
           Commissioner

30