# **<u>Exhibit K</u>**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STATE OF CONNECTICUT OFFICE OF | : | Civil Action No. 3:03CV1352 (RNC) |
| PROTECTION AND ADVOCACY | : | |
| FOR PERSONS WITH DISABILITIES; | : | |
| JAMES MCGAUGHEY, Executive | : | |
| Director, Office of Protection and | : | |
| Advocacy for Persons with Disabilities, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| WAYNE CHOINSKI, Warden, | : | |
| Northern Correctional Institution, | : | |
| in his official capacity; | : | |
| GIOVANNY GOMEZ, Warden, | : | |
| Garner Correctional Institution, | : | |
| in his official capacity; and | : | |
| THERESA C. LANTZ, Commissioner, | : | |
| Connecticut Department of Correction, | : | |
| in her official capacity; | : | MARCH 8, 2004 |
| | : | |
| Defendants. | : | |

## SETTLEMENT AGREEMENT

### A. GENERAL PROVISIONS

1. This settlement agreement is entered into by the parties to resolve all of the claims made in this action, wherein the plaintiffs, Office of Protection and Advocacy for Persons with Disabilities ("OPA") and James McGaughey, bring a number of claims relating to the conditions of confinement of inmates housed at the Northern Correctional Institution and Garner Correctional Institution.

2. In entering this agreement, the parties agree and represent that this agreement is fair, reasonable and adequate to protect the interests of all parties and, with respect to the population served by the plaintiffs, that in the opinion of OPA, entering into this agreement is in the best interests of prisoners and detainees with mental illness, who may develop mental illness, or who are at risk of developing mental illness, who are confined

at Northern CI and Garner CI. The parties further agree and represent that the terms and conditions of this agreement do not constitute "prospective relief" within the meaning of 18 U.S.C. § 3626.

3. This settlement agreement is not to be construed as a Consent Judgment or as an adjudication on the merits of this litigation. The defendants deny the allegations in this lawsuit and do not admit liability. By entering into this settlement agreement, the defendants do not concede that their past policies and practices violate any state or federal laws, deprive any inmates of their state or federal constitutional rights, or were otherwise inadequate. Moreover, the parties acknowledge that the policies and procedures outlined herein do not define clearly established constitutional rights of inmates or create any private right of action against the State of Connecticut, its agents, employees and/or representatives.

4. By entering into this agreement, the defendants do not waive, and are not authorized to waive, the sovereign immunity of the State of Connecticut or the State's immunity from suit guaranteed by the Eleventh Amendment.

5. This settlement agreement is binding upon the plaintiffs, the plaintiffs' successors in office, employees and agents, the defendants named in this lawsuit, and on the defendants' successors in office, employees and agents.

6. Except where otherwise provided, the Defendants shall be obligated to perform their obligations under this settlement agreement upon the date of the filing of the Court's Order of Dismissal of this matter. The date of the filing of the Court's Order of Dismissal shall hereafter be referred to as the "effective date" of the agreement.

7. The parties shall request that the Court, in its Order of Dismissal, incorporate the terms of this Agreement, thereby making "the parties' obligation to comply with the terms of the Settlement Agreement ... part of the order" consistent with the holding in Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 381 (1994). The parties agree that, after the Court issues such an order, it shall have jurisdiction and authority to enforce this Agreement only as set forth in paragraph A.13, and subject to the termination provisions in paragraph B. 17. See Id.; Scelsa v. City University of New York, 76 F. 3d 37, 40 (2d Cir. 1996).

8. Prior to the filing of any motion challenging the adequacy of the defendants' compliance with the terms and conditions of this agreement, the plaintiffs shall first notify the Commissioner of the Department of Correction, defendants' counsel and the appropriate consultants described in paragraph B.17 in writing, detailing the nature of the breach and the proposed remedy, with specific reference to the enumerated paragraphs in this agreement that are alleged to have been breached. The consultants shall meet and confer as soon as possible regarding the claim of noncompliance and shall convey their recommended resolution of the claim to the parties within 30 days of receipt of the claim. If the consultants are unable to agree upon a recommended resolution, they shall select, by mutual agreement and within 15 days, a neutral expert to arbitrate the claim as set

2

forth in paragraph B.17 and shall convey the resulting recommended resolution of the claim to the parties within 30 days of said neutral expert's receipt of the claim.  If the parties do not agree with the consultants' recommended resolution, they shall meet and confer within 10 days of the date of the consultants' recommendation.

9.  In the event the defendants do not comply with or are unable to comply with the consultant's recommended resolution within 10 days of the parties' meeting and conference described in paragraph A.8., the parties shall contact the appropriate magistrate judge and meet with the court in an effort to resolve any dispute with respect to the defendants' compliance with this agreement.  No motion or other proceeding seeking enforcement of this agreement shall be filed or otherwise initiated until the parties have exhausted their discussions with the magistrate judge.

10.  The plaintiffs may bring an action to enforce this agreement solely upon a pattern of noncompliance.  Individual, isolated instances of noncompliance shall not be sufficient grounds for an enforcement action.

11.  If, after exhausting the mandatory, informal resolution process outlined above in paragraphs A.8. and A.9., the plaintiffs file a motion seeking an order to enforce any portion of this agreement, the plaintiffs' request for relief must be limited to specific performance.  No money damages may be sought.  The plaintiffs shall not seek an order of contempt unless and until (1) the plaintiffs have sought to enforce this agreement by filing an appropriate motion with the court and (2)  the court has issued a clear and unambiguous order of specific performance to the defendants.  Before an order of contempt is issued, the court shall find by clear and convincing evidence that the defendants did not diligently attempt in a reasonable manner to substantially comply with the court's clear and unambiguous order.

12.  Plaintiffs' entitlement to attorneys' fees for monitoring and enforcement of this agreement shall be limited to the three year effective term of this agreement, and shall be limited to the hourly rates permitted under the Prison Litigation Reform Act.  In no event shall plaintiffs' entitlement to attorneys' fees for monitoring and enforcement exceed $20,000 in any calendar year for attorney's fees and $5,000 a year for plaintiff's monitoring and enforcement expenses.

13.  After the Court adopts this settlement agreement, the Court's jurisdiction over the matters set forth in this litigation shall be limited, and specifically, the Court shall retain jurisdiction solely to ensure that the defendants have fulfilled the obligations undertaken in this settlement agreement.  If the plaintiffs have reasonable cause to believe that the defendants have failed to substantially perform any obligation undertaken in this settlement agreement, they may follow the procedures for seeking enforcement as set forth in paragraphs A.8. – A.11. herein.  At any hearing regarding the issue of the defendants' compliance with the terms of this agreement, plaintiffs shall have the burden of proving that the defendants have a pattern of failing to substantially comply with one or more of the terms of this agreement.  If, after hearing, the Court finds that the defendants have failed to substantially comply, the sole remedy shall be an order

3

directing specific performance of the agreement herein. The Court shall apply Connecticut state contract law in deciding any motion seeking specific performance. For purposes of this agreement, "substantially comply" and "substantial compliance" mean that the defendants are in compliance with the terms of this agreement in all material respects.

14.    Only the plaintiffs named in this agreement or James McGaughey's successors in office shall have standing to file a motion seeking enforcement of any of the terms and conditions of this agreement. This agreement does not confer, and is not intended to confer, any rights upon any other party. The parties to this agreement expressly acknowledge that there shall be no third party beneficiaries to this agreement. Further, any consultants appointed by the parties to audit compliance with this agreement shall have no authority to initiate any proceedings with the court. Only the parties are authorized to initiate proceedings with the court.

