UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DISABILITY LAW CENTER,         )
    Plaintiff,              )
                     )
       v.                 )   C.A. No. 07-10463-MLW
                     )
                     )
MASSACHUSETTS DEPARTMENT OF     )
CORRECTION, ET AL.,            )
    Defendants.             )

MEMORANDUM AND ORDER

WOLF, D.J.                                         April 12, 2012

I. INTRODUCTION

    This case was brought in March, 2007, following reports of a number of suicides by mentally ill prisoners in the custody of the Massachusetts Department of Correction (the "Department"), including many held in segregated confinement.   Plaintiff Disability Law Center (the "DLC") represents all Massachusetts prisoners with mental illnesses.   It alleges that the Department, and certain individuals sued only in their official capacities, violated the federal constitutional rights of mentally ill inmates by subjecting those inmates to disciplinary and other forms of segregation for prolonged periods of time.   The complaint seeks declaratory and injunctive relief.

    In November, 2007, in the context of the Department's independent initiatives to improve conditions for mentally ill inmates in correctional facilities, the parties began attempting to settle this case.   In 2008, they asked the court to conduct a settlement conference.   This court has long believed that the

settlement of cases involving the constitutionality of the conduct of public officials is important in our democracy.  As the court explained in 1990, judges:

> should understand that in some cases the values to be protected by the Bill of Rights may best be served when other officials are required to recognize and wrestle with their responsibilities for constitutional interpretation.  As a corollary of this, judges should realize that they may often best serve constitutional interests by encouraging the responsible public officials and their constituents to settle constitutional controversies on proper terms, rather than by deciding the questions such controversies present.

Spacco v. Bridgewater School Department, 739 F. Supp. 30, 35 (D. Mass. 1990).[1]  With these principles in mind, the court agreed to the parties' request that it mediate their settlement discussions.

However, the court informed the parties of its view that judges should become involved in the administration of prisons only as a last resort and then only to the most limited extent necessary.[2]  It urged the parties to develop a settlement that would be consistent with these principles or risk having any

---

[1] This is also the express intention of Congress, which has enacted a statute concerning state correctional and other institutions that states: "It is the intent of Congress that deplorable conditions . . . amounting to deprivations of rights protected by the Constitution or laws of the United States be corrected, not only by litigation . . . , but also by the voluntary good faith efforts of agencies of Federal, State, and local governments."  42 U.S.C. §1997g; see also 42 U.S.C. §1997.

[2] As explained in this Memorandum, the court's view regarding its proper role in prison litigation is consistent with the principles codified in the Prison Litigation Reform Act (the "PLRA"), 18 U.S.C. §3626.

proposed resolution requiring judicial approval rejected by the court.

The parties' initial two-year effort to negotiate a settlement was frustrated by a fiscal crisis that constrained the Department's ability to agree to certain reforms. However, they eventually resumed settlement discussions. In December, 2011, the parties informed the court that they had agreed to a comprehensive Settlement Agreement (the "Agreement"). The Agreement, however, does not become effective unless the court approves it and agrees to retain jurisdiction over the case. Essentially, the court is asked to review the Agreement to ensure that it is fair, reasonable, and adequate, and if it is, stay the case while the parties perform under the Agreement.

The court continues to believe that a reasonable settlement of this case would be in the public interest. However, the Agreement raises a series of questions which the parties briefed and argued at hearings in February and March, 2012.

First, the court has considered its authority to approve the Agreement and stay the litigation. As discussed in this Memorandum, a federal court has inherent authority to stay litigation in order to manage its docket. The Supreme Court has recognized that a district court can retain jurisdiction to enforce a private settlement agreement when it dismisses a case. See Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 381-82

(1994). It follows that a federal court can also retain jurisdiction to enforce a private settlement agreement when it exercises its inherent authority to stay a case and remove it from the active docket.

It is permissible and appropriate for the court to evaluate the parties' Agreement before deciding whether to stay this case. While the court does not have the authority to review and approve private settlement agreements in ordinary litigation, it has the discretion, if not the duty, to do so here because the settlement is entered into by DLC acting in a representative capacity, and the rights of individuals who are not parties will be affected. Since the individuals whose interests are at stake are alleged to have serious mental illness, it is particularly appropriate that the court evaluate the fairness of the Agreement in deciding whether to stay litigation that was brought to protect their constitutional rights. Therefore, the court has evaluated the fairness of the settlement.

The court has also considered whether approving the Agreement and staying the litigation would comport with the requirements of the PLRA. The PLRA prohibits the court from granting or approving "prospective relief" unless it finds such relief "extends no further than necessary to correct the violation of a Federal right." 18 U.S.C. §3626(a)(1)(A). In this case, as in most prison litigation resolved by agreement, the Department denies that it is

4

violating the federal rights of any inmate and the stay of litigation for which the Agreement provides precludes the court from deciding whether such a violation has been proven. Therefore, if the judicial action required by the Agreement is "prospective relief," the findings required by §3626(a)(1)(A) could not be made and the required approval of the Agreement could not be granted.