15.    This agreement in no way waives or otherwise affects, limits or modifies the obligations of inmates to comply with the exhaustion requirements of the Prison Litigation Reform Act, the administrative directives of the Department of Correction or any current or future state or federal law governing the rights and obligations of incarcerated persons.

16.    Nothing in this agreement shall require or permit the defendants to violate the laws of the State of Connecticut or the United States of America, nor violate any terms or conditions of any collective bargaining agreements to which the State of Connecticut is or becomes a party. "Laws of the State of Connecticut or the United States of America" are state and federal constitutional provisions, statutes, judicial decisions, Rules of Court and regulations of administrative agencies.

17.    The defendants agree that at the present time they are not aware of any conflict between this Agreement and the Laws of the State of Connecticut or any presently existing collective bargaining agreements to which the State is a party. The Commissioner and other policy-making officials of the Department of Correction further agree that they will not seek any new Laws or the execution of new collective bargaining agreements, or any changes or amendments to existing Laws or collective bargaining agreements, that would undermine the obligations undertaken in this Agreement. Nothing in this section shall affect the Department of Correction's ability to defend litigation brought against it, to pursue all litigation options and to exhaust all appeal rights. If, in the future, there arises a conflict between the defendants' obligations under this Agreement and any Laws of the State of Connecticut or collective bargaining agreement, the defendants may follow the laws of the State of Connecticut or collective bargaining agreement, and they shall promptly notify counsel for the plaintiffs of the perceived conflict. In the event that the defendants, due to such a claimed conflict, cease compliance with any provision of this Agreement, the plaintiffs may seek to enforce this Agreement or may seek reformation of the Agreement to address such cessation of compliance. Compliance with any law or collective bargaining provision that is determined by the court to conflict with defendants' obligations under this Agreement

4

shall be a complete defense to a claim of noncompliance with this Agreement. Prior to instituting any such enforcement or reformation action, the plaintiffs shall notify the defendants, and the parties shall meet with the Court. The provisions of A.8. – A.11. do not apply in these circumstances. The defendants shall continue in full compliance with all provisions of this Agreement that are not affected by the purportedly conflicting Law or collective bargaining agreement.

18.   Nothing in this agreement shall be construed to limit, in any way, the authority of the Commissioner of the CDOC to transfer inmates to other state or federal jurisdictions and/or to a private prison.

## B.   SPECIFIC PROVISIONS

### 1.   Definitions

"CDOC" means the Connecticut Department of Correction, UConn Correctional Managed Health Care, and their employees, contractors, and agents.

"Congregate programming" means programming in which the prisoner interacts with other prisoners.

"Consultants" means the consultants provided for in paragraph B.17.

"DMHAS" means the Connecticut Department of Mental Health and Addiction Services.

"Designated housing unit for the mentally ill" means the IPM, IMHU, F Block, G Block, and H Block at Garner Correctional Institution, the observation cells at NCI, as well as any housing unit that may hereafter be established at GCI or NCI where prisoners are housed due to mental illness or impairment.

"Doctoral-level clinician" means a licensed psychiatrist, or a licensed psychologist with a Ph.D., Psy.D., or Ed.D. degree.

"Exigent circumstances" means circumstances under which the doing of an act otherwise required by this Agreement would create an unacceptable risk to the safety of any person. Whenever an act otherwise required by this Agreement is excused on account of "exigent circumstances," defendants shall attempt to resolve the "exigent circumstances" as soon as possible, and the act shall be performed as soon as possible after the "exigent circumstances" cease to exist.

"GCI" means Garner Correctional Institution.

"IMHU" means the Intensive Mental Health Unit at Garner Correctional Institution.

"IPM" means the Inpatient Mental Health unit at Garner Correctional Institution.

"NCI" means Northern Correctional Institution.

"Observation" means that an inmate has been removed from a housing unit at NCI and admitted to an observation cell in the NCI medical unit because of mental health concerns.

"Prisoner housed in a designated housing unit for the mentally ill" does not include a prisoner whom a doctoral-level clinician has certified in writing is housed in such a unit for reasons unrelated to that prisoner's mental health.

"Programming" means therapeutic, educational, recreational, work, or other activities.

"Qualified Mental Health Professional" and "Practitioner" mean psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health needs of patients. (Taken from NCCHC Standard J-E-05 Re: Mental Health Screening and Evaluation).

"Serious assault" means intentionally striking, attacking or attempting to strike or attack a Department of Correction employee, another inmate or any other person, with or without the use of an object or substance (Taken from DOC Code of Penal Discipline, A.D. 9.5.12 C & D).

"Seriously mentally ill" has the meaning set forth in Appendix A hereto.

2.      **Scope of Agreement**

Except as specified in paragraph B.4. below, this Agreement applies only to prisoners housed at GCI and NCI.

3.      **Removal of the Seriously Mentally Ill from NCI**

Persons who are subject to the DMHAS evaluation process set forth in Appendix B hereto and meet the definition of "Seriously Mentally Ill", as defined in Appendix A hereto, shall be removed from NCI within ten business days of receipt of DMHAS' report, absent exigent circumstances. If the removal of a prisoner is delayed because of "exigent circumstances," defendants shall attempt to resolve the "exigent circumstances" as soon as possible, and the prisoner shall be removed as soon as possible after the "exigent circumstances" cease to exist.

4.      **Exclusion of the Seriously Mentally Ill from NCI's Administrative Segregation Program**

Any prisoner being considered for transfer to NCI for placement in the administrative segregation program shall be evaluated by a licensed doctoral-level clinician, or by a qualified mental health professional if a licensed doctoral-level clinician is not available,

to determine whether the prisoner is seriously mentally ill. Absent exigent circumstances or the unavailability of a qualified mental health professional, the evaluation will take place prior to the transfer of the inmate to NCI's administrative segregation program. In the event there was no pre-transfer evaluation, or if the prisoner was not evaluated by a licensed doctoral-level clinician prior to transfer, then an evaluation by a licensed doctoral-level clinician shall be completed by the end of the third business day after the inmate's transfer to NCI's administrative segregation program. The evaluation shall include, at a minimum, review of the prisoner's medical and mental health files, and custody data, and a face-to-face interview with the prisoner, conducted in a private, confidential setting. For any prisoner being considered for transfer to NCI's administrative segregation program or transferred to NCI's administrative segregation program under this paragraph, defendants shall make a good faith effort to obtain records from any pre-incarceration psychiatric hospitalization, and any such records, if obtained, shall be reviewed by the doctoral-level clinician as part of the evaluation. If the prisoner is found to be seriously mentally ill, he shall not be transferred to or kept at NCI's administrative segregation program , except as set forth below:

1. Absent exigent circumstances, no seriously mentally ill prisoner shall be transferred to the administrative segregation program at NCI without prior notice to plaintiffs. If defendants wish to transfer a seriously mentally ill prisoner to the administrative segregation program at NCI, they shall give plaintiffs at least ten days' advance notice of the proposed transfer, unless exigent circumstances make such notice impracticable.

2. No seriously mentally ill prisoner shall be housed in the administrative segregation program at NCI unless defendants have produced a report to plaintiffs that

   a. provides documentation of the prisoner's dangerousness;
   b. describes all potential alternative placements, both in Connecticut and outside the state, that defendants have considered for the prisoner, and explains why none of them is workable; and
   c. identifies the additional services that will be provided to the prisoner if he is transferred to NCI, to help him with his serious mental illness and to mitigate the effect the conditions at NCI have on that illness.