However, as explained in this Memorandum, §3626(a)(1)(A) is not now implicated in this case because the court is not now ordering any "prospective relief" or, indeed, any "relief" at all. The requirements of §3626(a)(1)(A) must be satisfied in a case resolved by a  "consent decree," but not in a case resolved by a "private settlement agreement."  While the review and approval of a settlement agreement and retention of jurisdiction to enforce it are not typical of a private settlement agreement, they are also not incompatible with a private settlement agreement generally or as defined in the PLRA. The order requested in this case is not enforceable by contempt, which is an essential characteristic of a consent decree.  The order requested is not enforceable by contempt because the court is not ordering the parties to comply with their Agreement or to do anything at all.  Instead, the court is merely staying the litigation and providing the parties with an opportunity to perform under their Agreement.[3]  As explained in

---

[3] If the stay is lifted, DLC would be required to prove a violation of a federal right as well as a breach of the Agreement to obtain prospective relief that will be subject to the narrow

this Memorandum, the parties' Agreement is, therefore, far more similar to a "private settlement agreement" than to a "consent decree," as these terms are used in the PLRA.  As the court is not now being asked to enter an order that constitutes a consent decree and provides "prospective relief," the requirements of §3626(a)(1)(A) do not now apply.

Because the PLRA's limitations on "prospective relief" are not now implicated, the court has evaluated the Agreement solely to determine whether it is fair, reasonable, and adequate.  The court finds that the Agreement should be approved.

Where, as here, a settlement has been negotiated at arm's length after discovery that is sufficient for a plaintiff to make informed decisions, the settlement is presumed reasonable.  This presumption of reasonableness is confirmed by the terms of the Agreement.  The Agreement addresses the fundamental issue in this case – prison suicides – by providing a process for minimizing the possibility that inmates with serious mental illnesses will be confined in segregation and for reviewing the mental health of inmates in segregation.  Its reliance on Secure Treatment Units as a therapeutic alternative to confinement in segregation represents the best current practices concerning mentally ill inmates. Moreover, the implementation of many of the reforms required by the

---

tailoring requirements of §3626(a)(1)(A).

Agreement has already succeeded in decreasing self-injurious behavior and enhancing the safety of prison personnel.

In assessing the reasonableness of the settlement, the court has also considered the limited judicial role that the Agreement provides. The Agreement requires that the parties attempt to resolve any future disputes before requesting a lifting of the stay to litigate any issues that are truly intractable. The court is asked to retain jurisdiction generally for only three years and, in any event, for no more than five years if the Department breaches the Agreement. The limited role provided for the court contributes to the conclusion that the Agreement should be approved.

This is a case in which DLC has zealously represented the interests of mentally ill inmates. The Department has vigorously represented the interests of the Commonwealth of Massachusetts, which include deciding itself how to discharge the constitutional duty to provide adequate medical care for mentally ill inmates and to protect their safety. The Department has resisted any temptation to abdicate its responsibility to meet the challenges these inmates present and thus compel the courts to make the legally required, difficult decisions.

In these circumstances, it is particularly appropriate that the court approve the fair settlement that the parties have agreed upon and stay the litigation as they perform under their Agreement. In view of the constructive cooperation that has led to the

settlement, the court hopes and trusts that its active involvement in this case is now concluded.

II. PROCEDURAL HISTORY

This case was filed by DLC on March 8, 2007, on behalf of all Massachusetts prisoners with mental illnesses. As the Massachusetts agency designated pursuant to the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. §§10801 et seq., DLC is authorized to pursue legal and other remedies to ensure that individuals with mental illness are protected from abuse and neglect.

The complaint alleges that the isolation experienced in disciplinary and other forms of segregation within correctional facilities exacerbates existing mental illnesses suffered by some inmates and generates new mental illness in others who were previously healthy. In its complaint, DLC describes the alleged experiences of numerous inmates in Department facilities who it contends engaged in self-destructive behavior or committed suicide while being held in segregated confinement, including inmates who were held in segregation for years at a time despite recommendations from clinicians that they be removed from segregation. DLC further alleges that Department officials were aware of the serious risk of harm that segregation posed for mentally ill inmates and did not provide adequate mental health screening and services, or adequate alternatives to segregation for

mentally ill inmates.  It is alleged that these inmates were, therefore, subjected to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments, and that the defendants also violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, and the Americans with Disabilities Act, 42 U.S.C. §§12101 et seq.

In its Answer, the Department denied the allegations in the Complaint.  However, at the same time, it described the reforms it had initiated before the suit was filed to address the plight of mentally ill inmates.  These reforms were based on recommendations made by the Department's expert consultant on prison suicide prevention, Dr. Lindsay M. Hayes.

The parties began attempting to settle this case in November, 2007.  In 2008, they asked the court to try to mediate a settlement.  Expressing its previously described confidence that such constitutional cases are best resolved by the agreement of the parties themselves, the court accepted the parties' invitation to mediate their settlement discussions.[4]  However, as also discussed earlier, the court urged the parties to reach an agreement that would not unnecessarily involve the court in prison administration and would only require judicial action as a last resort.

---

[4] The parties agreed that they would not request the court's recusal based on its participation in their settlement discussions.

While discovery and litigation were generally stayed, the court allowed discovery important to the settlement discussions, including visits by DLC and its experts to Department facilities. The court met periodically with the parties.  In addition, the Department continued to implement certain reforms relating to mentally ill inmates.