If a prisoner housed at NCI in the administrative segregation program is found to be seriously mentally ill, that prisoner shall be removed from NCI within 10 days of that finding unless exigent circumstances warrant otherwise. If the removal of a prisoner is delayed because of "exigent circumstances," defendants shall attempt to resolve the "exigent circumstances" as soon as possible, and the prisoner shall be removed as soon as possible after the "exigent circumstances" cease to exist.

A prisoner who has been deemed unsuitable for transfer to NCI and placement in the administrative segregation program because he is seriously mentally ill, or has been removed from NCI's administrative segregation program because he is seriously mentally

7

ill, shall not thereafter be transferred to NCI and placed in the administrative segregation program unless (a) the dangerousness exception set forth in point 2. above applies or (b) unless more than four months have passed since the prisoner was found to be seriously mentally ill; a UCONN doctoral-level clinician has determined, after appropriate evaluation, that the prisoner is not currently seriously mentally ill and is not likely to become seriously mentally ill if transferred to NCI; and these findings are confirmed by an independent evaluation performed by a doctoral-level clinician from DMHAS selected by the parties. In the event the UCONN doctoral level clinician and the DMHAS doctoral level clinician disagree, the Commissioner of the DOC ("Commissioner") may transfer the prisoner to NCI and place him in the administrative segregation program if the Commissioner explains in writing why he/she disagrees with the conclusion of the independent DMHAS evaluation and agrees with the finding by the UCONN clinician that the inmate is not seriously mentally ill and is not likely to become seriously mentally ill if transferred to NCI and placed in the administrative segregation program. Conversely, if the Commissioner agrees with the evaluation done by the DMHAS clinician, the prisoner shall not be transferred to NCI and placed in the administrative segregation program. A copy of the written explanation will be sent to plaintiffs and to the consultants. A prisoner who is subject to this review process may be transferred to NCI and placed in the administrative segregation program pending the outcome of the review process; provided that in such cases, the initial determination shall take place within five days of that transfer, the independent evaluation shall take place within 10 days of the initial determination, and the Commissioner's review shall take place within five days of the independent evaluation. If the result of the review process is to transfer the prisoner back out of NCI's administrative segregation program, that transfer shall take place within five days of the completion of the review process. Defendants shall promptly notify plaintiffs and the consultants whenever a prisoner who has previously been found to be seriously mentally ill is transferred to NCI and placed in the administrative segregation program.

## 4.a.   Periodic Evaluations

Prisoners housed at NCI and in the administrative segregation program shall be evaluated not less than every 90 days by a doctoral-level clinician to determine whether their mental health is being adversely affected by confinement at NCI's administrative segregation program. This evaluation shall include, at a minimum, review of the prisoner's medical, mental health, and custody files, and a face-to-face interview with the prisoner, conducted in a private, confidential setting.

## 5.   Mental Health Staffing

CDOC shall employ at least 1 FTE psychiatrist, or the equivalent of 1 FTE psychiatrist, for each 150 prisoners who are prescribed psychotropic medications at GCI and NCI. Prisoners prescribed psychotropic medication by a M.D. for a reason other than for treating a mental health condition, shall not be included in this "150 prisoners" figure for staffing purposes provided however, that such prescriptions shall be subject to audit by the consultants as described below. For purposes of this section and section B.5.A.,

8

psychotropic medication to treat dyssomnia, or sleep disorders shall be considered to be prescribed for treating a mental health condition.  By "equivalent" in the first sentence is meant that some of the hours of psychiatric time can be replaced by hours of an APRN's time; but at least 60% of the required psychiatrist time must be filled by a psychiatrist; and when APRN hours are substituted for psychiatrist hours, there must be 1.2 hours of an APRN's time for every substituted hour of a psychiatrist's time. Thus, for example, if the equivalent of 1 FTE psychiatrist is required in an institution where 150 prisoners are prescribed psychotropic medications, this requirement can be met by having a psychiatrist 60% of full time and having an APRN 1.2 X 40% time, in other words, (if full-time is considered to be 40 hours per week), 24 hours of a psychiatrist's time and 1.2 X 16 or 19.2 hours of an APRN's time.  In terms of other staffing levels, the CDOC will comply with the National Commission on Correctional Health Care 2003 Standard #M-C-07, to wit:

"A written staffing plan assures that a sufficient number of health staff of varying types is available to provide adequate and timely evaluation and treatment consistent with contemporary standards of care."

"Compliance Indicators:  (1)  All aspects of the standard are addressed by written policy and defined procedures.  (2)  The responsible health authority approves the staffing plan. (3)  The adequacy and effectiveness of the staffing plan are assessed by the facility's ability to meet the health needs of the inmate population."

In accordance with the NCCHC 2003 standard #P-A-06, "A continuous quality improvement (CQI) program in all facilities monitors and improves upon health care delivered in the facility," a quality assurance/peer review mechanism will be developed to monitor the adequacy and effectiveness of the staffing plan, and changes to that plan will be made accordingly.

The usual and customary practice will be to provide the staffing required to implement this agreement.  However, short-term deviations shall be permitted in instances of absence beyond the power of the defendants to correct by means of providing overtime assignment or by any other means reasonably available to defendants.  Defendants shall give written notice of any such deviations to plaintiffs and to the consultants.

5a.   **Psychoactive Medication**

University of Connecticut Health Center, Correctional Managed Health Care, Policy and Procedures Number G 51.05 (Revised 12/20/01, 6/18/03) will be followed, with these additions and changes:

No prisoner shall have a prescription for psychotropic medication initiated, changed or discontinued without a prior, private, face-to-face interview with a psychiatrist, or APRN under a psychiatrist's supervision, unless exigent circumstances exist or an inmate refuses to participate in a private face-to-face interview. In cases where a prisoner is admitted to NCI or GCI already receiving prescribed psychotropic medications, the medications can

9

be prescribed prior to a visit with a psychiatrist or APRN, but with an order by a psychiatrist or APRN, pending a face-to-face visit within three days. Any prisoner who is prescribed psychotropic medication shall be evaluated in a private face-to-face interview with a psychiatrist or APRN at least every two months, or more often if clinically indicated. If the prisoner refuses to exit his cell to meet with the psychiatrist or APRN in an office for the purpose of an initial assessment for medications or a follow-up evaluation, the clinician will go to see the prisoner at his cell, assess the clinical situation, devise and institute an appropriate intervention for the individual prisoner under the circumstances, and record the encounter and the intervention in the medical chart within 96 hours of the refusal. In the case of routine changes or prisoner-initiated discontinuation of prescribed medications, the prescribing psychiatrist or APRN will attempt to schedule a meeting with the prisoner within 7 days of the refusal, to discuss the prisoner's condition and medications, or, if he refuses to come to the office, will visit the prisoner at his cell within 96 hours of the refusal, and will devise and carry out an appropriate treatment plan and record it in the prisoner's chart.

The foregoing paragraph does not apply to psychotropic medications prescribed by an M.D. for a reason other than for treating a mental health condition. The consultants shall address such prescriptions in the audit instrument described in Section B.17. and shall review the issuance of such prescriptions as part of their audits.

According to Policy #G 51.05, "The CMHC psychiatrist, or CMHC APRN with psychiatric certification, shall sign telephone orders within 72 hours of the order." At NCI and GCI, if a telephone order is given, the psychiatrist or APRN will try to see the prisoner within 24 hours if practical, but in any event shall see the prisoner within 72 hours. The meeting will occur in a private, confidential setting unless exigent circumstances or the prisoner's refusal make this impracticable.