However, after almost two years of settlement discussions, the parties could not progress further because a fiscal crisis imposed new constraints on the Department's ability to agree to additional reforms.  Therefore, in February, 2010, the stay of litigation was lifted.

Subsequently, the parties engaged in extensive discovery. This involved, among other things, visits by DLC and its experts to several Department facilities, and interviews with more than 100 inmates.

The parties eventually privately resumed their settlement discussions.  On December 12, 2011, after years of discovery, litigation, and negotiations, the parties reported that they had reached a settlement and requested the court's approval of their Agreement.

Except in certain circumstances, the Agreement prohibits the placement of inmates with serious mental illness in Departmental Disciplinary Units, a form of segregation, and limits the use of other forms of segregation of inmates with serious mental illness.

In the Agreement, the Department undertakes to screen inmates both before and during confinement in segregation.  The Department has also agreed to maintain a number of Secured Treatment Units to provide an alternative to segregation for inmates with serious mental illness, and to integrate mental health professionals into the disciplinary process.  Pursuant to the Agreement, the Department will seek to place inmates who have serious mental illness or who are at risk of substantial deterioration of their mental health in alternatives to segregation.  The Agreement provides that when inmates with serious mental illness are held in segregation, they will receive additional mental health services, and their status will be regularly reviewed by facility administrators and at least one mental health professional to determine whether alternatives to segregation exist.  The parties assert that these measures achieve the plaintiff's main goals in bringing this case, while institutionalizing initiatives the Department has begun to implement and which have already caused a significant reduction in self-injurious behavior by inmates and harm to prison staff.

Pursuant to the Agreement, the Department will periodically provide DLC with data and documents concerning whether the Department is complying with its contractual obligations.  In addition, the Department will give limited access to its facilities, personnel, and inmates to an expert retained and paid

by DLC to monitor and assess the Department's compliance with the Agreement.

The Agreement establishes a process for DLC to notify the Department of any concerns about compliance and for the parties to attempt to resolve any disputes privately.  If the parties are not successful in privately resolving a dispute regarding compliance with the Agreement, they may seek relief from this court, which is the sole forum for its enforcement.

The Agreement also provides that the court will retain jurisdiction over the case for three years with respect to any provision for which there is no outstanding determination that the Department is not in substantial compliance.  If during the three year period the court decides that the Department is not in substantial compliance with a provision of the Agreement, the court may extend its jurisdiction with regard to that provision for up to two years from the date of the finding of substantial noncompliance.  Therefore, it is possible that the court will retain jurisdiction for up to five years.

The Agreement provides that if the court finds that the Department is not in substantial compliance with any provision of the Agreement, it may issue an order designed to achieve compliance, but not initially an order of contempt.  Pursuant to §X.B.3 of the Agreement, any such remedial order must comply with the requirements of the PLRA.  As the parties agree, this means

that to obtain an order providing relief that is enforceable by contempt, plaintiff must prove not only that a provision of the Agreement has been violated but also that there has been a violation of a federal right, and that the relief ordered is limited only to what is necessary to remedy that violation as required by the PLRA, 18 U.S.C. §3626(a)(1)(A).  See March 9, 2012 Tr. at 11-12.

Finally, pursuant to the Agreement, without stipulating that the plaintiff is the prevailing party, the Department will pay $1,250,000 to DLC as attorney's fees and costs.  This amount settles any claim by DLC for fees and costs incurred prior to the date of approval of the Agreement.  It does not cover possible future fees and costs incurred during any proceeding to enforce the Agreement, for which DLC may seek an award if it is the prevailing party.  The Agreement requires that the plaintiff pay all fees and costs incurred by the expert designated to monitor the Department's compliance with the Agreement.

On January 6, 2012, the court ordered the parties to submit additional briefing on a number of issues, including the proper standard for the court's consideration of the request for approval of the settlement and proposed attorney's fees, the impact of the Agreement on the claims of inmates, and the role of the court in enforcing the settlement.  After a hearing on February 2, 2012, the court ordered additional briefing on the implications of the PLRA

for the court's authority to approve the Agreement and retain jurisdiction over the case as the parties request. A further hearing was held on March 9, 2012.

Although memoranda generally discussing the Agreement have been part of the public record, as requested by the parties the Agreement itself has been under seal because it has been uncertain whether the court would approve it. The parties agree, however, that the Agreement should be unsealed if and when it is approved by the court.

III. ANALYSIS

    A. It is Appropriate for the Court to Stay Further Proceedings and Retain Jurisdiction

The Supreme Court recognized in Kokkonen that a United States district court may retain jurisdiction to enforce the provisions of a private settlement agreement even as it dismisses the litigation that the settlement resolves. 511 U.S. at 381-82. If the court does not issue an order of dismissal that states it is retaining jurisdiction or incorporate the terms of the settlement agreement into the order of dismissal, enforcement of the settlement agreement is left for state courts, unless there is an independent basis for federal jurisdiction. Id. However, the Supreme Court explained that:

> If the parties wish to provide for the court's
> enforcement of a dismissal-producing settlement
> agreement, they can seek to do so. When the dismissal is
> pursuant to Federal Rule of Civil Procedure 41(a)(2),
> which specifies that the action "shall not be dismissed

14

at the plaintiff's instance save upon order of the court
and upon such terms and conditions as the court deems
proper," the parties' compliance with the terms of the
settlement contract (or the court's "retention of
jurisdiction" over the settlement contract) may, in the
court's discretion, be one of the terms set forth in the
order. Even when, as occurred here, the dismissal is
pursuant to Rule 41(a)(1)(ii) (which does not by its
terms empower a district court to attach conditions to
the parties' stipulation of dismissal) we think the court
is authorized to embody the settlement contract in its
dismissal order (or, what has the same effect, retain
jurisdiction over the settlement contract) if the parties
agree.