6.    **Confidentiality of Mental Health Services**

Prisoners shall have the opportunity to request mental health services 7 days a week through a confidential written request system. These requests shall be collected 7 days a week, and shall be triaged by mental health staff within 24 hours of collection. These requests, and any responses to them, shall be filed in the prisoner's mental health file. Except in emergencies or in instances where an inmate refuses to come out of his cell for a private interview, mental health evaluation and/or treatment shall not be provided at cell-front, but shall be delivered in a setting that provides audio privacy from other prisoners and from non-health care staff. If the prisoner refuses to exit his cell, a licensed doctoral level clinician or APRN will go to see the prisoner at his cell within 96 hours of the refusal, assess the clinical situation, devise and institute an appropriate intervention for the individual prisoner under the circumstances, and record the encounter and the intervention in the prisoner's health record.

Whenever CDOC policy or this agreement require that a prisoner be "evaluated," seen," "examined," "interviewed," "assessed," or "screened" (or any other similar term) for mental health purposes (including the 30 and 90 day mental health reviews required by A.D. 9.4, "Restrictive Status," para. 14.D.), a "cell front" interview shall not satisfy this

requirement. Rather, the prisoner shall be interviewed in a setting that provides audio privacy from other prisoners and from non-health care staff. This provision shall not apply in instances where an inmate refuses to come out of his cell for a private interview. If the prisoner refuses to exit his cell, a licensed doctoral level clinician or APRN will go to see the prisoner at his cell within 96 hours of the refusal, assess the clinical situation, devise and institute an appropriate intervention for the individual prisoner under the circumstances, and record the encounter and the intervention in the prisoner's health record.

7.    **Use of Force on the Mentally Ill**

Prior to a planned use of force on a prisoner housed in a designated housing unit for the mentally ill, clinical intervention shall be attempted by a qualified mental health provider, acting in consultation, if possible, with a doctoral-level clinician. The provider shall attempt to verbally counsel the prisoner and attempt to persuade him to cease the behavior that has led to the planned use of force. The provider shall document this process in the prisoner's health record.

If the clinical intervention described in the previous paragraph does not, in the opinion of the shift supervisor, resolve the situation requiring use of force, the shift supervisor shall issue a verbal warning to the prisoner, and shall provide the prisoner with a reasonable amount of time to cease the offending behavior before initiating the use of force. The shift supervisor shall document this warning in an incident report.

Prior to a planned use of chemical agents on a prisoner housed in a designated housing unit for the mentally ill, and absent exigent circumstances, the prisoner's health record shall be consulted by a qualified member of health services staff to determine whether the use of chemical agents on the prisoner is medically contraindicated. The substance of this consultation shall be documented on a medical incident report or the prisoner's health record.

Nothing in this section shall preclude a shift supervisor from authorizing use of force in an emergency to prevent significant injury to the inmate in question, or another person, or damage to property that raises safety concerns.

8.    **Discipline**

Before a Class A disciplinary report as defined in A.D. 9.5 is delivered to a prisoner housed in a designated housing unit for the mentally ill, a qualified mental health professional shall be consulted and asked to express an opinion as to (1) Whether the behavior for which the disciplinary report is given is a result of the prisoner's mental illness, and (2) Whether disciplining the prisoner would aggravate his mental illness. This consultation shall be documented in an incident report, a disciplinary investigator's report or the inmate's health record. If the practitioner answers in the affirmative to either of Questions (1) or (2) above, the disciplinary report shall not be delivered to the prisoner and shall be dismissed, unless the Warden directs in writing otherwise. In any

11

case in which a prisoner is given a disciplinary report despite the practitioner's affirmative answer to Questions (1) and/or (2), the form on which the practitioner's opinion is noted shall be given to the hearing officer prior to the disciplinary hearing and/or the imposition of any sanction.

In no event shall a prisoner receive disciplinary sanctions for verbally reporting to appropriate CDOC staff feelings or intentions regarding self-harm or suicide.

9.   **Observation**

Any prisoner at NCI who remains on Observation for more than 72 hours shall be transferred on an emergency basis to GCL. Prisoners in Observation shall be treated in compliance with NCCHC standards governing use of restraints and seclusion.

10.   **Restraint Policy**

No prisoner shall be required to wear restraints during recreation, except that:

1.   Upon transfer to Phase I of the administrative segregation program at NCI, a prisoner who has committed a serious assault or other serious incident that significantly impacts the operation of a housing unit or facility within the past 90 days may be required to wear restraints during recreation for not more than a 7 day period, unless a facility classification review demonstrates in writing a legitimate reason for continuing restraints.

2.   A prisoner who, while housed at NCI, commits a major misconduct involving serious assault or other serious incident that significantly impacts the operation of a housing unit or facility may be required to wear restraints during recreation for not more than a 21 day period, unless a facility classification review demonstrates in writing a legitimate reason for continuing restraints.

3.   Use of restraints during recreation for prisoners housed in a designated housing unit for the mentally ill shall be governed by paragraph B. 16 and not by this section.

4.   A monthly report shall be generated and given to plaintiffs and the consultants listing every prisoner who has been required to wear restraints during recreation for 21 or more days and for each such prisoner, the dates he has been required to wear restraints during recreation.

No prisoner shall be required to wear hand or wrist restraints during non-contact visiting, except that:

1.   Upon transfer to Phase I of the administrative segregation program at NCI, a prisoner who has committed a major misconduct involving serious assault or other serious incident that significantly impacts the operation of a housing unit or

facility within the past 90 days may be required to wear hand or wrist restraints during non-contact visiting for not more than a 7 day period, unless a facility classification review demonstrates in writing a legitimate reason for continuing restraints.

2.     A prisoner who, while housed at NCI, commits a major misconduct involving serious assault or other serious incident that significantly impacts the operation of a housing unit or facility may be required to wear hand or wrist restraints during non-contact visiting for not more than a 21 day period, unless a facility classification review demonstrates in writing a legitimate reason for continuing restraints.

3.     A monthly report shall be generated and given to plaintiffs and the consultants listing each prisoner who has been required to wear hand or wrist restraints during visiting for 21 or more days and for each such prisoner, the dates he has been required to wear restraints during visiting.

A prisoner for whom a major misconduct has been dismissed, or of which the prisoner has been found not guilty, shall not be deemed to have "committed" that misconduct for purposes of this section.

For prisoners housed in a designated housing unit for the mentally ill, four point restraints shall be applied and maintained only in accordance with A.D. 6.5, Use of Force (revised 2/28/03) section 9 on use of therapeutic restraints, a copy of which is attached as Appendix C.

11.     **Programming in Phase I**

Programming will be available to all prisoners in all three phases of the NCI administrative segregation program. Prisoners may have the opportunity to complete assignments while in their cells, but not all programming will be conducted exclusively in-cell. Programming will be available in English and Spanish. Sign language interpreter services shall be made available to deaf or hard of hearing prisoners, and any written material shall be made available in either Braille or large print format to any prisoner who is blind or has a visual impairment. Prisoners who are unable to read or write or otherwise unable to complete written assignments because of learning disabilities or other disabilities that preclude them from being able to concentrate (such as ADD or ADHD) shall be excused from all written assignments.