Id.

As described earlier, in this case the court has been asked to

approve the settlement, stay the case while the parties perform the

Agreement, and retain jurisdiction for at least three years and up

to five years in certain circumstances.  As Kokkonen instructs that

it is permissible for a federal court to retain jurisdiction to

enforce a settlement agreement after a case has been dismissed, it

follows that a court may also take the lesser step of staying the

case while retaining jurisdiction over possible disputes concerning

compliance with a settlement agreement.  The court may do so

because "federal district courts possess the inherent power to stay

pending litigation when the efficacious management of court dockets

reasonably requires such intervention." Marquis v. FDIC, 965 F.2d

1148, 1154 (1st Cir. 1992).  This "power to stay proceedings is

incidental to the power inherent in every court to control the

disposition of the causes on its docket with economy of time and

effort for itself, for counsel, and for litigants." Landis v.

North America Co., 299 U.S. 248, 254 (1936).  The First Circuit has endorsed the "familiar" use of administrative closings in order to remove litigation from a court's active files "in circumstances in which a case, though not dead, is likely to remain moribund for an appreciable period of time."   Lehman v. Revolution Portfolio L.L.C., 166 F.3d 389, 392 & n.3 (1st Cir. 1999).

In the circumstances of this matter, the court finds that it is permissible and appropriate to stay further proceedings and retain jurisdiction as requested by the parties if the Agreement is fair.  Permitting the parties to perform under their Agreement and return to this court as a last resort will conserve judicial resources, particularly where, as here, the cooperation that led to the Agreement provides the realistic hope that no future involvement of the court will be necessary.

B. The Court has the Discretion, if not the Duty, to Evaluate the Settlement

As explained previously, the Agreement provides that it becomes effective only if the court approves it.  This requirement has prompted the court to consider whether it has the authority to approve the settlement and, if so, whether it should exercise it.  This inquiry is necessary because federal courts generally "have neither the authority nor the resources to review and approve the settlement of every case brought in the federal court system."  Caplan v. Fellheimer Eichen Braverman & Kaskey, 68 F.3d 828, 835 (3d Cir. 1995).  Settlement "is solely in the hands of the parties"

in the case of "ordinary litigation, that is, lawsuits brought by one private party against another private party that will not affect the rights of any other persons." Ibarra v. Texas Employment Comm'n, 823 F.2d 873, 878 (5th Cir. 1987) (internal quotations omitted); see also Gardiner v. A.H. Robins Co., 747 F.2d 1180, 1189 (8th Cir. 1984).

The instant case, however, is not "ordinary litigation" brought by one private party against another. Rather, it is a suit against the state brought on behalf of mentally ill individuals by an organization that is designated pursuant to federal law to protect their rights. The fact that the case was filed on behalf of people who are not litigating it makes it similar to a class action or to an action litigated by a receiver, neither of which may, under the Federal Rules of Civil Procedure, be settled and dismissed without court approval. See Fed. R. Civ. P. 23(e), 66. The relevant Federal Rules of Civil Procedure are codifications of the common law, which "may call for review and approval in a variety of contexts where the settlement requires court action, particularly if it affects the rights of nonparties or nonsettling parties, or where the settlement is executed by a party acting in a representative capacity." Manual for Complex Litigation (Fourth) §13.14 (2004) at 172 (footnotes omitted). As the individuals whose interests are at stake in this case are alleged to be mentally ill, it is particularly important that the court determine whether the

17

settlement was reached without collusion and is fair to them.  In essence, the nature of this case provides the court the discretion, if not the duty, to exercise its previously discussed inherent authority to grant the requested stay of the claims DLC has made on behalf of mentally ill inmates only if the Agreement is found to be fair to them.  See Bragg v. Robertson, 54 F. Supp. 2d 653, 662-63 (S.D.W. Va. 1999) (court had authority to review settlement agreement before dismissing claims, where litigation was "citizen suit" brought by plaintiffs acting as surrogate attorneys general rather than typical private litigant, and parties had emphasized that the litigation affected rights of people who were not parties to the suit and involved matters of public interest); Gaxiola v. Schmidt, 508 F. Supp. 401, 402-03 (E.D. Tenn. 1980) (approving settlement involving minor plaintiffs after holding evidentiary hearing to determine whether the settlement was in their best interest).