The prisoner's demonstrated willingness to participate in the programming will be a factor that may be considered by the classification committee in deciding whether the prisoner will progress to the next phase of the NCI administrative segregation program; but specific answers given or not given in the course of that participation shall not be a factor that may be considered by the classification committee unless they demonstrate an unwillingness to participate or are threatening.

13

12.     **Length of Phase 1**

The minimum duration of NCI's administrative segregation Phase 1 shall be 120 days. After 180 days on Phase 1, a prisoner shall be promoted to Phase 2 unless a facility classification review demonstrates in writing a legitimate reason for the inmate to remain in Phase I.

If a prisoner remains on Phase 1 for more than 120 days, he shall be evaluated by a doctoral-level clinician to determine whether his progress through the phase system is being impaired by mental illness. This evaluation shall include, at a minimum, review of the prisoner's medical, mental health, and custody data, and a face-to-face interview with the prisoner, conducted in a private, confidential setting. The practitioner shall document this evaluation, and the practitioner's findings, in the inmate's health record. If the practitioner finds that the prisoner's progress through the phase system is being impaired by mental illness, the practitioner shall report this finding to the classification committee, which shall consider promotion of the prisoner to Phase 2, or other accommodation for the prisoner's mental illness. If the prisoner is not promoted to Phase 2, the evaluations required by this paragraph shall thereafter occur every 30 days while the prisoner remains in Phase 1.

A monthly report shall be generated and given to plaintiffs and the consultants listing every prisoner who has remained in Phase 1 for more than 120 days and for each such prisoner, the length of his stay at Phase I and the reason(s) for his continued stay in Phase I.

13.     **Conditions of Confinement**

Defendants shall install, and maintain in good working order, calendar clocks that are in or visible from all cells at GCI and NCI's administrative segregation program.

Prisoners in Phases 1, 2, and 3 of the NCI administrative segregation program shall be allowed to purchase commissary-approved audio devices at their own expense.

Prisoners in Phase 1 of NCI's administrative segregation program shall be allowed at least five hours out-of-cell outdoor recreation time per week.

After thirty days, prisoners in Phase 2 of NCI's administrative segregation program shall be allowed at least seven and one-half hours out-of-cell time per week, of which at least five hours shall be outdoor recreation time, and at least two and one-half hours shall be congregate programming.

Prisoners in Phase 3 of NCI's administrative segregation program shall be allowed at least fourteen hours out-of-cell time per week, of which at least five hours shall be outdoor recreation time, and at least two and one-half hours shall be congregate programming.

14

14. **Family**

Visiting, commissary or telephone calls may be reduced or eliminated as a penalty for misconduct by a prisoner. However, an inmate found guilty of a disciplinary report shall not lose both visiting and telephone privileges at the same time. Although there is no limit on the amount of time for which an inmate can lose visiting or telephone privileges if he continues amassing disciplinary reports, the maximum amount of time that may be served at any one time is 45 consecutive days. By way of example, if an inmate amasses several disciplinary reports and loses 135 days of visiting privileges and 135 of telephone privileges, the sanctions shall be served as follows: 45 days loss of phone privileges, with no loss of visiting privileges during this 45 day period. Then the phone privileges are temporarily restored for 45 days, while the inmate is on loss of visiting for 45 days, then visiting privileges are restored temporarily for 45 days, while the inmate is on loss of phone privileges for 45 days. The sanctions shall be served in this staggered manner until an inmate has served day for day each penalty imposed. In no event shall mail, legal visiting or legal telephone calls be reduced, eliminated, or otherwise affected as a sanction for misconduct, except that mail may be restricted for mail related misconduct.

15. **Staff Training**

All security staff at NCI and GCI shall receive at least eight hours of training per year on mental health issues. This training shall cover, at a minimum, the following topics:

- prevention of suicide and self-harm
- recognizing signs of mental illness
- communication skills for interacting with prisoners with mental illness
- alternatives to discipline and use of force when dealing with prisoners with mental illness.

This training shall include both live instruction and distribution of written materials, and shall be provided by instructors at an ACA accredited training academy.

16. **Garner Correctional Institution**

In the IPM and IMHU units and other designated housing units for the mentally ill at GCI, there will be 3 hours a day, 5 days a week of out-of-cell therapeutic, educational, rehabilitative and recreational programs offered to all prisoners who are capable of safely participating. These programs will include but are not limited to individual and group psychotherapy, milieu therapy, case management, social work intervention, a variety of psychiatric rehabilitation programs, substance abuse programs, recreational activities and supervised free time out of cell. Prisoners who are capable of safely doing so will participate in out-of-cell therapeutic, educational, rehabilitative and recreational activities at least 3 hours per day, 5 days a week. The aim is to progress every prisoner to participate in at least 5 hours per day of out-of-cell programming as soon as possible or when clinically indicated. If, because of a prisoner's assaultiveness, recent disciplinary reports, mental status, or other exigent circumstances, this much out-of-cell activity is

deemed inappropriate by mental health and correctional staff, or if limits on the manner of out-of-cell activity, including the use of restraints during recreation, is deemed necessary by correctional staff, then an individualized treatment plan will be devised and put into effect with one of its aims being the rapid preparation of the prisoner for participation in the therapeutic milieu and the therapeutic programs that are available on the unit for at least 5 hours per day, 5 days a week, and the end of any limits on the manner of out-of-cell activities, including the use of restraints during recreation.

Each inmate in the GCI treatment program will have an individualized treatment plan developed by the inmate's treatment team. The inmate's programming will be provided in accordance with the individualized treatment plan.

Defendants shall provide a monthly report prepared by the supervising psychologist to the plaintiffs, to the consultants, to the Facility Warden, Health Services Administrator, and to the CMHC Director of Mental Health Services, listing all prisoners whose out-of-cell activities have been restricted to less than 5 hours per day or whose manner of out-of-cell activities has been limited, including wearing of restraints during recreation, for more than seven consecutive days under the provisions of the previous paragraph and describing the rationale for the restrictions.

Upon admission to GCI, an inmate housed in a designated housing unit for the mentally ill may spend up to his first seven days in a "diagnostic and evaluation" program that may limit his out-of-cell time to the extent found appropriate by mental health and custody staff.

Where disciplinary problems arise, they will be managed according to this agreement, and in every instance possible, by having mental health staff collaborate with correctional staff in devising an intervention strategy that both maintains security and the smooth operation of the institution and promotes the aims of prisoners' mental health treatment.

17.    **Enforcement and Compliance Assessment**

This agreement shall remain in effect only for a period of three years from the effective date. The agreement, and all rights and obligations arising thereunder, shall terminate and shall no longer be enforceable three years from the effective date. Upon termination, without the need for any further order of any state or federal court, all jurisdiction of any court, as well as the right of the plaintiffs to seek specific performance of this agreement, shall end, and no court shall have the power or jurisdiction to enforce this agreement. The parties agree that nothing in this agreement may be construed to authorize the court to extend this agreement beyond the termination date referred to in this paragraph, and the plaintiffs expressly agree that they will not seek, and are barred from seeking, an extension of this agreement. As of the third anniversary of the effective date of the agreement, all rights and obligations shall terminate and any pending action for relief would be moot. In the event any motions or proceedings are pending on the third anniversary of the effective date of this agreement, the court shall be bound to dismiss any such motions or proceedings as the court's jurisdiction shall terminate with the exception of any attorneys' fees motions not yet acted upon by the Court.

The parties agree not to unilaterally seek to modify, extend, add to, terminate, or otherwise challenge this agreement, under the Prison Legal Reform Act or otherwise, for the duration of the three-year enforcement period. The parties further agree that this agreement may be modified or terminated at any time by mutual, written agreement.