The conclusion that the court may, and in this case should, condition the requested stay on a finding that the Agreement is fair is reinforced by the fact that the parties have made approval a prerequisite to the Agreement taking effect.  In the absence of an independent duty to approve a settlement, the parties do not have the power to compel the court to do so.  However, the Agreement involves matters that may affect whether mentally ill inmates will live or die.  Therefore, regardless of whether the

18

court has a duty to decide whether to approve the Agreement or only the discretion to do so, it is important that the court not unnecessarily frustrate the implementation of the Agreement by declining to evaluate its merits.

C. The Settlement is Fair, Reasonable, and Adequate

Therefore, the court has examined the Agreement to determine whether it is fair, reasonable, and adequate. This limited inquiry is comparable to that which is made in analogous contexts. See Voss v. Rolland, 592 F.3d 242, 251 (1st Cir. 2010) (district court approving class action settlement must decide whether it is "fair, reasonable, and adequate"); City Of Bangor v. Citizens Communications Co., 532 F.3d 70, 93 n.10 (1st Cir. 2008) (private settlements in cases involving Comprehensive Environmental Response Compensation and Liability Act evaluated to ensure fairness, adequacy, and reasonableness); see also Robidoux v. Rosengren, 638 F.3d 1177, 1179 (9th Cir. 2011) (district court considering settlement agreement involving federal claims of minors must consider whether settlement's provisions as to each minor plaintiff are fair and reasonable); Bragg, 54 F. Supp. 2d at 670 (approving and retaining jurisdiction to enforce private settlement after finding settlement to be "fair, adequate, reasonable, and faithful to the environmental statutes under which the litigation was brought").

Generally, "[i]f the parties negotiated at arm's length and conducted sufficient discovery, the district court must presume the settlement is reasonable." In re Pharm. Indus. Average Wholesale Price Litig., 588 F.3d 24, 32-33 (1st Cir. 2009) (class action settlement). This presumption applies here. The Agreement was reached after the plaintiff received substantial formal and informal discovery, and was the result of years of arduous, arm's length negotiations by energetic and experienced counsel. The plaintiff also had the benefit of the informed advice of a prison psychiatrist, Dr. Kathryn Burns, who has significant experience as an expert witness and as a monitor in prison mental health litigation. In addition, the Agreement follows a previous, unsuccessful attempt between 2007 and 2009 to reach a settlement, during which the court observed the integrity of the negotiations, including the absence of collusion. In these circumstances, the proposed settlement is presumed to be reasonable.

This presumption is confirmed by the terms of the settlement. In Dr. Burns' opinion, the Agreement "reflects best correctional practices in working with seriously mentally ill [] prisoners." Jan. 25, 2012 Aff. of Kathryn Burns, Exh. O to Joint Supplemental Submission in Support of Motion to Approve Settlement Agreement, at ¶14. The Agreement, among other things, provides a reasonable process for minimizing the confinement of inmates with serious mental illness in segregation and for reviewing the mental health

of inmates in segregation.  It also provides Secure Treatment Units as a reasonable therapeutic alternative to segregation.  The Department has already begun to implement the provisions of the Agreement, and the evidence indicates its efficacy in improving the mental health of inmates and enhancing the safety of prison personnel.

In addition, the Agreement involves an approach to protecting mentally ill prisoners that is similar to that employed in recent settlements and court orders in other jurisdictions.  See Mast v. Donahue, No. 2:05-cv-00037 LJM/WGH, at ¶¶11-16 (S.D. Ind. Jan. 23, 2007) (settlement agreement excluding seriously mentally ill prisoners from Secured Housing Unit); Austin v. Wilkinson, Civ. No. 4:01-CV-071, at ¶17 (N.D. Ohio. Jan. 8, 2002) (stipulation for injunctive relief excluding inmates with serious mental illness from particular facility); Jones'el v. Berge, No. 00-C-421-C, at §4.6 (W.D. Wis. June 24, 2002) (settlement specifying that no seriously mentally ill prisoners will be sent to, or remain in, supermax prison); Disability Advocates, Inc. v. New York State Office of Mental Health, 02-Civ-4002 (GEL), at §§1-5 (S.D.N.Y. Apr. 27, 2007) (settlement increasing therapeutic programming for inmates with serious mental illness who are subject to confinement sanction, and establishing new housing units with increased mental health services); Office of Prot. and Advocacy for Persons with Disability v. Choinsky, Civ. No. 3:03-1352 (RNC), at §§B.3-.4 (D.

21

Conn. Mar. 8, 2004) (settlement removing seriously mentally ill inmates from Connecticut's Northern Correctional Institution and excluding them from segregation, with limited exceptions); see also Erica Goode, Prisons Rethink Isolation, Saving Money, Lives and Sanity, N.Y. Times, March 10, 2012 (reporting many states taking steps to reduce number of inmates in long-term isolation).  The fact that the Agreement provides a manner of dealing with mentally ill inmates that is comparable to recent initiatives to address similar issues in other jurisdictions is added evidence that the Agreement is reasonable.

The Agreement provides for the payment to DLC of attorney's fees and costs of $1,250,000, although the Department does not agree, and the court does not now find, that DLC is a "prevailing party" with a statutory right to fees pursuant to 42 U.S.C. §1988 or any other federal fee shifting law.  This payment does not cause the Agreement to be unfair.  Rather, it is itself reasonable.