To assess the defendants' compliance with this agreement, the plaintiffs shall appoint a mental health consultant and a custody consultant and the defendants shall appoint a mental health consultant and a custody consultant, for a total of two consultants each, and a grand total of four consultants. The consultants shall be given continued access to GCI and NCI to monitor compliance with this agreement. As part of their assessment function the consultants shall have full access to the two facilities and all documents not covered by the attorney-client or work product privileges in the defendants' possession or control that pertain to NCI or GCI, except documents maintained by CDOC that relate to facility security operations, including but not limited to blueprints, chapter seven of the administrative directives, chapter seven of the unit directives, post orders, emergency plans, internal photographs, staff home phone numbers or home addresses, personnel files, or similar documents. The consultants shall also be permitted to conduct private, confidential interviews, on a voluntary basis, as to matters listed on the audit instrument, with both (1) GCI and NCI inmates and (2) any CDOC staff whose responsibilities pertain to NCI or GCI. CDOC will encourage CDOC staff members to talk to the consultants. However, it is understood by all parties that if a particular inmate has pending litigation against the CDOC or its employees, the CDOC staff members may be advised to contact their attorney first, before discussing said inmate with the consultants.

The parties will submit to the court the issue of ordering the disclosure of prisoner health records to the consultants. The parties and their consultants stipulate that any health records ordered to be disclosed by the Court shall be used solely to evaluate compliance with this agreement and all copies of health records shall be destroyed upon termination of this agreement.

The Court shall not, sua sponte or otherwise, expand or alter the provisions of this agreement. The court may, however, act on a motion to reform this agreement as set forth in Paragraph A.17.

The consultants shall not disclose to any inmate information which they obtained under this agreement without prior notification to the parties and their attorneys. Defendants shall have the right to object to the consultants' disclosure of information which, if disclosed to an inmate, could jeopardize the safety and security of staff, other inmates or the general public.

Each mental health consultant shall be a qualified mental health professional, and each party shall submit the name and credentials to the opposing party prior to the date this agreement becomes effective.

The consultants' sole function shall be to review compliance with this agreement. The consultants shall not review or become involved in matters which are not directly provided for in this agreement and they shall perform this function in accordance with their respective audit instruments. The consultants have no authority to add to or to alter the provisions of this agreement.

Prior to the effective date of this agreement, the mental health consultants shall meet with appropriate CDOC personnel and develop an audit instrument for the purpose of evaluating compliance with the mental health sections of this Agreement and the custody consultants shall meet with appropriate CDOC personnel and develop an audit instrument for the purpose of evaluating compliance with the custody sections of this Agreement. The audit instruments shall be developed solely to assess whether CDOC is in compliance with the express terms and conditions of this agreement, and may not be modified by the consultants during the three years this agreement is in effect except if, by mutual agreement of the two consultants who developed the audit instrument, they find it reasonably necessary in order to perform their duties. Once approved by the parties, the audit instruments shall form the basis of all consultant evaluations, and at no time may either consultant assess any aspect of CDOC operations that is not specifically identified in the audit instruments.

The audits shall be completed according to the following schedule, with reports submitted to counsel for the plaintiffs and the defendants:

- Six months after the effective date of the agreement
- One year after the effective date of the agreement
- Eighteen months after the effective date of the agreement
- Twenty-four months after the effective date of the agreement
- Thirty months after the effective date of the agreement

All consultants' reports shall remain confidential, and shall not be disclosed publicly by the consultants during the effective term of this agreement, except for the purpose of pursuing or defending any action to enforce this agreement, and except if disclosure is ordered by a court of competent jurisdiction. If either party to this agreement is made aware of a request for the entry of such a court order, that party shall notify the other parties to the agreement.

The consultants shall work collaboratively and in an effort to reach consensus on their audit items. In the event the consultants are unable to agree on the audit instrument or on whether the defendants are in compliance with one or more terms of this agreement, then the consultants shall select, by mutual agreement, a neutral expert to arbitrate these issues. The neutral expert shall be entitled to the same level of access to facilities, records, staff and inmates as the consultants.

It is expressly understood and agreed that any consultants appointed by the parties, and anyone selected to arbitrate disputes among the parties' consultants, are not court monitors or special masters, and that the consultants will not submit their reports or have

18

any communications with the Court without the express agreement of all parties. No consultant shall engage in any ex parte communications with any court having jurisdiction to enforce the terms of this agreement.

Upon submission of an appropriate invoice for services and expenses, CDOC shall reimburse each of the plaintiffs' consultants in an amount not to exceed a grand total of $40,000 per year for each of the three years this agreement is in effect (a year shall be each 12 month period following the effective date of this agreement). In the event that a neutral expert is required to arbitrate disputes between the consultants as set forth in this paragraph and as set forth in paragraph A.8., CDOC shall reimburse each such neutral expert in an amount not to exceed $15,000.00 per year.

## 18.    Attorneys' Fees and Costs

The defendants shall pay to the plaintiffs the sum of $177,850.00 for attorneys' fees and $13,131.16 for costs incurred in this case to date. Any future awards of attorneys' fees shall be calculated in accordance with the hourly rates established pursuant to the Prison Litigation Reform Act and limited to $20,000 a year as set forth in Paragraph A12 above for attorney's fees and $5,000 a year for plaintiff's monitoring and enforcement expenses.

## 19.    Approval of Legislature Required

Prior to submission of this agreement to the Court for approval, the parties acknowledge that the defendants' authority to enter into this Settlement Agreement is contingent upon the General Assembly's approval of this agreement pursuant to Conn. Gen. Stat. § 3-125a. The defendants have not obtained the General Assembly's approval at the time they and their attorneys signed this agreement, and will not have the General Assembly's approval until such time as the General Assembly has approved this agreement by resolution, or the thirty day period for the General Assembly to consider this agreement has elapsed, as described in Conn. Gen. Stat. § 3-125a.

PLAINTIFFS,
Office of Protection & Advocacy

_James M. McGaughey_
James M. McGaughey
Executive Director

_Nancy B. Alisberg_
Nancy Alisberg
Office of Protection & Advocacy
Federal Bar No. ct21321
60-B Weston Street
Hartford, CT  06120
Tel. (860) 297-4300 Fax (860) 566-8714
E-Mail: nancy.alisberg@po.state.ct.us

_Ben A. Solnit_
Ben A. Solnit
Tyler, Cooper & Alcorn, LLP
Federal Bar No. ct00292
205 Church Street
New Haven, CT  06509-1910
Tel. (203) 784-8200 Fax. (203) 777-1181
E-Mail: solnit@tylercooper.com

_David C. Fathi_
David C. Fathi
Federal Bar No. ct22477
ACLU National Prison Project
733 15th Street, NW, Suite 620
Washington, DC  20005
Tel. (202) 393-4930 Fax. (202) 393-4931
E-Mail: dfathi@npp-aclu.org

_Erin Boggs_
Erin Boggs
Federal Bar No. ct22989
Interim Legal Director
Connecticut Civil Liberties Union Foundation
32 Grand Street
Hartford, CT  06106
Tel. (860) 247-9823 x211 Fax (860) 728-0287
E-Mail: eboggs@cclu.org

DEFENDANTS,
Wayne Choinski, et al.