The amount of the payment is not the result of collusion between the Department and DLC, or its outside counsel from other nonprofit entities and private law firms.  Rather, the payment was negotiated separately from the other terms of the Agreement.  See Jan. 26, 2012 Aff. of Alison Silveira, Exh. P to Joint Supplemental Submission, at ¶12.  The amount to be paid is less than a conservative calculation of the lodestar and costs counsel incurred before the other terms of the settlement were agreed upon.  See 42

22

U.S.C. §1988; <u>Hutchinson ex rel. Julien v. Patrick</u>, 636 F.3d 1, 13
(1st Cir. 2011).   In addition, the amount to be paid does not
include  compensation  for  the  substantial  work  performed  by
plaintiff's counsel to conclude the settlement negotiations and
seek  judicial  approval  of  the  Agreement,  and  the  Agreement
precludes the plaintiff from seeking an award of additional fees
and costs  for  work performed prior  to  the  approval  of  the
Agreement.   The plaintiff does not waive its statutory right to
seek  reasonable  attorney's  fees  and  costs  if  it  prevails  in  any
future  litigation  to  enforce  its  terms.   However,  the  Agreement
makes no provision for such fees.

Moreover,  the  Agreement  obligates  the  plaintiff  to  pay  the
expense of the monitoring required by the Agreement.   In addition,
three of the entities that will be receiving counsel fees - DLC,
Prisoners'  Legal  Services,  and  the  Center  for  Public  Representation
- are public interest organizations that will use the payments that
they  receive  in  service  of  their  missions.   Therefore,  the
attorney's  fees  and  costs  now  being  approved  as  part  of  the
settlement will be substantially used to serve public purposes.   In
view  of  the  foregoing,  the  provision  for  costs  and  fees  is
reasonable.

Finally,  in  assessing  the  reasonableness  of  the  Agreement,  the
court  has  considered  the  role  the  Agreement  provides  for  it.   As
described  earlier,  in  agreeing  to  attempt  to  mediate  a  settlement

in 2008, this court told the parties that it believed that judges should become involved in prison administration only as a last resort and then only to the most limited extent necessary. This view is consistent with the manifest purpose of the PLRA, particularly 18 U.S.C. §3626(a)(1)(A). The parties have agreed to a settlement that is compatible with these principles. As explained below, the Agreement does not require the issuance of a consent decree, or any order that provides prospective relief or is enforceable by contempt. The Agreement merely provides for a stay of this litigation while the parties work cooperatively to address the needs of inmates with serious mental illness. It also provides a process for only bringing truly intractable disputes on serious issues to the court for future litigation. The court is retaining jurisdiction over the case for only a limited time. As indicated earlier, in view of the parties' successful efforts to settle this case, the court hopes and trusts that its approval of the Agreement will be the end of its involvement in this matter. In any event, the limited role provided for the court contributes to the conclusion that the Agreement is reasonable, as well as fair and adequate.

D. The Implications of the PLRA

As this case involves prison conditions, the court must assure that its approval of the Agreement comports with the PLRA. In particular, it is necessary to determine whether the requirement of

18 U.S.C. §3626(a)(1)(A) that any prospective relief not extend further than necessary to remedy the violation of a federal right is implicated by the request for approval of the Agreement and, if so, whether that requirement has been satisfied.   As indicated earlier and explained below, §3626(a)(1)(A) does not apply and prohibit the judicial action now being taken – approving the Agreement and staying the case – because the court is not now ordering any "prospective relief" or any "relief" at all.   Indeed, the court is not now ordering any party to do anything.

The PLRA was enacted in 1996 "partially in an effort to curb the involvement of the federal judiciary in day-to-day prison management." Morales Feliciano v. Rullan, 378 F.3d 42, 50 (1st Cir. 2004).   It prohibits a court from granting or approving "prospective relief" unless such relief meets the requirements of §3626(a)(1)(A), which states:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs.  The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

In essence, §3626(a)(1)(A) requires that a court find a violation of a federal right before ordering any prospective relief and then narrowly tailor the remedy ordered to assure that it does no more than correct that violation.

25

The PLRA defines "prospective relief" as "all relief other than compensatory money damages."   §3626(g)(7).   "Relief" is defined circularly as "all relief in any form that may be granted or approved by the court."   §3626(g)(9).   As has been correctly observed:

> The statutory definition sheds no light on the disputed term's meaning since "relief" is in essence defined as all relief.   Thus, while the definition teaches that it encompasses all instances of the term, it does not tell us what demarks and distinguishes those instances from others.

Coleman v. Wilson, 933 F. Supp. 954, 956 (E.D. Cal. 1996).

The PLRA generally contemplates that prison litigation may be resolved by agreement in one of two ways: by a "consent decree" or by a "private settlement agreement."   See §3626(c).  By definition, a consent decree is a form of "relief" subject to the constraints of §3626(a)(1)(A).   See §§3626(c)(1), (g)(9).   The PLRA defines a "consent decree" as "any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties but does not include private settlements."   §3626(g)(1).   A "private settlement agreement" is defined as "an agreement entered into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled."   §3626(g)(6).[5]  Section §3626(a)(1)(A) does not

---

[5] However, "[n]othing in this section shall preclude any party claiming that a private settlement agreement has been breached from seeking in State court any remedy available under State law."  18 U.S.C. §3626(c)(2)(B).

have to be satisfied where the litigation is resolved by a "private settlement agreement," because a "private settlement agreement" is not "relief" subject to the requirements of that provision.  <u>See</u> §§3626(c)(2), (g)(9); <u>see also</u> <u>Austin v. Hopper</u>, 15 F. Supp. 2d 1210, 1218 (M.D. Ala. 1998).