_Theresa C. Lantz_
Theresa C. Lantz
Commissioner of Correction

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _Terrence M. O'Neill_
Terrence M. O'Neill
Assistant Attorney General
Federal Bar No. ct10835
110 Sherman Street
Hartford, CT  06105
Tel. (860) 808-5450 Fax (860) 808-5591
E-Mail: terrence.oneill@po.state.ct.us

_Ann E. Lynch_
Ann E. Lynch
Assistant Attorney General
Federal Bar No. ct08326
110 Sherman Street
Hartford, CT  06105
Tel. (860) 808-5450 Fax (860) 808-5591
E-Mail: ann.lynch@po.state.ct.us

_Steven R. Strom_
Steven R. Strom
Assistant Attorney General
Federal Bar No. ct211
110 Sherman Street
Hartford, CT  06105
Tel. (860) 808-5450 Fax (860) 808-5591
E-Mail: steven.strom@po.state.ct.us

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed to the following this 8th day of March 2004:

## APPENDIX A

I.      Evaluation of Selected Prisoners at Northern Correctional Institution

CDOC agrees to evaluate certain prisoners at Northern Correctional Institution for serious mental illness, and to remove from NCI those found to be suffering from serious mental illness.

**Population to be Evaluated**

All prisoners housed at NCI who:

1.      Are classified as Administrative Segregation Phase I
2.      Are classified as Administrative Segregation Phases II or III, or SRG I, II, or III and have a mental health score of 3 or above
3.      Are in any phase of Administrative Segregation or SRG and have a history of psychiatric hospitalization based upon each inmate's most recent NCI Mental Health Intake Form
4.      Have been prescribed psychotropic medication within the last 6 months
5.      Have been assigned an "S" classification score
6.      Have a history of Self-mutilation or suicidal gestures within the last 12 months

Prisoners will be evaluated in the following order:

1.      Everyone who has been in Observation in the last month
2.      Everyone who has been in Observation twice or more times in the last year
3.      Everyone who is prescribed anti-psychotic and/or mood stabilizing medications
4.      Everyone who has been in Phase I of the Administrative Segregation program for over 9 months
5.      Everyone who is prescribed any psychiatric medication or has been prescribed such medications in the last six months.
6.      All others in the categories designated in the settlement agreement.

II.     Definition of Serious Mental Illness

I. For the purpose of the one-time evaluation process of selected inmates currently housed in the CT DOC Northern Correctional Institute at the request of the State of Connecticut Office of Protection and Advocacy:

a. Inmates with a current diagnosis, that takes past psychiatric history into account, of the following disorders that meet DSM-IV criteria, even if there are no current symptoms, and inmates who are currently under treatment for one of these disorders:

1) Schizophrenia
2) Delusional Disorder
3) Schizophreniform Disorder
4) Schizoaffective Disorder
5) Bipolar Disorder, all types
6) Major Depressive Disorder, Current or Recurrent
7) Mental Retardation
8) Organic Mental Disorder (including organic sequelae due to closed head injuries, Dementia, Delirium, Amnestic Disorder, as uncovered by a neuropsychological screening instrument and confirmed by Neuropsychological Testing that lead the individual to significant functional impairment.)
9) Other Psychotic Disorder (including Psychosis NOS) or serious mental illness that is frequently characterized by breaks with reality that lead the individual to significant functional impairment.
10) Severe Personality Disorder that is manifested by frequent episodes of psychosis, results in significant functional impairment, or results in significant or chronic self-injury.

b. Patients with a diagnosis of the following disorders that meet DSM-IV criteria and are currently in the active, symptomatic phase of the disorder, or are under treatment for the following disorders:
1) Brief Psychotic Disorder
2) Substance Induced Psychotic Disorder (excluding intoxication and withdrawal)
3) Psychotic Disorder due to a General Medical Condition

c. Patients who are determined, on the basis of a clinical evaluation, to be actively suicidal or at high risk of suicide in the foreseeable future.

d. Patients who have attempted suicide using lethal means and intending to die, i.e., have engaged in behavior that evidences serious suicidal risk, considering recency, lethality, and intent.

e. Patients who have had active suicidal intent on an ongoing and unremitting basis.

f. Other patients with severe and debilitating symptoms related to the following diagnoses, to include but not limited to: anxiety disorders, including post traumatic stress disorder; dysthymic disorder; cyclothymic disorder; mood disorder secondary to a general medical condition or substance use; and inmates with significant or chronic self injury within the past year, including bona fide suicide attempts. These cases will be reviewed before disposition on a case by case basis by the Director of Mental Health Services.

g. Other exceptional cases approved by the Director of Mental Health Services.

h. Inmates with serious mental illness, as described above, who discontinue psychiatric or mental health treatment against medical advice and remain symptomatic or dysfunctional.

2

III. For the purpose of ongoing screening by the Connecticut Department of Corrections of all inmates prior to placement at the Northern Correctional Institute:

a. through h. in II. above is the same.

## APPENDIX B

Evaluating clinicians

Evaluations will be performed by clinicians employed by the Connecticut Department of Mental Health and Addiction Services ("DMHAS") in accordance with the attached DMHAS written proposal. A written report will be generated by the evaluating clinician on each prisoner evaluated. Reports will be generated on a rolling basis as soon as possible but no later than 10 business days after the evaluating clinicians complete each evaluation and will be provided to the parties as they are generated.

Mar-05-2004  01:39pm   From-TYLER COOPER + ALCORN LLP          +12037771181        T-191   P.003/005   F-988

Draft # 2 10/30/03
DMHAS Proposal to Provide DOC-NCI Evaluations Pursuant to CCLU Litigation

Project
DMHAS will provide diagnostic assessments including current level of functioning assessments of 250 inmates housed in NCI. Providing that 9 evaluations are completed per week and that the project start up will require 8 weeks preparation, this project is estimated to take approximately 10-12 months. The initial anticipated cost of this project is $1 million, not including in-kind contributions of DMHAS to this effort.

Project Director
The project director will be DMHAS licensed clinical social worker/clinical manager (Betsy Graziano) who will provide a full-time in-kind contribution. Her current role of DOC liaison will be temporarily re-assigned to other DMHAS staff. She will work under the direct supervision of Gail Sturges, DMHAS Forensic Director, and will be assigned a full time support staff currently assigned to the forensic division (this will necessitate the hiring of a temp to replace these services). BG will work closely with her counterparts in NCI to ensure cases are scheduled, information is reviewed & available to teams, access to inmates is timely, problems are resolved with the goal of efficiently utilizing the evaluators' time. DOC will provide her with office space at NCI and the full support of the warden and the clinical staff. DOC will provide a senior clinical staff member to partner with BG for the duration of the project.

DOC Responsibilities
DOC will provide office space to the project director and confidential interviewing room (in close proximity to BG) and will ensure expedited access to inmates scheduled for evaluation (not delayed by counts, etc.) and will maintain the safety of the staff. Per MOU, DOC will provide BG & the evaluators full access to the inmate's custodial file and medical record, unless prohibited by law, DOC will provide a summary of the custodial file prior to the evaluation, which will include information determined relevant to the evaluation (e.g. PSI, disciplinary history, criminal record, etc.). DOC will ensure the availability of a senior clinical staff member on site when a team is scheduled, and will make such person immediately available by phone at all other times.