Outside the context of the PLRA, because they are entered as judicial orders, generally consent decrees are evaluated by the court and approved only if they are fair and lawful.  <u>See</u> <u>Aronov v. Napolitano</u>, 562 F.3d 84, 91 (1st Cir. 2009).  In addition, "[w]hile a consent decree begins as a settlement, it is one that 'includes an injunction, or some other form of specific relief,' which may ultimately be enforceable by contempt."  <u>Id.</u> (quoting Charles A. Wright & Mary Kay Kane, <u>Law of Federal Courts</u> §98, at 702 n.2 (6th ed. 2002)); <u>see also</u> <u>Rufo v. Inmates of the Suffolk County Jail</u>, 502 U.S. 367, 378 (1992) ("A consent decree . . . is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees."); <u>Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland</u>, 478 U.S. 501, 518-19 (1986).  Therefore, an order enforceable by contempt is a fundamental feature of a consent decree.  <u>See</u> <u>Local No. 93</u>, 478 U.S. at 518; <u>Aronov</u>, 562 F.3d at 91-92.  Consistent with this, consent decrees in PLRA cases are commonly defined as orders enforceable by contempt.  <u>See, e.g.,</u>

Rowe v. Jones, 483 F.3d 791, 796-97 (11th Cir. 2007) (per curiam); Hazen ex rel. LeGear v. Reagen, 208 F.3d 697, 699 (8th Cir. 2000); Benjamin v. Jacobson, 172 F.3d 144, 157 (2d Cir. 1999).

"By contrast, a private settlement does not, ordinarily, receive court approval." Aronov, 562 F.3d at 91 (emphasis added). In addition, a private settlement agreement is generally not subject to judicial enforcement except in an action for breach of contract. See Kokkonen, 511 U.S. 375; see also United States v. City of Miami, 664 F.2d 435, 439 (former 5th Cir. 1981) (opinion of Rubin, J.) ("If the parties agree to compose their differences by a settlement agreement, however, the only penalty for failure to abide by the agreement is another suit."). This understanding is reflected in the PLRA's provision for the enforcement of private settlement agreements through "reinstatement of the civil proceeding that the agreement settled" or through an action in state court by a party claiming that the agreement has been breached. See 18 U.S.C. §§3626(c)(2), (g)(6); see also Hazen, 208 F.3d at 699 (distinguishing consent decrees from private settlement agreements, which are "enforceable only through a new action for breach of contract").

In the instant case, the fact that the court is required to approve the Agreement before it becomes effective and to retain jurisdiction to enforce the Agreement may suggest that it constitutes a consent decree which is subject to §3626(a)(1)(A).

See Ingles v. Toro, 438 F. Supp. 2d 203, 214-15 (S.D.N.Y. 2006); Gaddis v. Campbell, 301 F. Supp. 2d 1310, 1313-14 (M.D. Ala. 2004). However, the fact that "a private settlement does not, ordinarily, receive court approval," Aronov, 562 F.3d at 91, does not mean that a private settlement agreement may never involve approval by the court.  As explained earlier, in this case the court is not evaluating and approving the settlement to determine whether any agreed-upon relief should be ordered.  Rather, the court is approving the settlement as an exercise of its inherent authority to decide how to manage its docket, and to condition the requested stay – and, therefore, the retention of jurisdiction – on a finding that a settlement which affects the rights of individuals not before the court is fair.

In these circumstances, the court is not now ordering any "relief" or "prospective relief."  In cases involving the court appointment of monitors or special masters, courts have relied on the common legal usage of the term "relief" and found that no "relief" or "prospective relief" is issued by an order that pertains to the "means of obtaining the relief" rather than to the "'ultimate form of the remedy.'" Carruthers v. Jenne, 209 F. Supp. 2d 1294, 1300-01 (S.D. Fla. 2002) (quoting Benjamin v. Fraser, 156 F. Supp. 2d 333, 342-43 & n.11 (S.D.N.Y. 2001)); Madrid v. Gomez, 940 F. Supp. 247, 250 (N.D. Cal. 1996); Coleman, 933 F. Supp. at 957.  Similarly, in the instant case, the court is only approving

29

an Agreement that provides a means of obtaining relief for any future violation of federal law and not now ordering any form of remedy.