Evaluators
In order not to compromise services to DMHAS clients, the following plan does not utilize any DMHAS direct care staff, but instead shifts some forensic evaluations currently provided by DMHAS forensic staff to Yale for the duration of the project, thereby freeing up DMHAS forensic evaluators for this project. Additionally, these DMHAS clinicians are experienced at clinically evaluating criminal defendants and providing forensic reports. They are familiar with DOC, and issues of malingering, secondary gain, character pathology, and conduct disorders. All evaluators will be DMHAS employed (some via the Yale contract) clinicians: LCSWs, APRNs, clinical PhDs, and forensic psychiatrists.

## Scope of Evaluation

The evaluators will provide a diagnostic assessment with a focus on psychiatric diagnosis, current mental status and level of functioning. The evaluators will not conclude whether or not placement at NCI is appropriate or harmful to the inmate, or whether the environmental or social conditions at NCI contribute to the diagnosis. Nor will the evaluators assess the quality of mental health treatment provided by DOC to the inmate.

## Prioritization of Inmate Evaluations

Inmates will be evaluated with priority given to MH 3's in the most restrictive settings, followed by other MH 3's, then inmates with MH 1 or 2 beginning with those in the more restrictive settings.

## Method of Evaluation

The evaluations will be conducted by an interdisciplinary team, which will include a LCSW or APRN, a PhD, and an MD. Such interdisciplinary teams have been successfully utilized for many years in performing competence to stand trial evaluations and result in more comprehensive assessments in shorter periods of time, and enhanced ability to distinguish cases in which further testing is indicated, as well as greater precision in framing the test question or issue. The evaluation will consist of three components:

(1) Current behavioral assessment: Developed collaboratively by BG & assigned DOC staff. Will consist of a review of the DOC custodial and medical record files, interviews with infirmary and CO's to obtain observations, program staff to determine level of participation, interpersonal strengths and weaknesses. A standardized summary will be provided to the team prior to the interview.

(2) Clinical interview by multidisciplinary team: Team will review current behavioral assessment and the medical record (custodial file also provided at time of interview); conduct a standard clinical diagnostic interview (biopsychosocial history, psychiatric/substance abuse history, medication history, mental status exam). The team will determine if additional testing is necessary based on this assessment.

(3) Current MMPI performed by DOC: DOC will arrange to have current MMPI's done on all inmates being evaluated (except those who are not sufficiently literate), including testing for Spanish speaking inmates. DOC will provide the MMPI report to the team in a timely manner. If recommended by the evaluators DMHAS will provide any additional psychological testing, but other testing (e.g. medical, neurocognitive or neurological) will be provided by DOC, with the findings provided to the team. If necessary, evaluators may interview DOC custodial or treatment staff for more information.

If an inmate refuses to participate, BG will attempt to elicit the inmate's cooperation. Failing that, pursuant to the MOA the evaluators will review the records described above and will provide a report based on that information. In appropriate cases, the team may ask to be escorted to the inmate's cell to observe his appearance & behavior, and/or may interview DOC staff and consider those observations.

Mar-05-2004  01:39pm   From-TYLER COOPER + ALCORN LLP          +12037771181          T-191   P.005/005   F-696

## Report

The evaluators will prepare a report based on an agreed upon format. Any evaluator may write the report on behalf of the team. Signature by any team member implies the review & approval of all participating evaluators. Reports will be provided to DOC as completed.

## Procedure

**Phase 1:**

   (1) Establish an MOA (involve AGs representing both agencies to deal with Hipaa, liability of evaluators, scope of responsibilities, notice to inmates, etc.) Estimated time: 8 weeks

   (2) Develop evaluation protocols. Estimated time: 8 weeks

- Clinical interview structure
- Team composition & schedule
- Training and orientation of DMHAS staff
- Report format
- Develop data base & documentation process
- Re-allocation of current DMHAS resources
- Increase allocation to OCE's for use of per diems
- Transfer funds to Yale contract to support reassignment of work
- DOC coordination (assignment of space & support, developing a pre-evaluation record summary, inmate access protocol, identification of inmates based on prioritization schedule

The DMHAS Project Steering Committee (KM, GES,BG, TMK, PA, Madelon, Sue D.) will develop the above, with input as needed from DOC staff. An Interagency Project Oversight Committee, co-chaired by the Commissioners of DMHAS and DOC, will provide final review.

## Phase 2: Implementation

   (1) Prioritization & scheduling of inmates

   (2) 3 teams per week (no more than 1 team daily) scheduled to interview 3 inmates per day (9/wk)

   (3) MMPI testing plan developed and implemented by DOC

   (4) Psychological & other testing as determined by team

   (5) Reports completed and provided to DOC upon completion

   (6) DMHAS Project Steering Committee to meet weekly, monitor & modify protocols as needed

   (7) Periodic meetings of Interagency Oversight Committee to assess and monitor progress

## Phase 3: Final Report and Documentation. Project completed

## APPENDIX C

A.D. 6.5, Use of Force – REVISED – 2/28/03
Prepared for signature 3/3/03 – effective 3/5/03

\* \* \* \*

9.    Therapeutic Restraints.  Restraints shall be used only in situations that are directly proportionate to the presence of imminent physical danger to the inmate, others or the environment.

A.    No On-Site Health Services Staff.  Placement of an inmate in full stationary restraints shall be in accordance with this Directive.  Soft restraints shall be used.  The placement shall require an order from the on-call psychiatrist or physician within one (1) hour.

B.    On-Site Health Services Staff.

    1.    Criteria.  An order to restrain shall be subsequent to an evaluation by a physician.  If a physician is not on-site, an assessment shall be made by a Registered Nurse with a telephone order obtained within one (1) hour from a physician and so documented.  The physician may discontinue restraints subsequent to a direct evaluation.  In the absence of a physician, a Registered Nurse may discontinue restraints with a telephone order from a physician.

    2.    Equipment.  Restraint equipment shall be approved by the Director of Health, Mental Health and Addiction Services and shall be maintained in accordance with Administrative Directive 7.2, Armories.

    3.    Cell Condition.  Wherever possible, the authorized restraint bed shall be placed in the middle of the room away from the walls to prevent injury of staff and inmates during placement.  The cell shall also be free of obstruction to allow for clear observation of the inmate.

    4.    Procedure.  This process shall be video recorded in accordance with Section 16 of this Directive.  A video recording shall be designated to each inmate while on full restraint status and the video recording shall be utilized at least during placement, each (2) hour check, during any notable change in behavior and removal of restraints.

    This procedure shall be implemented in collaboration with supervising custody staff.  The inmate shall be placed on a mattress, which is positioned on top of a bed frame and the inmate shall be positioned face up.  Arms and legs shall be restrained such that discomfort to the inmate is minimized.

A post incident medical evaluation shall be conducted upon placement and at the indicated intervals: (a) circulation – every 15 minutes; (b) respiration – every 15 minutes; (c) pulse – every 30 minutes; (d) blood pressure – every 60 minutes; and (e) temperature – every 120 minutes.

These checks shall be executed and documented by Health Services staff in the inmate health record. At least every two (2) hours the restraints must be totally removed or serially removed and each limb of the inmate moved to full range of motion and assessed for trauma, blood circulation, and/or diminished nerve sensation.

The inmate shall be allowed to attend to bodily functions every two hours. Restrained inmates shall receive normally scheduled meals. Meals shall be bite-sized and served on paper plates, unless a physician has ordered alternate dietary arrangements. If feasible, the inmate may have one (1) arm released to use for feeding. Fluids shall be offered every two (2) hours. Food and fluid intake/output and refusal shall be documented. Immediate removal of restraints shall be initiated where a decompensating physical condition of a restrained inmate contraindicates restraints. In such circumstances, the physician shall be notified immediately.