The court recognizes that in <u>Benjamin</u> the Second Circuit noted in dicta that because of the monitoring body's "substantial responsibilities," the distinction between "relief itself and the monitoring of relief" might be difficult to make.  <u>Benjamin v. Fraser</u>, 343 F.3d 35, 49 (2d Cir. 2003).  However, in contrast to <u>Benjamin</u> and the other foregoing cases in which the court ordered monitoring or the use of special masters, this court is not now ordering the parties to comply with the Agreement, including its monitoring provision, or to do anything else.  It is only deciding to stay the case because the Agreement is fair and reasonable.  If in the next three years DLC perceives a material breach of the Agreement and the parties are unable to resolve any dispute themselves, either party may request a lifting of the stay. Removing the stay would be comparable to the reinstatement of the case, which is a feature of a "private settlement agreement" as defined in the PLRA.  <u>See</u> §3626(g)(6).  As explained earlier, any proven violation of the Agreement will not be a basis for finding that the Department is in civil or criminal contempt.  This too is generally a characteristic of a private settlement agreement, rather than a consent decree.  <u>See</u> <u>Aronov</u>, 562 F.3d at 91.  Once again, under the Agreement, to obtain a future order that is

enforceable by contempt, the plaintiff would have to prove both a breach of the Agreement and a violation of federal law.  Any such order, whether entered by consent or as a result of a decision on a disputed issue, would be an order subject to the narrow tailoring requirements of §3626(a)(1)(A).  This approach is consistent with the purposes of the PLRA because the court is not now, in the absence of a demonstrated violation of a federal right, becoming involved in prison administration, see Morales Feliciano, 378 F.3d at 50, and may do so in the future only as a last resort, if the plaintiff demonstrates both a violation of the Agreement and a violation of a federal right.

In view of the foregoing, the Agreement is substantially similar to a private settlement agreement and materially different than a consent decree, both generally and as defined in the PLRA.[6]

---

[6] The court recognizes that the distinction between consent decrees and private settlement agreements has been addressed somewhat differently in cases involving the question whether a plaintiff is a "prevailing party" entitled to a statutory award of attorney's fees pursuant to 42 U.S.C. §1988 and other federal fee shifting statutes.  See, e.g., Buckhannon Bd. & Care Home, Inc. v. West Virginia Dept. of Health & Human Res., 532 U.S. 598, 604 & n.7 (2001); Hutchinson, 636 F.3d at 9-11.  Generally, these cases have recognized a distinction, similar to that made in the PLRA and the cases implementing it, between consent decrees enforceable by contempt and private settlements enforceable through new litigation.  See, e.g., Aronov, 562 F.3d at 91; Smyth, 282 F.3d at 281; Christina A. ex rel. Jennifer A. v. Bloomberg, 315 F.3d 990, 993 (8th Cir. 2003).  Courts in these cases, however, have analyzed this distinction in a different context, in order to determine whether there is a sufficient "judicial imprimatur" to qualify the plaintiff as a "prevailing party" in the litigation.  See Buckhannon, 532 U.S. at 604; Hutchinson, 636 F.3d at 11; Roberson v. Giuliani, 346 F.3d 75,

The findings required by §3626(a)(1)(A) could not now be made because a violation of a federal right by the Department has not been admitted or proven.   However, such findings are not required because the court is not now ordering any "relief" or "prospective relief" and, therefore, §3626(a)(1)(A) is not implicated.

IV. ORDER

    In view of the foregoing, the court finds that: it has the inherent authority to stay this case, and to condition the requested stay of this case upon a finding that the Agreement is

_____

81-83 (2d Cir. 2003).   In so doing, several courts, including the First Circuit, have concluded that retaining jurisdiction to enforce a settlement agreement is not materially different from entering a consent decree, and found that the plaintiffs in such cases are "prevailing parties" entitled to attorney's fees.   See Hutchinson, 636 F.3d at 10-11; see also Roberson, 346 F.3d at 82-83 (finding district court's inability to use contempt power without the "extra step" of first ordering specific performance is not "significant enough to deprive plaintiffs of prevailing party status," where retention of jurisdiction did not "simply preserve a federal forum" but, rather, "effectuated the obligations of the parties under the Agreement"); but see Christina A., 315 F.3d at 993-94 (holding that settlement agreement does not make a plaintiff a "prevailing party" because violation of court order dismissing the case would not be punishable by contempt).

    The foregoing cases, including the First Circuit's decision in Hutchinson, do not qualify this court's conclusion that §3626(a)(1)(A) is not implicated in this case.   None of these decisions, except Christina A., involve the PLRA generally. Christina A. only addressed the fee shifting provisions of the PLRA, 42 U.S.C. §1997e(d).   See 315 F.3d at 994-95.   Therefore, the foregoing decisions only construe the term "prevailing party" for the purpose of 42 U.S.C. §1988 and comparable fee shifting statutes.   They do not address the meaning of the terms "relief" and "prospective relief," which is the issue involved in determining whether §3626(a)(1)(A) is implicated in the instant case.

fair, reasonable, and adequate; that such a finding is justified; and that because the court is not now ordering any prospective relief, the requirements of §3626(a)(1)(A) are not now implicated. Accordingly, it is hereby ORDERED that:

1.  The Joint Motion to Approve the Settlement Agreement (Docket No. 248) is ALLOWED.

2.  This case is STAYED and the court, therefore, retains jurisdiction.

3.  Unless otherwise ordered, this case will be dismissed three years after the date of this Order.

4.  The Settlement Agreement (Docket No. 252) is UNSEALED.


        /s/ Mark L. Wolf
UNITED STATES DISTRICT COURT